## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
-----------------------------------------------------------x
                                           :
In re                                      :    Chapter 11
                                           :
AFA INVESTMENT INC., et al.,               :    Case No. 12-11127 (____)
                                           :
              Debtors.                     :    (Joint Administration Pending)
                                           :
                                           :
-----------------------------------------------------------X
```

## DECLARATION OF RON ALLEN IN SUPPORT OF FIRST-DAY PLEADINGS

1.      I currently serve as the Interim Chief Executive Officer ("Interim CEO")
of AFA Foods, Inc. ("AFA Foods"), a Delaware company and one of the debtors and debtors in
possession in the above-captioned chapter 11 cases (collectively, the "Debtors").

2.      I have been with AFA Foods or its predecessors since 1967 and have held
executive positions since 1976.  I was Chief Executive Officer of AFA Foods from July 2008
until March 2010.  I was given the title of Executive Chairman through this same period until my
most recent title change to Interim CEO.

3.      On the date hereof (the "Petition Date"), each of the Debtors filed
voluntary petitions for relief under chapter 11 of title 11 of the United States Code
(the "Bankruptcy Code"), as well as certain motions and other pleadings (collectively, the "First
Day Pleadings") with this Court.  I am authorized by the Debtors to submit this Declaration on
their behalf in support of the First Day Pleadings.

4.      As discussed more fully below, the Debtors' primary objective in
commencing these chapter 11 cases is to pursue the prompt sale of their assets with the goals of
maximizing value for stakeholders, preserving jobs, minimizing supply disruptions for
the Debtors' customers and ensuring an uninterrupted supply chain for the Debtors' vendor

community.  The First Day Pleadings seek the urgent operational and administrative relief necessary to:  (a) assist the Debtors' transition into chapter 11; (b) preserve value (including going concern value) to the fullest extent possible; (c) obtain the financing necessary to support the sale process; and (d) ultimately, promote the prompt sale of the Debtors' assets.

5.      I have reviewed the First Day Pleadings, and it is my belief that the relief sought therein is narrowly tailored and necessary to achieve the goals identified above.

6.      In my capacity as Interim CEO of AFA Foods and based on my longstanding 45-year history with the company, I am intimately familiar with the Debtors' day-to-day operations, financial condition, business affairs and books and records.  Except as otherwise indicated, all facts set forth in this Declaration are based upon:  (a) my personal knowledge; (b) my review of relevant documents; (c) information supplied to me by other members of the Debtors' management team or professionals retained by the Debtors; or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

7.      Part I of this Declaration provides a brief overview of the Debtors' business.  Part II provides a description of the Debtors' corporate and prepetition debt structures.  Part III provides a discussion of the events that compelled the emergency commencement of these chapter 11 cases.  Part IV affirms and incorporates the facts that support the relief requested in the other First Day Pleadings (including with respect to the Debtors' proposed postpetition financing arrangements).

## PART I

### Overview of the Debtors' Businesses

8.      The Debtors are a consolidation of various independent meat processors, acquired at various times since 2008 by funds or entities managed by The Yucaipa Companies ("Yucaipa").  The oldest of the Debtors traces its roots back to 1967 when American Foodservice was created as the food processing arm of the fast food chain Gino's Inc., located in the Mid-Atlantic States (which later changed its name to American Foodservice Corporation in 1972).  In 2010, AFA Investment Inc. acquired the California-based operations of United Food Group, substantially increasing the size and scope of the Debtors' operations.  Today, the Debtors as a group comprise one of the largest ground beef processing enterprises in the United States. Annually, the Debtors process over 500 million pounds of ground beef products, which are distributed throughout the foodservice and retail grocer industries nationally.

9.      The Debtors operate beef processing facilities in California, Georgia, New York, Pennsylvania and Texas and maintain their headquarters in King of Prussia, Pennsylvania. The Debtors specialize in processing case-ready ground beef and individually quick frozen hamburger patties to customers across the retail and foodservice market nationally.  The Debtors' customers consist of some of the largest retail and foodservice companies in the nation, many of which have longstanding and valuable relationships with the Debtors.  Retail customers include WalMart, Safeway, Supervalu, BJ's and Weis.  Foodservice customers include Burger King, Jack in the Box, Carl Karcher Enterprises (which includes the Carl's Jr., Hardee's and Green Burrito brands), Wendy's and Del Taco.

