UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

------------------------------------------------------x
: 
In re : Chapter 11
:
AFA INVESTMENT INC., *et al.*,[1] : Case No. 12-11127 (MFW)
:
       Debtors. : Jointly Administered
:
: Hearing Date: April 24, 2012 at 2:00 p.m. (ET)
: Objections Due: April 17, 2012 at 4:00 p.m. (ET)
------------------------------------------------------x

### APPLICATION OF DEBTORS TO RETAIN AND EMPLOY IMPERIAL CAPITAL, LLC AS INVESTMENT BANKERS, *NUNC PRO TUNC* AS OF THE PETITION DATE

The above-captioned debtors (collectively, the "Debtors") hereby apply to the Court for the entry of an order, pursuant to sections 327(a) and 328(a) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2014(a) and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"): (a) authorizing them to retain and employ Imperial Capital, LLC ("Imperial") as their investment bankers, *nunc pro tunc* as of April 2, 2012 (the "Petition Date"), in accordance with the terms and conditions set forth in that certain engagement letter dated as of March 21, 2012 (the "Engagement Letter"),[2] a copy of which is attached hereto as Exhibit A;

---

[1] The Debtors are the following nine entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): AFA Investment Inc. (0331); American Foodservice Corporation (1780); American Fresh Foods, Inc. (7389); American Fresh Foods, L.P. (7302); AFA Foods, Inc. (0429); American Fresh Foods, LLC (7301); Fairbank Reconstruction Corporation (2405); American Foodservice Investment Company, LLC (9525); and United Food Group LLC (7584). The address of each of the Debtors is 860 First Avenue, Suite 9A, King of Prussia, Pennsylvania 19406.

[2] Any references to, or summaries of, the Engagement Letter in this Application are qualified by the express terms of the Engagement Letter, which shall govern if there is any conflict between the Engagement Letter and such summaries or references herein. Capitalized terms not otherwise defined herein shall have the meanings given to them in the Engagement Letter.

ATI-2511217v9

(b) approving the terms of Imperial's employment and retention, including the fee and expense structure and the indemnification, contribution, reimbursement and related provisions set forth in the Engagement Letter; (c) waiving certain informational requirements of Local Rule 2016-2; and (d) granting such other and further relief as is just and proper. In support of this Application, the Debtors submit the Declaration of Marc A. Bilbao, a Managing Director of Imperial (the "Bilbao Declaration"), which is attached hereto as Exhibit B and incorporated herein; and further respectfully state as follows:

## Background

1. On the Petition Date, each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being administered jointly.

2. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. The Debtors are among the largest ground beef processing enterprises in the United States. Annually, the Debtors process more than 500 million pounds of ground beef products, which are distributed primarily to restaurants and retail grocery stores across the United States. As of the Petition Date, the Debtors operated beef processing facilities in California, Georgia, New York, Pennsylvania and Texas and maintain their headquarters in King of Prussia, Pennsylvania.

4. As of the Petition Date, the Debtors have approximately 850 full-time employees. As of December 31, 2011, on a consolidated basis, the Debtors' books and records reflected approximately $958 million in annual revenues. As of February 29, 2012, on a

consolidated basis, the Debtors' books and records reflected approximately $219 million in assets and $197 million in liabilities.

5. As described in the Declaration of Ron Allen in Support of First-Day Pleadings (Docket No. 8), the Debtors have commenced these cases to conduct a prompt sale of their business assets with the goal of preserving and maximizing value for stakeholders.

## Jurisdiction

6. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue for this matter is proper in this district pursuant to 28 U.S.C. § 1409.

## Imperial's Qualifications

7. The Debtors seek to retain Imperial as their investment bankers because, among other things, Imperial has extensive experience and an excellent reputation in providing high quality investment banking services to debtors in chapter 11 cases and other restructurings. The Debtors believe that Imperial is well positioned to assist them in completing a prompt sale of their assets that will maximize value.

8. Imperial is a full-service investment bank offering sophisticated institutional sales and trading, a wide range of investment banking advisory, capital markets and restructuring services and institutional research. Imperial's institutional sales and trading professionals service over 1,200 institutional accounts. Imperial's investment banking professionals provide advisory services to middle market corporations, institutional investors and private equity funds.

