UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| AFA INVESTMENT INC. *et al.* | ) | Case No. 12-11127 (MFW) |
| | ) | Courtroom Number 4 |
| DEBTORS. | ) | 824 North King Street |
| | ) | Wilmington, DE 19801 |
| | ) | |
| | ) | April 3, 2012 |
| | ) | 3:00 P.M. |

TRANSCRIPT OF HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors: Pachulski Stang Ziehl & Jones LLP
BY: LAURA DAVIS JONES, ESQ.
TIMOTHY P. CAIRNS, ESQ.
919 North Market Street, 17th Floor
Wilmington, DE 19899-8705
(302) 652-4100

ECRO: BRANDON MCCARTHY

Transcription Service: Reliable
1007 N. Orange Street
Wilmington, Delaware 19801
Telephone: (302) 654-8080
E-Mail: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording: transcript produced by transcription service.

| | |
|---|---|
| For the Debtors: | Jones Day<br>BY: TOBIAS S. KELLER, ESQ.<br>555 California Street<br>26th Floor<br>San Francisco, California 94104<br>(415) 626-3939 |
| | Jones Day<br>BY: JEFFREY B. ELLMAN, ESQ.<br>1480 Peachtree Street, N.E.<br>Suite 800<br>Atlanta, Georgia 30309<br>(404) 581-3939 |
| For GECC: | SIDLEY AUSTIN LLP<br>By: JENNIFER C. HAGLE, ESQ.<br>555 West Fifth Street<br>Los Angeles, California 90013<br>(213) 896-6000 |

INDEX

| | Page |
|---|---|
| OPENING STATEMENT: | |
| For the Debtors, by Ms. Davis Jones | 4 |
| NOTICE OF AGENDA MATTERS: | |
| For the Debtors, by Mr. Keller | 5 |
| For the Debtors, by Mr. Ellman | 11 |
| For the Debtors, by Mr. Keller | 28 |
| For GECC, by Ms. Hagle | 31 |

THE CLERK: All rise. Please be seated.

THE COURT: Good afternoon.

MS. DAVIS JONES: Good afternoon, Your Honor. For the record, Laura Davis Jones of Pachulski Stang Ziehl & Jones on behalf of AFA Investment Inc. and the related Debtors. First, Your Honor, let me thank you for giving us time in your afternoon to present a limited number of first day motions. We did file the case early, very early yesterday and we had a series of first day motions and proposed orders that we shared with Mr. Kenney, and I'm pleased to tell Your Honor that we have resolved all issues raised with the Trustee's office.

THE COURT: Okay.

MS. DAVIS JONES: And we have some blacklines that we'll submit as we go along that address any issues that Mr. Kenney had, and I want to thank him for being so prompt with us on that. Your Honor, we did file a supplemental motion with respect to wages that we'll address a little later, but I wanted to make sure Your Honor saw that motion.

THE COURT: I did not.

MS. DAVIS JONES: Your Honor, may I approach with that motion as well as a copy of the amended agenda that we filed?

THE COURT: Oh yes, I'm sorry I did get it.

MS. DAVIS JONES: Does Your Honor have the amended

agenda as well?

THE COURT: You may hand that up.

MS. DAVIS JONES: Thank you. Your Honor, that amended agenda just reflects the filing of the supplemental motion and also reflects that we've agreed to adjourn the hearing with respect to the 503(b)(9) procedures until we're back before the Court on the next hearing. Your Honor, we are pleased to be co-counsel with Jones Day on this case, and I believe Your Honor noticed Tobias Keller and Jeffrey Ellman both sitting here at counsel table. Your Honor, we have filed motions for their admission *pro hac vice*, and without further adieu, Your Honor, I will yield to Mr. Keller.

THE COURT: Thank you.

MR. KELLER: Good afternoon, Your Honor, Tobias Keller of Jones Day.

THE COURT: All right.

MR. KELLER: With us here today is Ron Allen. Mr. Allen is the Executive Chairman and Interim CEO with the company, and has been with the company and its predecessor since 1967. In addition, we've got Mr. David Beckham, he's a senior managing director at FTI and he's acting as a CRO for the company. We don't expect to introduce live testimony today, but they'll be available to answer questions or for offers of proof.

THE COURT: Okay.

MR. KELLER: With the Court's leave I'd like to just give a quick background on the company and why we're here and then we have a number of first day motions that Mr. Ellman would be presenting. The last of the motions we'll be presenting is the debtor in possession financing motion which I'll be presenting and hope to be assisted by bank's counsel from Sidley & Austin.

THE COURT: Okay.

MR. KELLER: AFA Investment and the related companies are independent meat processors, including American Food Service and the United Food Group. They've been operating together under the AFA Investment holding company where the lead equity sponsor is the Yucaipa Companies and their affiliates, private equity funds that are based in Los Angeles. The Debtors have plants in California, Texas, Georgia, New York and Pennsylvania. Their core business is purchasing meat, primarily beef, buying it and processing it into ground beef into beef patties. Over one million pounds of meat are processed on a daily basis. The company has an outstanding safety record and good employee relations. There are no unions or defined benefit plans with the company. There are approximately 850 full time employees and approximately 130 temporary employees, so roughly a thousand people whose livelihoods are generated from this business. Their annual sales in the aggregate are just under

a billion dollars.