10.     The Debtors do not purchase, raise or slaughter cattle.  Rather, they purchase meat from various vendors for processing into value added ground beef products.

Competitors include other independent nonintegrated beef processors (i.e., companies that purchase meat from slaughterers for processing), as well as integrated companies that purchase and slaughter cattle as well as process and package ground beef products.

11.    The Debtors have an impeccable food safety record, and a reputation for supplying high quality, wholesome, value-added products.  The Debtors sell certain products under the brand names Moran's, Stone River Ranch and Miller Quality Meats.

12.    As of the Petition Date, the Debtors have approximately 850 full time employees.  As of December 31, 2011, on a consolidated basis, the Debtors' books and records reflected approximately $958 million in annual revenues  As of February 26, 2012 (the Debtors' fiscal month end), on a consolidated basis, the Debtors' books and records reflected approximately $219.6 million in assets and $197.3 million in liabilities.

## PART II

### Corporate and Prepetition Debt Structure of the Debtors

#### *Corporate Structure*

13.    The Debtors are the following nine companies:  AFA Investment Inc.; American Foodservice Corporation; American Fresh Foods, Inc.; American Fresh Foods, L.P.; AFA Foods, Inc.; American Fresh Foods, LLC; Fairbank Reconstruction Corporation; American Foodservice Investment Company, LLC; and United Food Group LLC.

14.    A chart displaying the organizational structure of the Debtors is shown below.



15.     AFA Investment Inc. – the ultimate parent of the Debtors – is a private company, owned primarily by funds or entities managed by Yucaipa Corporate Initiatives Fund II, LLC,[1] with minority shares owned by certain members of management.  In addition, equity warrants and indirect preferred equity interests are held by MBPCo Holdings, LLC, and affiliate of Beef Products Inc. (together, "BPI").

---

[1]     Certain individuals affiliated with Yucaipa and its affiliates serve on the boards of directors of certain Debtors, and a Yucaipa affiliate had a management contract with AFA Investment, Inc.

***Prepetition Debt Structure***

16.    The Debtors' major prepetition liabilities are comprised of:  (a) a first lien credit facility secured by a first lien in substantially all of the Debtors' assets; (b) a second lien credit facility secured by a second lien in substantially all of the Debtors' assets; (c) an industrial development bond related to the Debtors' Georgia facility; and (d) unsecured trade and other ordinary course debt arising from the Debtors' operations and contractual arrangements.

## First Priority Secured Debt

17.    The Debtors (some as borrowers and some as guarantors)[2] are party to that certain Amended and Restated Credit Agreement, dated as of February 9, 2010, as amended by (a) that certain Forbearance Agreement and Amendment No. 1, dated as of April 5, 2011 (the "First Forbearance Agreement"); and further amended by (b) that certain Second Forbearance Agreement, dated as of August 4, 2011; (c) that certain Third Forbearance Agreement and Amendment No. 2, dated as of December 7, 2011; and (d) that certain Fourth Forbearance Agreement, dated as of March 16, 2012 (collectively, as further amended prior to the date hereof, the "Prepetition First Lien Credit Facility") with General Electric Capital Corporation ("GECC"), as Agent (the "Prepetition First Lien Agent").  The lenders under the Prepetition First Lien Credit Facility are GECC and Bank of America, N.A. (together, the "First Lien Lenders").  Yucaipa also holds certain first lien loans in an original principal amount of $1.4 million that it purchased from the First Lien Lenders in conjunction with the First Forbearance Agreement.  The Prepetition First Lien Credit Facility provided the Debtors with a term loan in the amount of $15,360,715 and a revolving loan in an amount up to $68,600,000.