9. As an active bankruptcy and restructuring advisor with significant experience in a variety of industries including, among others, targeted media, recreational

equipment, educational travel, airlines, event technology services and integrated facilities management, Imperial and its professionals have extensive experience in transactions involving complex financial and operational challenges. Imperial specializes in working with financially distressed companies both in chapter 11 cases and in out-of-court transactions. See, e.g., In re Mesa Air Group, Inc., No 10-10018 (MG) (Bankr. S.D.N.Y. Jan. 5, 2010) [Docket No. 372]; In re MagnaChip Semiconductor Fin. Co., No. 09-12008 (PJW) (Bankr. D. Del. Sept. 10, 2009) [Docket No. 274]; In re Monaco Coach Corp., No. 09-10750 (KJC) (Bankr. D. Del. Apr. 9, 2009) [Docket No. 132]; In re Qimonda Richmond LLC, No. 09-10589 (MFW) (Bankr. D. Del. May 18, 2009) [Docket No. 370]; In re Landsource Communities Development LLC, No. 08-11111 (KJC) (Bankr. D. Del. Aug. 27, 2008) [Docket No. 504]; In re Aloha Airlines Inc., No. 08-00337 (LK) (Bankr. D. Haw. Apr. 8, 2008) [Docket No. 203]; In re Movie Galley Inc., No. 07-33849 (DOT) (Bankr. E.D. Va. Nov. 27, 2007) [Docket No. 1016]; In re Custom Food Prods., Inc., No. 07-10495 (PJW) (Bankr. D. Del. June 14, 2007) [Docket No. 307]; In re Mesaba Aviation, Inc., No. 05-39258 (GFK) (Bankr. D. Minn. June 8, 2005) [Docket No. 641].

      10.    The resources, capabilities and experience of Imperial in advising the Debtors are crucial to these chapter 11 cases. The Debtors commenced these cases with the goal of maximizing value to stakeholders through an expeditious sale of their assets to one or more buyers. An experienced investment banker, such as Imperial, is essential to this process and will provide related services that complement the work provided by the Debtors' other professionals. Imperial will concentrate its efforts on serving as the Debtors' sole investment banker in these chapter 11 cases to pursue an expeditious sale of all or substantially all of the Debtors' assets through one or more transactions.

11. Additionally, since the days immediately prior to the Petition Date, Imperial has been working with the Debtors in assisting them in the preparation of marketing materials and due diligence information in support of a potential sale transaction, and in contacting and soliciting initial indications of interest from potential purchasers. Through this process, Imperial has gained relevant knowledge of the Debtors' businesses, assets and finances that will be valuable to its ongoing efforts in the sale process. Given Imperial's expertise, background and prior experience with the Debtors, the Debtors believe that Imperial is both well qualified and well positioned to provide essential investment banking services to the Debtors in these chapter 11 cases in an efficient and timely manner.

### Services to Be Provided by Imperial

12. The parties have entered into the Engagement Letter, which governs the relationship between the Debtors and Imperial, subject to the additional terms and conditions set forth herein and in the Proposed Order (as defined below). The terms and conditions of the Engagement Letter were negotiated between the Debtors and Imperial and reflect the parties' mutual agreement as to the substantial efforts that will be required in this engagement. Under the Engagement Letter, in consideration for the compensation contemplated thereby, Imperial has provided and has agreed to provide the following services:

(a) providing the Debtors with an analysis of their business, operations, properties, financial condition, competition, industry, forecast, prospects and management;

(b) assisting the Debtors in preparing Transaction Offering Materials with respect to any Transaction;

(c) identifying and contacting selected qualified buyers for the Transaction and furnishing them, on behalf of the Debtors, with copies of the Transaction Offering Materials;

(d) assisting the Debtors in developing, evaluating, structuring and negotiating the terms and conditions of a potential Transaction and the related sale and auction procedures, and conducting any auction on behalf of the Debtors;

(e) advising the Debtors on a proposed purchase price and form of consideration for the Transaction;

(f) assisting the Debtors in arranging for potential buyers to conduct due diligence investigations;

(g) communicating with the Debtors' creditors and potentially with the Court and/or the office of the United States Trustee for the District of Delaware (the "U.S. Trustee") on the sale or liquidation process;

(h) if requested, providing testimony in proceedings before this Court, whether by deposition or in court; and

(i) providing such other investment banking services as Imperial may agree upon with the Debtors.