The meat industry is highly competitive. Historically there is a complex supply chain ranging from ranchers at the beginning, slaughterhouses, processers, distributors and finally the retailers that sold the business. With the rise of the corporate agri business, there has been very significant competition from vertically integrated players like Cargill who raise the beef on the hoof all the way through delivering it to the retailers. As a result there's been tremendous competition that has reduced margins tremendously and has led to tremendous consolidation within the industry, AFA being one of the entities, the major players now that has been consolidated. There has been a separate trend which has been the consolidation of food retailers like Wal-Mart and Safeway on the retail side, and quick serve restaurants like Burger King or Carl's Jr. on the quick serve side. They offer great volumes to companies such as AFA but they can also hurt companies when they change their buying procedures. In this case, the Debtors lost some significant business that resulted in significant over-capacity several months ago. They requested and obtained additional support from their equity sponsor and from a critical vendor to the tune of about $25 million in the aggregate. Even with those contributions, liquidity was tight.

And last month the main stream news and social media raised concerns about one of the components used by the Debtors in making their products. That component is known in the industry as boneless lean beef trimmings, what they call BLBT. There's been another unfortunate epithet that has been used more widely in the media. It is important to note that the companies do not produce BLBT, and in fact would not use BLBT but for the request of their customers. Such that as customers have changed their ordering to reduce their reliance on BLBT, all my client has done is moved to use another higher quality fillers to complete the processing. All the same, because of the media uproar and the high level of consciousness, there have been two implications for the company. One, is there have been tremendously reduced sales, and the other is they've been costs associated with realigning the product mixes, and then restocking the new product mixes that have resulted in higher working capital needs.

Initially, the companies approached the lenders to see if they could get an over advance on their line. The lending group, the first lien lender group did in fact try to accommodate the company to a $5 million over advance, prepetition. But the impact of the BLBT publicity was greater than hoped or expected, it has been more sustained and remains an issue of concern to all of the parties. That

essentially brings us to where we are today.

The hope of doing an internal restructuring and operational restructuring has dimmed and the amount of capital that appears to be necessary simply isn't available in the current environment. Accordingly, the Debtors' boards agree to a tightly controlled process with three objectives in mind. First and foremost, maximizing value. And just as a matter being candid with the Court, it does not look like that the sale proceeds at the end of the process will be sufficient to pay off all of the secured debt, the first and the second lien debt. Secondly, importantly again to the companies and their boards, to preserve the jobs. We have a thousand people whose livelihoods turn on this business, and the company does feel a strong sense of responsibility to its employees. They believe that this process is likely to result in a set of going concerns sales at least to some degree that will preserve some if not all the jobs. Finally, because of the tight interconnected nature of the supply chain, there are vendors and some customers who are also highly reliant on AFA and its business to act as the *de facto* distributor of their meat products or to provide a tremendous amount of their meat products so that the issues relating to those economies and the employees who are there is also implicated by trying to do a controlled wind down process that preserves going concern value.

Your Honor will undoubtedly have noted the time table that's set forth in some of the financing documents, but I will highlight them. The company will be filing a sale motion or motions within two weeks. It is unlikely that we will have a lead bidder for those, but they will set forward the processes that we intend to employ. The companies intend to present to the banks for review a letter or letters of intent within 45 days of the petition date. We anticipate having an auction or auctions in 76 days, and we'll seek approval of the prevailing, the bidders of the prevailing, the prevailing bidders of the sales within five days thereafter, and we expect to consummate a sale within 87 days or roughly three months from the filing of the petition date. We realize it's an ambitious schedule, but it's one that we are committed to meeting. I would note that we have identified and retained a banker, they've already begun, the initial indications are promising. They have sent out about 60 teasers for which we have 15 parties who have already either signed or who have requested nondisclosure agreements, and seven of them are parties who are strategic buyers who we believe understand the industry and the capacity very well, and are serious parties within a trust in proceeding the company.

As Ms. Jones noted, we have put the 503(b)(9) motion on for regular notice. We simply wanted to assure the Court

we are well aware that there's a significant community of vendors who have provided critical supplies in the last 20 days. We are committed to understanding that that group of people and figuring out how we're going to go about dealing with a 503(b)(9) claims, and the 503(b)(9) motion is the first step in corralling and understanding who that community is and how we're going to go about dealing with it.

Unless the Court has any questions, I propose at this point to introduce Mr. Ellman.

THE COURT: No, you may proceed.

MR. KELLER: Thank you. Your Honor Jeff Ellman from Jones Day.

MR. ELLMAN: Good afternoon, Your Honor. Again for the record Jeffrey Ellman from Jones Day on behalf of the Debtors. Before I proceed, Your Honor, I do have a stack of the first day orders, other than the DIP order, if I could approach.

THE COURT: You may. Thank you.

MR. ELLMAN: And, Your Honor, I intend to go through the agenda, the amended agenda in that order. As I understand it, you should in that stack have the orders we're proposing to have the Court sign, and if there are changes, behind that order will be the blackline, so I think that's the procedure.

THE COURT: Thank you.