---

[2]    AFA Foods, Inc., American Foodservice Corporation, Fairbank Reconstruction Corporation, American Fresh Foods, L.P., and United Food Group LLC are each borrowers, and AFA Investment Inc., American Foodservice Investment Company, LLC, American Fresh Foods, LLC and American Fresh Foods, Inc. are each guarantors under the Prepetition First Lien Credit Facility.

As of the Petition Date, approximately $11.5 million was outstanding under the term loans and approximately $47.9 million was outstanding under the revolving loan.  In addition, the Debtors have issued letters of credit under the Prepetition First Lien Credit Facility in the approximate amount of $3.1 million.  The Letters of Credit remained outstanding as of the Petition Date.

**Second Priority Secured Debt**

18.    The Debtors (some as borrowers and some as guarantors)[3] also are party to that certain Second Lien Credit Agreement, dated as of February 9, 2010, as amended by (a) that certain Waiver and First Amendment to Credit Agreement, dated as of April 5, 2011; and as further amended by (b) that certain Waiver and Second Amendment to Credit Agreement and Ratification of Guaranty and Security Agreement, dated as of December 7, 2011 (collectively, as further amended prior to the date hereof, the "Prepetition Second Lien Credit Facility"), with Yucaipa Corporate Initiatives Fund II, LLC as Agent (the "Prepetition Second Lien Agent").  Including the initial advances and all subsequent advances, a total of approximately $75.6 million is outstanding under the Prepetition Second Lien Credit Facility.

19.    The liens granted under the Prepetition Second Lien Credit Facility are subordinate to the liens granted under the Prepetition First Lien Credit Facility.  The Prepetition First Lien Agent and Prepetition Second Lien Agent are parties to that certain Intercreditor Agreement, dated as of February 9, 2010 (the "Intercreditor Agreement").  The Intercreditor Agreement limits the Prepetition Second Lien Agent's ability to exercise certain of its rights and remedies with respect to the collateral pledged under the Prepetition Second Lien Facility.

---

[3]    AFA Foods, Inc., American Foodservice Corporation, Fairbank Reconstruction Corporation, American Fresh Foods, L.P., and United Food Group LLC are each borrowers, and AFA Investment Inc., American Foodservice Investment Company, LLC, American Fresh Foods, LLC and American Fresh Foods, Inc. are each guarantors under the Prepetition Second Lien Credit Facility.

DOCS_DE:178980.2

**Municipal Development Bond Financing**

20.     Debtor American Fresh Foods, L.P. is party to a $1,000,000 bond issuance (the "Series 2005A Bonds") and a $7,425,000 bond issuance (the "Series 2005B Bonds") and, together with the Series 2005A Bond the "Bonds") by the Thomasville Payroll Development Authority (the "Issuer").  The Series 2005A Bonds are Tax-Exempt Variable Rate Demand/Fixed Rate Revenue Bonds , and the Series 2005B Bonds are Taxable Variable Rate Demand/Fixed Rate Revenue Bonds.  These Bonds were issued to finance (a) construction of a manufacturing facility located in Thomasville, Georgia; (b) the acquisition and installation of equipment at the facility; (c) the payment of a portion of the costs and expenses of the financing; and (d) the lease of the facility by the Issuer.  The payment of the principal and interest on the Bonds is secured by an irrevocable Letter of Credit issued by Wachovia Bank, N.A. n/k/a Wells Fargo Bank, N.A. (the "Credit Issuer"), pursuant to a Reimbursement and Security Agreement dated as of April 1, 2005 between American Fresh Foods, L.P. and the Credit Issuer.  The Letter of Credit, in the approximate amount of $1,014,000, remained outstanding as of the Petition Date.

**Unsecured Trade Debt**

21.     In the ordinary course of operating their beef processing business, the Debtors purchase goods and services from, or otherwise have accrued payables to, over 2,000 vendors and other creditors in the ordinary course of business.  The major categories of goods and services that the Debtors purchase from these creditors include meat, packaging, cryogenic gases and freight services used in the Debtors' business.  As of the Petition Date, the Debtors estimate that they owe approximately $60 million in unsecured obligations for these and related goods and services.