13. The services that Imperial will provide to the Debtors are necessary to enable the Debtors to maximize the value of their estates. Moreover, the services contemplated by the Engagement Letter are required to comply with the Debtors' new postpetition financing facility. The Debtors believe that the services will not duplicate the services that other professionals will be providing to the Debtors in these chapter 11 cases. Specifically, Imperial will carry out unique functions and will use reasonable efforts to coordinate with the Debtors' other retained professionals to avoid the unnecessary duplication of services. In particular, the services provided by Imperial will not duplicate the services to be provided by FTI Consulting, Inc., the Debtors' proposed provider of a chief restructuring officer and additional restructuring support personnel.

## Professional Compensation

14. In consideration of the services to be provided by Imperial, and as more fully described in the Engagement Letter, subject to this Court's approval the Debtors have

agreed to pay Imperial the proposed compensation set forth in the Engagement Letter (the "Fee Structure"):[3]

    (a)    Monthly Fee. A Monthly Advisory Fee of $100,000, payable on the first day of each month; and

    (b)    Deferred Fee. A Deferred Fee payable as follows, provided that under no circumstances shall Imperial be entitled to payment of more than one Deferred Fee:

        (i)    $250,000 if the assets of the Debtors' estates are (A) liquidated under a chapter 11 plan, (B) sold to any of the Debtors' prepetition secured lenders (collectively, the "Lenders") pursuant to a credit bid submitted by the Lenders, if no third party submits an executed offer or offers with no material contingencies providing for aggregate consideration equal to or exceeding $40,000,000 or (C) otherwise sold for less than $40,000,000 in aggregate consideration; or

        (ii)    If the aggregate Transaction Consideration[4] for the assets of the Debtors' estates equals or exceeds $40,000,000, then Imperial shall be entitled to either (A) the greater of $1,000,000 or 2% of the aggregate consideration for the transaction in the context of a single transaction or (B) the greater of $500,000 or 2% of the aggregate Transaction Consideration for each transaction where the Transaction Consideration is at least $10,000,000, up to a maximum of $1,500,000 in total for all such multiple transactions.

        For the avoidance of doubt, only a single Deferred Fee may be earned by Imperial under subparagraphs (i) or (ii) above.

15.    Imperial will credit aggregate Monthly Advisory Fees in excess of $200,000 against the amount of any Deferred Fee earned; provided, however, that no more than $300,000 in Monthly Advisory Fees will be credited against the amount of any Deferred Fee.

16.    In addition to the fees described above, the Debtors agree to reimburse Imperial for its customary and reasonable expenses incurred in connection with the matters

---

[3] The Fee Structure described below is modified or simplified from the terms of the Engagement Letter as necessary to account for the commencement of these cases.

[4] Under the terms of the Engagement Letter, "Transaction Consideration" refers to "the purchase price paid for the business or assets of the [Debtors], plus, without duplication, the assumption or payoff of indebtedness of the [Debtors], less cash and cash equivalents of the [Debtors] on hand at the closing or closings of any [transaction]." See Engagement Letter at 2.

contemplated by the Engagement Letter, including, without limitation, reasonable fees, disbursements and other charges of Imperial's counsel (subject to application to and approval of this Court).

### The Fee Structure is Appropriate and Should Be Approved Under Section 328(a) of the Bankruptcy Code

17. The Debtors believe that the Fee Structure is comparable to those generally charged by investment bankers of similar stature to Imperial for comparable engagements, both in and out of bankruptcy proceedings, and reflects a balance between a fixed, monthly fee and a contingency amount that are tied to the consummation and closing of the transactions and services contemplated by the Debtors and Imperial in the Engagement Letter.

18. The Fee Structure described above is consistent with Imperial's normal and customary billing practices for comparably sized and complex cases, both in-court and out-of-court, involving the services to be provided in these chapter 11 cases. The Fee Structure is consistent with and typical of arrangements entered into by Imperial and other investment bankers of comparable standing in connection with the rendering of similar services to clients such as the Debtors. Imperial and the Debtors believe that the Fee Structure is both reasonable and market-based.