MR. KELLER: The first -- before I start, I also would like to point out we did, as the Court is well aware, file the Declaration of Mr. Allen who is in the courtroom which supports all these motions, and he is of course, as Mr. Keller said, available in the courtroom today. The first order which is agenda item 3 is the motion for joint administration. The Debtors are affiliates under section 102, excuse me, 1012, and we seek joint administration under rule 1015(b), I think we provided a form of order that's consistent with local practice.

THE COURT: All right. Does anybody wish to be heard on that? All right, I had no issue with this, so I will enter the order.

MR. ELLMAN: Thank you very much, Your Honor. So the second, the next matter is item 4 on the agenda which is the application to retain Kurtzman Carson Consultants LLC as the claims and noticing agent in this case under 28 U.S.C. Section 156(c), sections 105(a) of the Bankruptcy Code and Rule 2002(f). We do have more than 200 creditors in this case, so under the local rule 2002-1(f) we are required to retain a claims noticing agent. We did we believe follow all of the requirements of the protocol that's in place at this time in the district, and I can tell you to the extent it wasn't clear we did in fact get three proposals and reviewed them. So, Your Honor, we would ask that this be approved.

THE COURT: All right. Anybody wish to be heard on that? All right, I will enter the order in accordance with our local rule.

MR. ELLMAN: Thank you very much, Your Honor. Item 5 on the agenda is the motion by the Debtors for an order approving the continued use of the Debtors' cash management system under sections 345, 363 and 503(b)(1) of the Bankruptcy Code, and various of the local rules. We are seeking to maintain and avoid disruption in the cash management procedures of the company while it's in chapter 11, the cash management process and bank accounts, etc. described in our motion. I'd be happy to go through the four or five forms of relief we're seeking which I think are relatively typical if the Court's interested; otherwise, I can inform the Court of the change we made at the request of the United States Trustee.

THE COURT: All right. Well tell me the changes first.

MR. ELLMAN: Okay. And there should be a blackline of this order, Your Honor. There are basically three things the U.S. Trustee had asked us to do. One was to serve copies of the order on the cash management banks, which we've agreed to do, and that is in the blackline. That is at I think paragraph 10. We also have been asked and agreed that we will notify the U.S. Trustee and any creditors committee

within five business days to opening any new bank accounts, which again is reflected in paragraph 2 of the order as amended. And the third item, Your Honor, is that in the event the Debtor elects to deposit any funds outside of the cash management procedures in place under local rule 4001-3, the Debtors will notify the U.S. Trustee and provide a copy of a certification provided by the institution in accordance with the local rule. And that is also reflected in the blackline. Those are the only changes we made, Your Honor.

THE COURT: Okay.

MR. ELLMAN: We would ask for the motion be approved.

THE COURT: All right. They look fine to me. Anybody else wish to be heard? All right. I'll enter the order as revised.

MR. ELLMAN: Thank you very much, Your Honor. The next item is agenda item 6. And this is the motion by the Debtors for an order authorizing them to pay employee wages and benefits. This is under sections 105, 363 and 507, as well as section 541 of the Bankruptcy Code. And as Mr. Keller indicated, we have 850 employees plus 130 temporary workers which clearly we're going to need their assistance, they are critical to operating the facilities and interfacing with customers and suppliers and doing all the things that are critical to preserving the value here pending the

anticipated sale.

We described in our motion the various kinds of wages and compensation, the benefit plans, the prepetition business expenses to be reimbursed for travel and related processing and other costs. I'm happy to go into some more detail. I think the one thing I want to point out is that the compensation we're paying in all cases will be below the priority cap of 11,725. I was informed to get that on the record, Your Honor. And if you have not had an opportunity to read the supplement, I'll be happy to at least describe that to you and maybe skip the other stuff.

THE COURT: I have. But for the record, you can identify.

MR. ELLMAN: Yes. Well, Your Honor, the supplement identified two things that we learned about shortly after the filing of our papers. One was a, what they call a quarterly bonus program, it's a rank and file program, it's been around for 20 years at the plants, it's on a separate payroll cycle which is I think why we missed it while we were doing this. But it's on a quarterly payment cycle, and each quarter the plans that are participating in this look at a variety of operational metrics for efficiency, safety, etc., and they adjust the numbers and provide a slight, and sometimes more than slight benefit to the individuals. The range of payments range from you know could be zero or $100, couple

hundred dollars up to two or three thousand dollars. I think the highest number I've seen is 3800. But again, these are all rank and file individuals, it's a longstanding program, it's considered a part of compensation and it's an expectation. The next payment is due on the 14th or thereabouts this month. What happens is when the quarter ends, January to March, it takes them a little bit of time to figure out what the metrics look like, they calculate the number and they make the payment within a couple of weeks. I think we said in our papers, our supplement that the amount that's owed is about $435,000 in total. You'll see in our order we put a cap on that, 500 simply because as we're doing the math, we wanted to have a little more cushion in case the numbers come out differently. But they're very confident it'll be less than 500,000. Again, I think it's important to say even with this payment, the compensation numbers will still be below the cap, 11,725. So that's the one item.