22.     The largest component of this unsecured trade debt is comprised of obligations to beef vendors, who historically were paid by the Debtors on 14-day terms;

ATI-2511930v9                              -8-

however, over the past few months there has been a significant contraction in the amount of credit the Debtors' vendors have been willing to extend.

### Lease Obligations

23.     The Debtors' New York and California processing facilities are leased. Prior to the Petition Date, the Debtors' approximate annual expense for leased properties was approximately $2.8 million.

## PART III

### Events Leading to the Commencement of These Cases

24.     The Debtors operate in a highly competitive industry, marked by growing overcapacity. Despite the Debtors' reputation for high quality, an exceptional safety record, longstanding customer and vendor relationships, strong brands and nationwide scale of operations, they have struggled in the past two years to generate substantial Earnings Before Taxes, Depreciation and Amortization ("EBITDA"). Competition includes larger scale integrated operations that in some cases have advantages based on their size and scope of operations, in addition to other independent meat processors who compete fiercely in all relevant markets.

25.     Although the Debtors produce a limited amount of other protein products, the Debtors' business relies almost exclusively on ground beef products. The Debtors purchase cuts of beef to process into their various products. Generally, the pricing of both the raw materials and many of the Debtors' finished products are based on USDA national pricing indexes. After accounting for processing costs, and other necessary expenditures, the spread between these indexed prices allows only thin margins. Efficient operation and profitability in the current market are largely premised on maintaining a projected and consistent level of output.

26.     The Debtors have been unable to maintain a reasonable level of profitability in recent years due to several key factors, including, among others, (a) decreasing retail demand, particularly impacting the United Food Group facility in Los Angeles; (b) costly, customer specified requirements for finished product testing; and (c) lower sales in certain foodservice outlets due to the diversification into competing proteins and other reasons.  In particular, changes in the internal operating strategies of certain key foodservice customers significantly reallocated volume from the Debtors to other providers of ground beef products.  In response, the Debtors sought alternatives to replace lost volumes.  Because all significant foodservice companies already were customers of the Debtors, the Debtors pursued a strategy to increase sales to retail customers.  This transition led to replacing volume from a few established foodservice customers with sales to numerous new customers, each of which with its own product specifications, packing requirements and distribution arrangements.  Addressing this transition put a significant strain on the Debtors' resources.  Nevertheless, the implementation of this strategy was succeeding until recent and unanticipated market developments involving an unfounded public outcry over the use of boneless lean beef trimmings ("BLBT"), as discussed in detail below.  The impact of these recent events, along with other factors, such as changes to the imported meat market, have proved challenging to the Debtors and strained their liquidity.

27.     Under these conditions, the Debtors have struggled to increase their market share, improve profitability and adequately service their debt.  As conditions have become increasingly difficult, the Debtors have aggressively worked to increase productivity and decrease costs, and have worked with their lenders cooperatively to address potential defaults and provide for the liquidity needs of the Debtors.  To that end, the Debtors have entered into a series of four amendments and forbearance agreements with their First Lien Lenders during 2011

and 2012. To further assist in their restructuring efforts, the Debtors also obtained $14 million (including forgiveness of trade receivables) from an equity issuance to an entity owned by Yucaipa and BPI and $10 million (in the form of additional debt under the Prepetition Second Lien Credit Facility) from Yucaipa in December 2011. The most recent equity and loan infusions were largely exhausted in the face of more restrictive vendor trade terms and reductions in credit limits that the Debtors experienced in early 2012. The Debtors continued throughout the end of 2011 and the beginning of 2012 to work with their First Lien Lenders to address a longer term solution to restructure their businesses. Restructuring advisors from FTI Consulting, Inc. were retained to assist in this process.

      28.    After evaluating all potential options, the Debtors ultimately determined that the sale of their businesses would provide the best opportunity to maximize the value of their assets and address the business challenges faced by the Debtors.