19. To induce Imperial to represent the Debtors, the Fee Structure was designed to reflect the difficulty of the extensive responsibilities Imperial has undertaken and expects to undertake and to account for the potential for an unfavorable outcome resulting from factors outside of Imperial's control.

20. Imperial's investment banking and distressed company expertise, which will be required by the Debtors during the term of Imperial's engagement hereunder, were important factors in determining the Fee Structure, along with a determination that the ultimate

benefit to the Debtors derived from the services provided by Imperial hereunder cannot be measured by a mere reference to the number of hours expended by Imperial's professionals.

21. The Fee Structure (including the Deferred Fee) has been agreed upon in anticipation that a substantial commitment of professional time and effort will be required of Imperial and its professionals, particularly since the need for an expeditious sale process is expected to require an intense effort of Imperial's professionals at the outset of these cases.

22. In light of the foregoing, and given the numerous issues that Imperial may be required to address in the performance of its services hereunder, Imperial's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for Imperial's services for engagements of this nature both in the in-court and out-of-court contexts, the Debtors believe that the Fee Structure is fair and reasonable and market-based under the standards set forth in section 328(a) of the Bankruptcy Code.

### Record Keeping and Applications for Compensation

23. It is not the general practice of investment banking firms, including Imperial, to keep detailed time records similar to those customarily kept by attorneys and required by Local Rule 2016-2(d). Because Imperial does not ordinarily maintain contemporaneous time records in one-tenth hour increments or provide or conform to a schedule of hourly rates for its professionals, pursuant to Local Rule 2016-2(g), the Debtors request that Imperial be excused, with respect to its fees only, from strict compliance with such information requirements pursuant to Local Rule 2016-2(d) and from compliance with any timekeeping requirements in any order establishing procedures for interim compensation and reimbursement of expenses of professionals pursuant to section 331 of the Bankruptcy Code (an "Interim Compensation Order"). Thus, Imperial should only be required to maintain time records in half-

hour increments setting forth, in a summary format, a description of the services rendered by each professional and the amount of time spent on each date by each such individual in rendering services on behalf of the Debtors.

24. However, Imperial will maintain detailed records of any actual and necessary costs and expenses incurred in connection with the aforementioned services. Imperial's applications for compensation and expenses will be paid by the Debtors pursuant to the terms of the Engagement Letter, in accordance with Local Rule 2016-2(e) and any procedures established by the Court, pursuant to an Interim Compensation Order or otherwise.

### Payments Prior to the Petition Date

25. During the 90 days immediately preceding the Petition Date, Imperial received one payment from the Debtors in the amount of $54,032 (the "Prepetition Payment"). Of the Prepetition Payment, $35,484 was applied in satisfaction of the pro-rated Monthly Advisory Fee for the month of March, and the balance of $18,548 was taken as a deposit against out-of-pocket expenses, as provided for in the Engagement Letter (the "Expense Deposit"). As of the Petition Date, Imperial held approximately $7,500 of the Expense Deposit.[5] Other than as set forth herein, Imperial did not receive any payments from the Debtors during the one year immediately preceding the Petition Date.

26. As of the Petition Date, the Debtors owed Imperial approximately $3,333.33, representing the pro-rated value of one day of the Monthly Advisory Fee for the month of April. Upon entry of an Order approving the Application, Imperial will waive any

---

[5] The exact amount of the unused Expense Deposit as of the Petition Date is pending a final accounting of prepetition expenses. Pursuant to the Engagement Letter, any unapplied amounts of the Expense Deposit are to be returned to the Debtors upon completion of the services provided for in the Engagement Letter or the termination of Imperial's retention.

claim for this amount. Other than this amount, the Debtors do not owe Imperial any amounts for fees or expenses incurred prior to the Petition Date.