The other item has to do with our plant in California which we've indicated in our papers and announced that it's like to be idle in the coming week. When we do that and we furlough or terminate employees at that facility, that could create certain payment obligations under California law which are fairly stringent as I understand it. Effectively what happens is when you, when that person is separated at that juncture, the employer has to pay all the

accrued unused vacation pay. We already have asked for ability to pay vacation pay in our papers, but we didn't account for these numbers. The numbers there could be around $365,000, we round it to 400 because again, we're calculating the exact amount, we want to have a little cushion, but it has to be paid immediately upon that separation. So to comply with the statute in California, we've added that as well.

I can tell you that from talking to the United States Trustee's office about both the motion and the supplement, they were fine with the motion and the supplement with simply one comment, which we have addressed in the blackline of the order. And that was, there's a reference, Your Honor, in paragraph 2 at the end that says that nothing herein shall be deemed to authorize the payment of any amounts that may be subject to 503(c) of the Bankruptcy Code. So we're not going to violate 503(c) which deals with, as Your Honor is aware, certain executive compensation and other items. The original drafts of 503(b), the U.S. Trustee said we should correct that, which we have done. Beyond that, the blackline shows that we've incorporated the supplement into the order, and the numbers I just referenced. And with that, we would ask the Court approve the motion.

THE COURT: All right. Does anybody wish to be heard on this? All right. The revisions look fine, and I

did review the supplement. So I will approve it as supplemented and revised.

MR. ELLMAN: Thank you very much, Your Honor, we appreciate that. The next item number 7 on the agenda, a motion for an order authorizing the Debtors to pay certain prepetition taxes. This is a motion filed under section 105, 363(b), 507(a) and 541 of the Bankruptcy Code. We believe that payment of these taxes that are set forth in the motion are appropriate and necessary to avoid disruptions of the case, there are trust fund taxes in some cases that are not available to creditors. There are certain kind of payments that are necessary to maintain good standing and operating certain places and to avoid director and officer liability. Again, I'm happy to go through the details of them. I can tell you that the U.S. Trustee only had one request here which was to make representation, which I'm prepared to do, that all the taxes we intend to pay under this motion are current taxes, there are no stale old taxes here. So with that, the only other change, I think hopefully there's a blackline, Your Honor, there was simply a scrivener's kind of error, you'll see in paragraph 2, we have $3500, fairly de minimis amount for payment of business license fees. And in fact, in our motion, that covers both business license fees and annual report taxes that we've added. It doesn't change the numbers, just making clear we can pay both of those

things. And with that, we'd ask for the motion to be approved.

THE COURT: All right. Well the U.S. Trustee asked the question I would have asked. So I will enter the order then authorizing the payment.

MR. ELLMAN: I appreciate that. Thank you, Your Honor. The next item on the agenda is number 8, which is the motion of the Debtors for an order authorizing the continuation of insurance programs and to pay related claims. This is under sections 105(a), 363 and 364 of the Bankruptcy Code. The Debtors submit that it's important to be able to maintain their insurance policies and programs, preserve their assts, comply with the law, the U.S. Trustee guidelines and continue their operations in the post petition period. The insurance policies in the programs are described in some detail in the motion. The biggest piece of this is the Workers' Comp piece, which of course is essential for us to operate to maintain those program in addition to all the other kinds of insurance. And there is a fairly detailed exhibit listing all the insurance policies and the like. The U.S. Trustee had no objections to this. Again, I'm happy to answer any questions or go through the details of the programs.

THE COURT: Well, am I correct this is largely a self-insured?

MR. ELLMAN: It's largely self-insured only for some of the medical programs in Texas. The other -- self-insured is not really the right way to look at this because most of the programs --

THE COURT: You're obligated to repay them if they pay more than the premiums.

MR. ELLMAN: Well, we're obligated for the first traunch to have a true up at the end. That's correct. But we're not in a position now where we're expecting to pay anything at this point. The first $400,000 level of insurance through, it's funded through Zurich it's paid through Churchill.

THE COURT: Yes.

MR. ELLMAN: Right. So typically that is sufficient, we pay that money and they cover all the costs up to 400. At this point there's nothing for us to pay, we prepaid effectively that level of insurance and Zurich kicks in above a million. It is true that down the road there could be some true up, but there's nothing in our motion suggesting the need at this point to pay any further amounts. As far as we're concerned, at this point we have paid for the coverage that we need in those jurisdictions with that insurer.

THE COURT: Well, since I'm only considering on an interim basis I'm only authorizing payments that would come

due before the final hearing. So it's clear.

MR. ELLMAN: That's appropriate, Your Honor.

THE COURT: Okay.

MR. ELLMAN: I just want to be clear for the record that for most of those insurance programs, we expect that unlike true self-insureds, there is no self, there's no retention, there's no self-insured piece that we have to additionally fund.

THE COURT: At the beginning.

MR. ELLMAN: Yeah, I think we've already funded everything that will ever have to be funded. But you know there could be a true up at the end which we're not really dealing with today.

THE COURT: Okay.

MR. ELLMAN: And with that, again, we'd ask that the motion be approved.

THE COURT: All right. I will approve it then on an interim basis.