      29.    As March 2012 approached, however, the Debtors were faced with a stark reality: given the recent events in the market, the remaining availability under the Prepetition First Lien Credit Facility was going to be inadequate to implement the preferred approach to implementing a restructuring and optimizing the value of the Debtors for all constituencies. The Debtors worked with the First Lien Lenders to negotiate a further forbearance and an overadvance of approximately $5 million to fund both ongoing operations and the completion of an effective and expeditious sale process (the "Overadvance"). To that end, on March 23, 2012, the Debtors hired Imperial Capital LLC ("Imperial") to market the Debtors' assets for sale.

      30.    The Debtors' business is seasonal, especially for retail customers, with increase sales volume and profitability in the spring when people increase grilling activities as warmer weather arrives. The Debtors expectation was that the increase in sales volume in the

spring, coupled with the Overadvance of new funds from the First Lien Lenders, would provide

sufficient time to complete the marketing of the Debtors' assets and develop a comprehensive

sale and restructuring strategy. This plan, unfortunately, was quickly undermined by market

forces beyond the Debtors' control.

31.    In producing many of their products, the Debtors use BLBT according to

customer specifications. BLBT has been widely used for 20 years in the meat processing

industry and has been determined on numerous occasions to be a safe food product consisting of

100% lean beef, and is approved by the United States Department of Agriculture ("USDA").

BLBT is produced by taking USDA inspected fat trim of beef and separating the lean beef from

the fat through a low temperature rendering process. This process creates a beef product that is

93% lean. To ensure the product's safety, BLBT is exposed to food grade ammonium hydroxide

gas, a treatment commonly used in the production of many foods, to destroy e-coli and other

bacteria. This is a longstanding USDA-approved practice.

32.    In recent months, BLBT has been the subject of extensive negative media

coverage following so-called "whistleblowing" by former USDA inspectors who have referred to

BLBT as "pink slime." This controversy accelerated following an "exposé" report on ABC

World News Tonight on March 7, 2012, questioning the practice of using BLBT. Ongoing

media attention has called into question the wholesomeness of BLBT. This controversy has

dramatically reduced the demand for all ground beef products. Almost all retail grocery stores

have succumbed to public pressure to reduce or eliminate the sale of products containing BLBT,

as well as public requests to prominently label products containing BLBT.

33.    The Debtors' products do not rely on the use of BLBT. The Debtors use

BLBT only to the extent that it is required by the specifications of orders received from

-12-

customers. However, the Debtors were faced with the combined impacts of (a) the drop in sales

of all ground beef products (both BLBT-containing and BLBT-free products), driven by the

negative media coverage; and (b) the attendant increase in working capital needs that

accompanied the necessary transition to a new BLBT-free product. This combination of factors

proved to be too much for the Debtors' already strained liquidity. Unfortunately, the BLBT

controversy has persisted longer than expected, and therefore continues to adversely impact the

Debtors' sales volumes. Rather than enjoying the start of an expected seasonal increase in sales,

sales actually have declined. In recent weeks, the Debtors' facilities (particularly in California)

have been operating well below capacity and well below both historical averages and projections

for this year.

      34.     Under these unfavorable and rapidly changing market conditions, the

Overadvance was quickly exhausted and Debtors' plans for an out-of-court sales process were

undermined. From its very preliminary work, Imperial was able to determine that there is

potentially significant interest in the Debtors assets, particularly from buyers interested in adding

processing capacity in the Debtors' markets, obtaining state-of-the art facilities and leveraging

the strong commercial relationships of the Debtors. Unfortunately, obtaining additional funding

for the sale and restructuring process outside of bankruptcy was no longer a viable alternative.