### Indemnification Provisions

27.     Pursuant to Schedule I to the Engagement Letter, the Debtors have agreed, among other things, to indemnify, hold harmless and provide contribution and reimbursement to Imperial and its affiliates, counsel and other professional advisors, and the respective directors, officers, controlling persons, agents and employees of each of the foregoing under certain circumstances.[6]

28.     The Debtors and Imperial believe that the indemnification provisions contained in Schedule I to the Engagement Letter are customary and reasonable for investment banking engagements, both in and out-of-court, and reflect the qualifications and limitations on indemnification provisions that are customary in this District and other jurisdictions. See, e.g., In re Penton Business Media Holdings, Inc., Case No. 10-10689 (AJG) (Bankr. S.D.N.Y. Mar. 5, 2010); In re FairPoint Commc'ns, Inc., Case No. 09-16335 (BRL) (Bankr. S.D.N.Y. Jan 11, 2010); In re Trident Resources, Corp., Case No. 09-13150 (MFW) (Bankr. D. Del. Sept. 8, 2009); In re Charter Commc'ns, Inc., Case No. 09-11435 (JMP) (Bankr. S.D.N.Y. Apr. 15, 2009); In re Movie Gallery, Inc., Case No. 07-33849 (DOT) (Bankr. E.D. Va. Oct. 18, 2007).

29.     The terms and conditions of the Engagement Letter were negotiated by the Debtors and Imperial at arm's-length and in good faith, and Imperial has agreed, at arm's length

---

[6] Schedule I to the Engagement Letter provides, in part, that the Debtors will indemnify and hold harmless Imperial and each Indemnified Person from and against any losses, claims or proceedings, directly or indirectly related to or arising out of Imperial's engagement, except to the extent that any such loss, claim, damage, liability or expense is finally judicially determined to have resulted primarily from such Indemnified Person's willful misconduct, fraud or gross negligence. To the extent that the description in this Application and the terms of Schedule I to the Engagement Letter are inconsistent, the terms of Schedule I of the Engagement Letter shall control, but shall be modified as set forth in the proposed order granting this Application, attached hereto as Exhibit C (the "Proposed Order").

and in good faith, to the modification of certain of such terms and conditions to satisfy anticipatorily the expectations of the U.S. Trustee and the Court, as reflected in the form of the Proposed Order.

30.     The Debtors respectfully submit that the indemnification, contribution, exculpation, reimbursement and other provisions contained in Schedule I to the Engagement Letter, viewed in conjunction with the other terms of Imperial's proposed retention, and as modified in the Proposed Order are reasonable and in the best interests of the Debtors, their estates and creditors in light of the fact that the Debtors require Imperial's services to successfully reorganize. Accordingly, as part of this Application, the Debtors request that the Court approve the Engagement Letter, as modified herein and in the Proposed Order.

**Basis for Relief**

31.     The Debtors seek authority to retain and employ Imperial as their investment banker under section 327 of the Bankruptcy Code, which provides that a debtor is authorized to employ professional persons "that do not hold or represent an interest materially adverse to the estate, and that are disinterested persons, to represent or assist the [Debtors] in carrying out their duties under this title." 11 U.S.C. § 327(a). Section 1107(b) of the Bankruptcy Code elaborates upon sections 101(14) and 327(a) of the Bankruptcy Code in cases under chapter 11 of the Bankruptcy Code and provides that "a person is not disqualified for employment under section 327 of [the Bankruptcy Code] by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case." 11 U.S.C. § 1107(b).

32.     In addition, the Debtors seek approval of the Engagement Letter (including, without limitation, the Fee Structure and the indemnification provisions in

Schedule I, as modified in the Proposed Order) pursuant to section 328(a) of the Bankruptcy Code, which provides, in relevant part, that the Debtors "with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis. . . ." 11 U.S.C. § 328(a).

33. Section 328 of the Bankruptcy Code permits the compensation of professionals, including investment bankers, on more flexible terms that reflect the nature of their services and market conditions. As the United States Court of Appeals for the Fifth Circuit recognized in Donaldson Lufkin & Jenrett Sec. Corp. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.), 123 F.3d 861 (5th Cir. 1997):

> Prior to 1978 the most able professionals were often unwilling to work for bankruptcy estates where their compensation would be subject to the uncertainties of what a judge thought the work was worth after it had been done. That uncertainty continues under the present § 330 of the Bankruptcy Code, which provides that the court award to professional consultants "reasonable compensation" based on relevant factors of time and comparable costs, etc. Under present § 328 the professional may avoid that uncertainty by obtaining court approval of compensation agreed to with the trustee (or debtor or committee).