MR. ELLMAN: Thank you, Your Honor. Item 9 we've dealt with already, that's the 503(b)(9) procedures which as Mr. Keller indicated are not going forward today, they will be upon notice. And that takes us to the 10th item which is the motion to honor customer obligations under sections 105(a) and 363. Like most businesses, the customers are the lifeblood of the business, and we need to have our customers

provide us the core of confidence and loyalty to allow us the opportunity to preserve the value and move forward towards the sale. And those are very critical longstanding relationships. In many cases, they'll be extremely valuable as we pursue the sale to have those in place. Obviously, we rely on them during the case for generating revenue as well. We really just talk about two policies in there that are the primary ones which are returns and various forms of rebates which we've asked to honor. The U.S. Trustee had no objection to this and we would ask for this to be paid, or to be approved. Thank you.

THE COURT: All right. I will approve it, again, on an interim basis.

MR. ELLMAN: Appreciate that. Thank you, Your Honor. Item 11 is the motion of the Debtors for an order authorizing the payments of certain prepetition claims of essential suppliers. This is under sections 105 and 363. As you've already heard, Your Honor, it's in our papers and as Mr. Keller indicated, the Debtors receive and process and transport over 500 million pounds of beef per year, it's over a million pounds a day, it is a perishable product. I guess maybe that goes without saying. So this beef must be properly stored and transported, maintained in a sanitary condition, and delivered to each customer's needs which are oftentimes very highly specified in the way it's packaged,

the way, you know, how fresh it is and all these types of things, what the components of it are. So it's somewhat of a just in time model to a certain extent. Especially when we're talking about the retail customers who you know put the beef on the grocery shelves, the dates, you know, use by this date, that has to be there on time, it has to be fresh, it has to be in the right package. So the Debtors can't afford to compromise on the quality, they certainly can't afford to compromise on the safety, they're regulated in that respect, and the market is too competitive to fall down on any of these items. So interruptions of operations are extremely damaging both to the Debtors and their business, but also to their commercial relationships which are an extraordinary part of the value here as well as the sale process and transition to a buyer eventually. So we've made every effort and will make every effort I should say to avoid having to pay very many claims, but we believe in consideration that it was appropriate and necessary to have the flexibility to do that and limited circumstances where a vendor is capable of stopping production or delaying production, etc. So we tried to design a critical vendor program that was fairly targeted within broad categories, but given the Debtor fairly stringent sort of set of rules to live by so we could make sure the estate benefits.

There are basically four categories of the critical

suppliers, both goods and services. The meat suppliers, obviously that is the product we make, we need the meat to process, it has to be the right quality, it has to be the right quantity, it has to have the right content, fat content, etc., so we have to be able to have those people supplying us on time. Packaging good suppliers, packaging is not just packaging in this business. The customers have very specific ways they need the product packaged, very unique specifications. Of course, it’s paramount the importance of safety and freshness of the product that the packaging has to accomplish. The sanitization services, this is not just someone who comes in with a mop and a broom, you have facilities that need to be USDA requirements, you need specialized people who know how to do this. There aren’t a lot of them around in the places where have facilities, and so we need those people to be available to us. And shippers and warehouses. Shippers, obviously we have to get our stuff around, so it has to be on special trucks, refrigerated, frozen, has to get there while it’s still fresh. Stopping this product in transit is not going to be very helpful to selling the product at the end of the day. So those are the categories. We have a budget cap of $6 million which we hope not to spend. And I won’t go into the details, unless the court would like, but we did define in our motion the series of trade terms and the expectation of a trade agreement.

We're not going to give the money without getting something back that we feel the estate can justify as reasonable value coming in.

The U.S. Trustee reviewed this and the only comment they had and we've agreed to do is for the Debtors to provide a monthly report of who we have paid under this program to the U.S. Trustee which we will certainly do, and it's not in the order, but we'll represent on the record that we will do that. And unless the Court has questions, we'd ask for the motion to be approved.

THE COURT: All right. I had no questions, and with that addition of the reporting, I will approve it.

MR. ELLMAN: Thank you very much, Your Honor. And that takes us to the last of the agenda items before the DIP financing, that's item 12. This is the motion for an order establishing procedures with respect to utilities. And Your Honor, we sought interim orders addressing the utility adequate assurance issues under section 366, we've got 60 utilities, obviously essential to running these facilities, as you can imagine. We've proposed to put in a deposit of $255,000 in an interest bearing escrow account, that roughly is two weeks of utility services. Our exhibit to the motion lists out by utility how much the two weeks is equivalent to. It's a, you know, an estimate obviously the two weeks based on the monthly usage. We've also proposed some procedures as

to how parties could request additional adequate assurance, and in accordance to what I understand is Your Honor’s preference we are not seeking those procedures to be approved today. Instead what we’re seeking is a bridge order that approves the deposit and gives us the protection of adequate assurance on the basis of, you know, temporary basis ending the final hearing. And that’s that the form where you have in front of you in Your Honor. We also spoke to the U.S. Trustee who raised one issue, and their concern is it might be difficult to have that amount of money in one account to get an interest bearing account at an institution, and so you’ll see the order we made just one change which is to reflect that this escrow, I don’t have a blackline but hopefully you do, but if you don’t, it really just says we will enter, put the $255,000 into a newly created segregated interest bearing account, and the new language is (or multiple accounts as necessary) and that’s the adequate assurance deposit. So that’s the only change we did make at the U.S. Trustee’s request.

THE COURT: Okay.

MR. ELLMAN: And with that, we would ask that the motion be approved as a , on a bridge order basis.