      35.     Faced with an immediate and unanticipated liquidity crisis, the Debtors

determined during the week of March 26, 2012 that they would not be able to pay vendors absent

an additional infusion of liquidity. When it became apparent that no additional lending would be

available outside of bankruptcy, the Debtors promptly began to explore the possibility of

bankruptcy financing with its lenders and initiated preparations for an emergency chapter 11

filing. Without the ability to borrow under the Prepetition First Lien Credit Facility or any other

source of financing, and facing a substantial liquidity shortfall, the urgent commencement of these cases became necessary to (a) address the Debtors' immediate liquidity needs and (b) provide the opportunity to pursue and consummate a sale that will preserve and maximize the value of the Debtors' assets (including going concern value) to the fullest extent possible.

36.     The Debtors recognize the challenges of filing these cases on an emergency basis in the face of adverse market conditions.  Nevertheless, the Debtors believe that the chapter 11 process offers the best – and probably the only – means of preserving going concern value, maximizing the return for stakeholders, saving employee jobs to the extent possible and avoiding a disorderly liquidation.  The Debtors have negotiated a debtor in possession financing arrangement with the First Lien Lenders (the "DIP Financing") that provides an opportunity for the Debtors to engage in an expedited sales process in chapter 11. Given the expressions of preliminary interests already received by Imperial from an initial survey of the marketplace, the Debtors believe that this process has a reasonable prospect of success and can lead to one or more transactions that maximize value and provide all stakeholders with the best result possible under the circumstances.

37.     To conserve cash and cut unneeded processing capacity under current market conditions, the Debtors expect to idle their California facility this week.  Assuming prompt access to the new DIP Financing, the Debtors currently anticipate that remainder of their operations will continue in chapter 11 and that going concern value can be preserved.

38.  ·   The ultimate disposition of these cases will depend on the success of the sale process and the ability to consummate one or more expeditious sales of the Debtors' business assets.  The Debtors recognize that, in addition to significant secured debt, the Debtors may face substantial claims under section 503(b)(9) of the Bankruptcy Code because most

vendors currently supply the Debtors on less than 14-day terms.  For the reasons described above, the Debtors nevertheless believe that the best (and perhaps only) means of maximizing value for all stakeholders, as well as saving both jobs and the value inherent in the network of customer and vendor relationships, is to pursue the sale process in chapter 11.

## PART IV

### Facts Relevant to the First Day Pleadings

39.     Concurrently with the filing of these chapter 11 cases, the Debtors filed the First Day Pleadings requesting certain limited relief.  Generally, the First Day Pleadings have been designed to assist in the transition into chapter 11 and the preservation of value pending the anticipated sale of the Debtors' assets.

40.     I have reviewed each of the First Day Pleadings filed contemporaneously herewith (including the exhibits thereto), and I incorporate by reference the factual statements set forth in the First Day Pleadings.  It is my belief that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and is critical to the Debtors' estates.

41.     It is my further belief that, with respect to those First-Day Pleadings requesting the authority to pay discrete prepetition claims or continue selected prepetition programs (e.g., those First-Day Pleadings seeking relief related to the Debtors' obligations to their employees, customers, critical vendors, certain taxing authorities and insurance programs), the relief requested is essential to the Debtors' efforts to preserve and maximize value in these cases and avoid immediate and irreparable harm to the Debtors and their estates and creditors.

42.     Any diminution in the limited relief requested in the First Day Pleadings could have an immediate and irreparable harmful impact upon the going concern value of the estates to the detriment of all of the Debtors' stakeholder constituencies.  The Debtors believe that payment of those selected prepetition claims identified in the First Day Pleadings will

ATI-2511930v9                                                    -15-

forestall such irreparable harm and that all creditors of the Debtors will ultimately benefit from the relief requested therein.

43.    As part of the First-Day Pleadings, the Debtors have filed a motion seeking authority to enter into the DIP Financing to ensure that the Debtors have sufficient liquidity to pay vendors and meet their other financial obligations as they pursue a sale of substantially all of their assets in attempt to maximize value for the Debtors' estates and their various stakeholders. It is my informed view that the financing package provided under the DIP Financing was the best the Debtors could obtain given the Debtors' prepetition debt structure and current financial condition.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: *April 2*, 2012
King of Prussia, Pennsylvania

_____
Ron Allen