Id. at 862 (citations omitted), cited in Riker, Danzig, Scherer, Hyland & Perretti LLP v Official Comm. of Unsecured Creditors (In re Smart World Techs. LLC), 83 B.R. 869, 874 (S.D.N.Y. 2008). Owing to this inherent uncertainty, courts have approved similar arrangements that contain reasonable terms and conditions under section 328 of the Bankruptcy Code. See, e.g., In re U.S. Airways, Inc., Case No. 02-83984 (SJM) (Bankr. E.D. Va. Aug. 12, 2002); see also In re J.L. French Auto. Castings, Inc., Case No. 06-10119 (MFW) (Bankr. D. Del. Mar. 24, 2006).

34. Further, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 amended section 328(a) of the Bankruptcy Code, which now provides as follows:

> The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, <u>on a fixed or percentage fee</u> basis, or on a contingent fee basis.

11 U.S.C. § 328(a) (amendment underlined). This change makes clear that the Debtors are able to retain a professional on a fixed or percentage fee basis, such as Imperial's Fee Structure, with bankruptcy court approval.

35. The Engagement Letter appropriately reflects (a) the nature and scope of services to be provided by Imperial, (b) Imperial's substantial experience with respect to investment banking services and (c) the fee structures typically utilized by Imperial and other leading investment bankers that do not bill their clients on an hourly basis.

36. Similar fixed and contingency fee arrangements have been approved and implemented by courts in other large chapter 11 cases. <u>See</u>, <u>e.g.</u>, <u>In re Blockbuster, Inc.</u>, Case No. 10-14997 (BRL) (Bankr. S.D.N.Y. Sept. 23, 2010); <u>In re Penton Business Media Holdings, Inc.</u>, Case No. 10-10689 (AJG) (Bankr. S.D.N.Y. Mar. 5, 2010); <u>In re Neenah Enterprises, Inc.</u>, Case No. 10-10360 (MFW) (Bankr. D. Del. Feb. 3, 2010); <u>In re FairPoint Commc'ns, Inc.</u>, Case No. 09-16335 (BRL) (Bankr. S.D.N.Y. Jan 11, 2010); <u>In re Trident Resources, Corp.</u>, Case No. 09-13150 (MFW) (Bankr. D. Del. Sept. 8, 2009); <u>In re Motor Coach Industries Int'l, Inc.</u>, Case No. 08-12136 (BLS) (Bankr. D. Del. Sept. 15, 2008). Accordingly, the Debtors believe that Imperial's retention on the terms and conditions proposed herein is appropriate.

**Imperial's Disinterestedness**

37. To the best of the Debtors' knowledge and except to the extent disclosed herein and in the Bilbao Declaration, (a) Imperial is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as required by section 327(a) of the Bankruptcy Code, and does not hold or represent an interest materially adverse to the Debtors' estates; and (b) Imperial has no connection to the Debtors, their creditors or other parties in interest in these chapter 11 cases.

38. As set forth in further detail in the Bilbao Declaration, Imperial has certain connections with creditors and other parties in interest in these chapter 11 cases. All of these matters, however, are unrelated to these chapter 11 cases. Imperial does not believe that any of these matters represent an interest materially adverse to the Debtors' estates or otherwise create a conflict of interest regarding the Debtors or these chapter 11 cases.

**Notice**

39. Notice of this Application shall be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtors' 30 largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions; (c) counsel to the agent for the Debtors' prepetition first lien lenders and postpetition lenders; (d) counsel to the agent for the Debtors' prepetition second lien lenders; and (e) all entities that have requested notice pursuant to Bankruptcy Rule 2002. The Debtors respectfully submit that no further notice of this Application is required.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form of the Proposed Order, (a) granting the relief sought herein and (b) granting to the Debtors such other and further relief as the Court may deem proper.

Dated:  April 10, 2012               Respectfully submitted,
        King of Prussia, Pennsylvania

                                     AFA Investment, Inc., *et al.*

                                     /s/ Ron Allen
                                     Ron Allen
                                     Designated Officer