THE COURT: All right. Yeah, the bridge order looks fine to me, and with that change that’s fine as well.

MR. ELLMAN: And I guess, Your Honor, at some point

maybe if we have a hearing when we're setting dates, we will need a date on there for an objection date and a hearing date.

THE COURT: All right.

MR. ELLMAN: Thank you very much, Your Honor, that's all I have.

THE COURT: How far out are we talking? Maybe we can talk dates now.

MR. ELLMAN: Well, I think we were talking about having a hearing maybe on final DIP financing around I think the 24th of this month, I think it's a Tuesday.

THE COURT: It is.

MR. ELLMAN: I don't know if we've talked to everyone, but I think it worked for a lot of people's calendars.

THE COURT: All right. At 2:00, does that work?

MR. ELLMAN: It certainly works for me, Your Honor.

UNIDENTIFIED SPEAKER: On April 24th, Your Honor?

THE COURT: On April 24th, a Tuesday. All right. Then I will fill that date in here as well.

MR. ELLMAN: Thank you, Your Honor. And as far as an objection deadline, I assume you'll fill that in as well for that.

THE COURT: Yeah, that'll be the week before April 17th.

MR. ELLMAN: April 17th.

THE COURT: Okay.

MR. ELLMAN: Thank you, Your Honor. I'll turn the podium back to Mr. Keller.

THE COURT: Okay.

MR. KELLER: Thank you, Your Honor. We have been negotiating a number of issues such that there have been some substantive changes to the form of the order that was proposed as well as to the underlying credit agreement. I think it would assist the Court if I might approach the bench and hand up a revised form of order with a blackline, if I may approach.

THE COURT: You may. Thank you.

MR. KELLER: By way of background, prior to the commencement of the case, the Debtor had about $11.5 million in first lien term loans and a revolver that was approximately $48 million. On top of that are substantial second lien loans. And in approaching the prospect of this bankruptcy case, we knew that it would be essential to have a Debtor in possession financing facility. First we needed the use of cash collateral and the ability to access cash as our working capital needs fluctuated. Perhaps more importantly, and it has been validated in the last day, our vendors as a condition to doing business are all asking us whether we have postpetition financing and what the scope in terms of that

is. So it turned out to be an essential element of our proceeding forward to explain that we do in fact have the support of our secured lenders.

As I indicated, Your Honor, we do have in the courtroom Mr. David Beckham, he is the Chief Restructuring Officer of the affiliated Debtors. If Mr. Beckham were called to testify he would testify that he spoke to approximately six potential alternative lenders ranging from traditional banks doing asset based financing to alternative lenders. He presented the terms upon which the Debtor could borrow and found that there were no lenders that would lend on terms that were as favorable or more favorable than the terms that are presented in the proposal before Your Honor. Before I turn to the changes, I just wanted to score a few of the items that are included in the proposal. It is what we have been calling a creeping rollover, whereas as we collect the assets that belong to the prepetition lenders, we are turning the proceeds over to prepetition lenders and paying down revolving loan. As we purchase new inventory and that inventory proceeds through the change until it ultimately becomes proceeds, that will be, those advances will come from the new facility and will be, the assets that are purchased will be the underlying collateral for the new facility. The Debtor in possession facilities pricing is in fact lower than the prepetition credit agreement. The DIP loan is at the

contract rate set forth in the first lien document, the DIP loan, default interest will be the same interest plus 200 basis points. The fees are $250,000 facility fee and $100,000 agency fee which we think is very reasonable for the size of this facility. We will continue to employ a borrowing base borrowing facility which will provide for the seamless operations of the Debtors. The revised order indicates that one of the issues that was only implicit in the prior order was there is an express right to reallocate adequate protection or roll up payments in the event that Your Honor determines that the prepetition lenders did not maintain valid enforceable liens after review by the creditors committee or other interested parties.

And then with that I refer to the changes, there were two sets of changes, one that was requested by the second lien lenders. By and large the second lien lenders were prepared to consent to the financing, they have agreed to consent, they're represented by counsel today. We did not include detailed provisions for the review and allowance of their claims in the first draft that has been included in the draft, and you'll see those provisions in the blackline. Those provisions are substantially similar to the provisions that were included in the, or included for the benefit of the first lien lenders. We have consulted with the company, and the company has consented to include those provisions. I

would note just as a typo, or an error in the last moment, in D sub 1, in the order before Your Honor, we struck a few words that were simply not intended to be included.

THE COURT: What page are you on?

MR. KELLER: It is at page 8. The words are, but excluding any obligations under the term B loans, the term B loans were a small tranche that were held by Yucaipa's part of the first part of the loan obligations, and they were not meant to be called out, or after the discussions it was determined they were not to be called out, so we have stricken that in the order that was handed up to Your Honor.

The second set of changes were changes that were made at the request of the United States Trustee. That negotiation or discussion really occurred between bank’s counsel and the United States Trustee. And to address those I propose to introduce Ms. Hagle from the Sidly & Austin firm.

THE COURT: Okay.

MR. KELLER: Thank you.

MS. HAGLE: Good afternoon, Your Honor. How would Your Honor propose that I proceed? I can give you some general background of support, I can address the U.S. Trustee comments specifically. I have one other change, interlineation to the DIP order that needs to be made as well.

THE COURT: All right. Well just tell me the changes I guess.

MS. HAGLE: Okay. With respect to, just flipping through the blackline if that's the easiest thing probably. One page 2, based on revised DIP budgets, and again we apologize, Your Honor, as was explained by Mr. Keller, the events precipitating this bankruptcy required everyone to be moving very quickly. The overall amount of the DIP loans will be $56 million, and that's reflected on page 2. On page 3, we have further clarified that the DIP loans and the priming nature of the DIP loans are --

THE COURT: What page, I'm sorry?

MS. HAGLE: Page 3, paragraph 4.

THE COURT: Okay.

MS. HAGLE: That the priming nature of the DIP loans are in fact subject to permitted liens as that definition is provided in the credit agreement. I'll skip over any typos or non, what I would view to be sort of non-substantive changes that were just fixes. I think the next change, and anyone feel free to correct me if I'm wrong, the next substantive change is on page 7. In addition to updating some of the numbers with respect to the outstandings, we just wanted to clarify, under the existing prepetition debt, Your Honor, there is a revolving loan, a term A loan and a term B loan. The term B loan was occasioned by the investment,

additional investment of the current equity sponsors, and therefore is subject to turnover in respect to the term loan A, so we're just clarifying that although the term loan B will get the benefit of adequate protection by virtue of replacement liens and super priority claims junior to the DIP that to the extent interest is paid on account of the term loan B which is only $1.4 million will be subject to the turnover provisions and be turned over to the term loan A lenders as contemplated by the adequate protection being awarded to the first lien lenders.

Mr. Keller already pointed out the fix of deletion of the language in paragraph romanette (i) on page 8, and again that is to give both the term loan A and B under the prepetition debt, the benefit of the stipulations of the Debtor, as it's all part of the same facility. With respect to the Debtor's stipulations on the second lien obligations, I think Mr. Keller already walked you through the company's position with respect to inserting those provisions which you'll see crossing the redline language into page 11 and 12. On page 15, paragraph K is just reflecting that we have now received subject to these changes the consent of the second lien lenders, and therefore, I don't think we need to get into any of the terms of the inter creditor agreement or what they might or might not have been bound to as it is now moot. The next change is at the bottom of page 16 and into page 17.

And again giving the second lien lenders the benefit of the section 552 provisions. Moving under the order, again the changes on page 18 in paragraph 3 are just reflecting the revised amount of the DIP loan at $56 million. There is a change on the waterfall provision on page 19, the waterfall dealing with how proceeds as they roll into this facility are going to be advanced, and including provision for the mechanics of application of postpetition proceeds against the rollup. At the bottom of the page, under paragraph E, 6th should be 5th to reflect that 5th was deleted. And in the next provision the language should be stetted or reinstated 6th to payment of any other amounts under the DIP facility, period, with the balance of that paragraph which was formerly 7th to be deleted.

THE COURT: Okay.

MS. HAGLE: On page 21, there is a typo in the redline language. And again I apologize, we were working on a number of interlineations and objections and comments so we thought it was better to try to get as far as we could. Copies of any invoices with respect to such fees, expenses and costs shall and delete O-V-E, be provided to the U.S. Trustee.

THE COURT: All right.

MS. HAGLE: Flip all the way to page 28, Your Honor, clarifying that the second lien lenders will be entitled to

the adequate protection that they are entitled to under the operative intercreditor agreement which is just basic junior replacement liens and super priority claims but no cash adequate protection payments. And that covers the language into 29 and page 30. And further deleted language in paragraph 15 based on comments that we had received from the U.S. Trustee and others. Page 31 also addressing comments of the U.S. Trustee related to our contemplation of the possible appointment of a committee and committee counsel including them in the carve out, increasing the post event of default carve out to $250,000, so the overall carve out is comprised of any amounts budgeted prior to an event of default including paid and accrued, but unpaid. And then if there were to be an event of default a $250,000 cap in addition to budgeted amounts. The insertion of the word actually about maybe a little bit more than half is in response to the U.S. Trustee’s clarification that the carve out, again comprised of the total budget plus the 250, is only reduced dollar for dollar by any amounts actually paid as opposed to accrued and unpaid. Paragraph 17, in response to the U.S. Trustee’s comment, there may be other parties in interest other than the committee that might want to avail themselves of the investigation period, we did not mean to infer that other people would not have the same rights. Or maybe we did but we got caught. But I won’t admit it. On page 34, again

comments from the U.S. Trustee verifying that if a Trustee were to be appointed during this case, before the investigation termination date or if there were any proceedings to be commenced that they can get the benefit of those proceedings even though they weren't part of the reference during the investigation period. The changes on page 36 are really giving general further assurance rights with respect to perfecting liens and taking actions with respect to rights related to adequate protection for the benefit of the second lien lenders.

THE COURT: Okay.

MS. HAGLE: Page 39 is just a clarification of what we all know to be true and that is that the Court may consider any matters that you would like to consider, but in the context of this paragraph if there were to be an event of default we were to come in and argue about whether or not there was an event of default, we did not mean to infer that you couldn't consider other things, so clarifying that in response to a U.S. Trustee comment.

THE COURT: Okay.

MS. HAGLE: With respect to paragraph 26(c) the intent of that with respect to the second lien's right to credit bid should be deleted.

THE COURT: Start over again, with respect to 26(c)?

MS. HAGLE: Yes, on page 41.

THE COURT: All of it should be deleted?

MS. HAGLE: All of it should be deleted and replaced with the following language.

THE COURT: Okay.

MS. HAGLE: And it's a short sentence, Your Honor, do you mind if I give it to you?

THE COURT: Go ahead.

MS. HAGLE: I'm sorry.

THE COURT: No problem.

MS. HAGLE: In real time. The second lien agent shall retain any and all rights that it may have on behalf of the second lien lenders as set forth in the inter creditor agreement.

THE COURT: Okay.

MS. HAGLE: We didn't want to go through and figure out what rights that had or if they had a right to credit bid, and so that seemed like a fair fix. And I'm assuming that's okay. I discussed that specifically and I'm looking right now to counsel for the second liens with Munger. Paragraph 29 is I think a very important point with respect to the Court's ability to reallocate any payments that it is approving with respect to the roll up adequate protection or otherwise for the benefit of the first lien lends in the event that it is ultimately determined that the liens and security interest of the first lien lenders are invalid. We

skip to page 47 at the bottom, and again this is in response to a U.S. Trustee comment that had attempted to limit what you might or might not be able to do with respect to a chapter 11 conversion order, dismissal order.

THE COURT: All right.

MS. HAGLE: Deleting that language. I think I hit the high points. I'm looking at the U.S. Trustee to confirm that I've hit everything. Thank you. And I want to thank you again, the U.S. Trustee for being so constructive and quick.

THE COURT: Okay. Does that resolve all of the U.S. Trustee's concerns?

MR. KENNEY: Yes, Your Honor.

THE COURT: All right. Good. I want to thank the parties for that. I just note from the budget, it appears that the roll up will be complete in the next three weeks. Am I correct?

MS. HAGLE: Depending on how the cash comes in. And again projections are difficult with the level of cash that moves through this company, virtually complete.

THE COURT: Okay. And based on the, without prejudging any bid procedures motion, based on the timeframe, when would any sale hearing be held?

MS. HAGLE: The sale hearing would be targeted for the 76th day which would be as soon as possible day after

which the investigation period has expired, in the event that the lenders want to credit bid. And then the sale would be targeted to close by the 87th day. So generally within a three month time period but tied to the standard investigation period. And frankly what Imperial Capital, the investment banker, has indicated to us to be a relatively fair and robust marketing time period, there are a relatively closed number of potential buyers, it's not in the hundreds. And as Mr. Keller indicated, the investment banker has been up and running now for about a week and a half and has already gotten out a fair number of NDA's, so we feel confident that this is a fair period of time.

THE COURT: All right. Mid June is that what we're talking about, end of June for the sale to be complete is what we're talking about?

MS. HAGLE: Yeah.

THE COURT: All right. Again, without prejudging it.

MS. HAGLE: That's correct. We can always make adjustments if things go well, better than anticipated.

THE COURT: All right. I think you've dealt with my issues. I want to thank the U.S. Trustee. All right. No other issues?

MS. HAGLE: No other issues. If you have no questions, I will --

THE COURT: I have none. And based on the declaration and the revisions I will enter the order. Do the handwritten changes exist on here?

MR. DEHNEY: Your Honor, Robert Dehney. I just want the opportunity to review the changes with my co-counsel, so I've asked counsel for the ability to do that. But otherwise, everything sounds fine.

MR. KELLER: Your Honor, in response to the question that I didn't answer, I think probably the most prudent thing to do particularly in light of Mr. Dehney's request, is that we get an authorized form of the order and we provide it to your clerk, we can do that here in real time --

THE COURT: All right.

MR. KELLER: -- rather than allowing ambiguities.

THE COURT: I'll give the original back to you so that you can be sure that it includes the last changes. In addition, if I can go back to the utility bridge order, I note that it says that the deposit is due within 21 days of the petition date, but I think you need to do it within 20 or risk turn off, shut off of utilities.

MR. KELLER: That would be fine, Your Honor, I think that's probably prudent, and we can make that change or you can make it --

THE COURT: I'll just make the handwritten changes.

MR. KELLER: -- within 20 days. Thank you. I think

we will get it done sooner in any event. Thank you.

THE COURT: All right.

MR. KELLER: Your Honor, then just as final housekeeping, I'm not sure if it's necessary that as a formal matter I move the affidavit of Mr. Allen in. But to the extent that that's required, we would move that that be admitted.

THE COURT: All right. It will be admitted since he's here and available for cross.

MR. KELLER: And then secondly, just again to be sure, we did not, we omitted an objection deadline for the DIP financing hearing. May I suggest April 17th, the week before the hearing?

THE COURT: Yes.

MR. KELLER: Thank you, Your Honor. I don't believe we have any other matters, Your Honor. I thank you for your time.

THE COURT: All right. We can stand adjourned, and you can hand the final order to my clerk.

MR. KELLER: Thank you, Your Honor.

THE COURT: Thank you.

(Hearing adjourned 4:03 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*/s/ Theresa Pullan* — April 11, 2012

Theresa Pullan, CET**D-650 — Date