# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| AFA INVESTMENT INC., *et al.*,[1] | : | Case No. 12-11127 (MFW) |
| Debtors. | : | Jointly Administered |

# DISCLOSURE STATEMENT WITH RESPECT TO JOINT CHAPTER 11 PLAN OF LIQUIDATION OF DEBTORS AND DEBTORS IN POSSESSION

**JONES DAY**
Jeffrey B. Ellman
Brett J. Berlin
Daniel J. Merrett
1480 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309
Telephone: (404) 581-3939
Facsimile: (404) 581-8330

*Counsel to the Debtors*

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones
Timothy P. Cairns
Peter J. Keane
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

*Delaware Counsel to the Debtors*

Dated: December 24, 2013

1 The Debtors are the following nine entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): AFA Investment Inc. (0331); American Foodservice Corporation (1780); American Fresh Foods, Inc. (7389); American Fresh Foods, L.P. (7302); AFA Foods, Inc. (0429); American Fresh Foods, LLC (7301); Fairbank Reconstruction Corporation (2405); American Foodservice Investment Company, LLC (9525); and United Food Group LLC (7584) ("UFG"). Each of the Debtors was formerly located at 860 First Avenue, Suite 9A, King of Prussia, Pennsylvania 19406.

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M. ON [__________], 2014, EASTERN TIME. TO BE COUNTED, THE VOTING AND CLAIMS AGENT MUST ACTUALLY RECEIVE YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE.**

**CERTAIN INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND ANY EXHIBITS ATTACHED HERETO IS SPECULATIVE, AND PERSONS SHOULD NOT RELY ON SUCH DOCUMENTS IN MAKING INVESTMENT DECISIONS WITH RESPECT TO (A) THE DEBTORS OR (B) ANY OTHER ENTITIES THAT MAY BE AFFECTED BY THE CHAPTER 11 CASES.**

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. HOWEVER, THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED FOR REVIEW AND APPROVAL. PENDING FINAL APPROVAL, THE DEBTORS HAVE REQUESTED PRELIMINARY APPROVAL OF THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION FOR THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN, SUBJECT TO FINAL APPROVAL AT THE COMBINED HEARING (DEFINED BELOW).**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THEIR JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN. YOU SHOULD NOT RELY UPON OR USE THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. RATHER, HOLDERS OF CLAIMS AND INTERESTS AND OTHER ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR CAUSE OF ACTION, CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT. THE PLAN ADMINISTRATOR MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS. THE PLAN RESERVES FOR THE PLAN ADMINISTRATOR THE RIGHT TO BRING CAUSES OF ACTION (DEFINED IN THE PLAN) AGAINST ANY ENTITY OR PARTY IN INTEREST EXCEPT THOSE SPECIFICALLY RELEASED. SUCH CAUSES OF ACTION MAY INCLUDE, WITHOUT LIMITATION, ACTIONS TO RECOVER AVOIDABLE PREPETITION TRANSFERS, WITH RESPECT WHICH AN AVOIDANCE ACTION COMMITTEE HAS BEEN GRANTED DECISION-MAKING AUTHORITY BY THE DEBTORS AND THE BANKRUPTCY COURT.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE OR MAY BE FILED PRIOR TO THE COMBINED HEARING. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS AND THEIR BOOKS AND RECORDS EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' CHIEF RESTRUCTURING OFFICER HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, NO ENTITY HAS AUDITED THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DEBTORS FILED THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE

DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM OR INTEREST IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN.

# TABLE OF CONTENTS


Page

I. SUMMARY ..... 1
- A. The Purpose of the Disclosure Statement ..... 1
- B. The Purpose of the Plan ..... 1
- C. Treatment of Claims and Equity Interests ..... 1
- D. Entities Entitled to Vote on the Plan ..... 5
- E. Solicitation ..... 6
- F. Voting Procedures ..... 7
- G. Combined Disclosure Statement Approval and Confirmation Hearing ..... 7

II. BACKGROUND TO THESE CHAPTER 11 CASES ..... 8
- A. Events Leading to the Commencement of the Chapter 11 Cases ..... 8
- B. The Debtors' Former Business ..... 9
  - 1. The Debtors' Former Operations ..... 9
  - 2. Employees ..... 9
  - 3. Directors ..... 10
- C. The Debtors' Corporate Structure ..... 10
- D. Summary of Prepetition Indebtedness ..... 10
  - 1. The First Lien Credit Facility ..... 10
  - 2. The Second Lien Credit Facility ..... 11
  - 3. Municipal Development Bond Financing ..... 11
  - 4. Unsecured Trade Debt ..... 11
  - 5. Lease Obligations ..... 12
- E. The Prepetition Product Recalls and Related Litigation ..... 12
  - 1. The Northeast Outbreak and Related Litigation with GOPAC ..... 12
  - 2. The Western States Outbreak and Related Litigation with Cargill ..... 14

III. ADMINISTRATION OF THE CHAPTER 11 CASES ..... 14
- A. Overview of Chapter 11 ..... 14
- B. Initial Motions and Certain Related Relief ..... 14
  - 1. Motion to Approve the Debtor in Possession Financing Facility ..... 15
  - 2. Motion to Authorize Procedures for the Assertion of Twenty-Day Claims ..... 16
  - 3. Applications to Retain Professionals ..... 16
  - 4. First Day Relief ..... 16
- C. Official Committee of Unsecured Creditors ..... 17
- D. Filing of Schedules and Setting of Bar Dates ..... 17
- E. Asset Sales ..... 17
  - 1. The Marketing Process ..... 17

# TABLE OF CONTENTS
(continued)

Page


2. The Sales of the California Assets and the Georgia Assets .... 18
3. The Sales of the Pennsylvania Assets, the Texas Assets and the New York Assets .... 18

F. Assets Remaining After the Sales of the Facilities .... 18
G. Satisfaction of the DIP Facility .... 19
H. The Debtors' Use of Cash Collateral After Satisfying the DIP Facility .... 20
I. The Committee Investigation of the Second Lien Lenders' Liens .... 20
J. The WARN Action .... 21
K. Avoidance Actions .... 22
L. Disallowance of the GOPAC Claims .... 23
M. The Global Settlement .... 23

1. Summary of the Underlying Disputes .... 23
2. The Original Settlement .... 24
3. Renegotiation to Reach the Global Settlement .... 24
4. The Settlement Hearing and Approval of the Global Settlement .... 25
5. Summary of Key Terms of the Global Settlement .... 25
6. Diagram of the Flow of Funds Under the Global Settlement .... 28
7. Appeal of the Global Settlement Approval Order .... 30
8. Effectiveness and Implementation of the Global Settlement .... 30

IV. PLAN TERMS FOR TREATMENT OF CLAIMS AND EQUITY INTERESTS .... 30

A. Summary .... 30
B. Administrative Claims and Priority Claims .... 30

1. Administrative Claims .... 30
2. Priority Tax Claims .... 31
3. Adequate Protection Claim .... 31
4. WARN Claims .... 31
5. Reclamation Claims .... 31

C. Classes of Claims and Equity Interests: Classification, Treatment and Voting Rights .... 31

1. Non-Tax Priority Claims (Class 1) .... 31
2. Second Lien Lender Secured Claims (Class 2) .... 32
3. Other Secured Claims (Class 3) .... 32
4. Twenty-Day Claims (Class 4) .... 33
5. General Unsecured Claims (Class 5) .... 33
6. Equity Interests (Class 6) .... 33

D. Acceptance or Rejection of the Plan .... 34

# TABLE OF CONTENTS
# (continued)


Page

1. Impaired Classes of Claims Entitled to Vote ..... 34
2. Classes Deemed to Accept the Plan ..... 34
3. Classes Deemed to Reject the Plan ..... 34
4. Nonconsensual Confirmation ..... 34

V. CERTAIN PLAN TERMS FOR MEANS FOR IMPLEMENTATION OF THE PLAN ..... 34
A. Corporate Action; Winding Up of Affairs; Closing of the Cases ..... 34
B. Revesting of Assets Free and Clear ..... 35
C. Source of Funds for Plan Distributions ..... 36
D. Plan Administrator ..... 36
E. Resignation, Death or Removal of Plan Administrator ..... 37
F. Substantive Consolidation ..... 37
G. Compromise and Settlement of Twenty-Day Claims ..... 38
H. Dissolution of the Committee ..... 38
I. Creditor Advisory Board ..... 38

VI. CERTAIN PLAN TERMS GOVERNING DISTRIBUTIONS ..... 38
A. Reserves ..... 38
B. Delivery of Distributions ..... 39
C. Application of Distributions ..... 39

VII. CERTAIN PLAN TERMS CONCERNING DISPUTED CLAIMS ..... 39
A. No Distribution Pending Allowance ..... 39
B. Resolution of Disputed Claims ..... 39
C. Objection Deadline ..... 40
D. Estimation of Claims ..... 40

VIII. PLAN TERMS FOR TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..... 40
A. Rejection/Assumption of Executory Contracts and Unexpired Leases ..... 40
B. Claims Based on Rejection of Executory Contracts or Unexpired Leases ..... 41

IX. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ..... 41
A. Conditions Precedent to Confirmation ..... 41
B. Conditions Precedent to the Effective Date ..... 41

X. RELEASES, INJUNCTIONS AND RELATED PROVISIONS ..... 42
A. Compromise and Settlement ..... 42
B. Releases Implemented by the Global Settlement Approval Order ..... 42
C. Exculpation ..... 42
D. Vesting and Preservation of Causes of Action ..... 42

# TABLE OF CONTENTS
## (continued)

Page


E. Release and Injunction ....43

F. Releases of Liens ....44

XI. CONSOLIDATION OF THE DEBTORS AND CANCELLATION OF INTERCOMPANY CLAIMS ....44

XII. RETENTION OF JURISDICTION ....44

XIII. CERTAIN ADDITIONAL TERMS OF THE PLAN ....45

A. Final Fee Applications ....45

B. Payment of Statutory Fees ....45

C. Modification of Plan ....45

D. Revocation of Plan ....46

E. Successors and Assigns ....46

F. Governing Law ....46

G. Reservation of Rights ....46

H. Section 1146 Exemption ....46

I. Section 1125(e) Good Faith Compliance ....46

J. Plan Controls Disclosure Statement ....47

K. Notices ....47

L. Filing of Additional Documents ....47

XIV. CERTAIN FACTORS TO BE CONSIDERED REGARDING THE PLAN ....47

A. Risks of Delayed Confirmation or Non-Confirmation of the Plan ....47

B. Risks Associated with Proving and Collecting Claims Asserted in Litigation ....47

C. Risks Regarding the Amount of Certain Claims ....48

D. Risks Associated with the Costs of Administering the Estates After the Effective Date ....49

E. Risks Regarding the Consummation of the Global Settlement ....49

XV. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ....49

A. General ....49

B. Federal Income Tax Consequences ....50

1. Federal Income Tax Consequences to Holders of Allowed Claims in Class 2 and Class 4 ....50

2. Certain Other U.S. Federal Income Tax Consequences to Holders of Claims ....50

C. Discussion Intended Only as a Summary ....51

XVI. ALTERNATIVES TO CONFIRMATION OF THE PLAN ....51

A. Acceptance and Confirmation of the Plan ....51

B. General Confirmation Requirements ....51

C. Best Interests Test ....52

**TABLE OF CONTENTS**
**(continued)**

**Page**


D. Financial Feasibility Test ..... 53

E. Acceptance by Impaired Classes ..... 53

XVII. RECOMMENDATION AND CONCLUSION ..... 55

## EXHIBITS

| | |
|---|---|
| **Exhibit A** | Joint Chapter 11 Plan of Liquidation of Debtors and Debtors in Possession[2] (which includes, as an exhibit thereto, the Global Settlement Term Sheet) |

2 Any exhibits to the Plan that are not already attached thereto will be filed with the Bankruptcy Court no later than ten days before the deadline to vote to accept or reject the Plan. Any such additional exhibits will be made available on the website of the Debtors' balloting and tabulation agent, Kurtzman Carson Consultants LLC ("KCC"), at http://www.kccllc.net/afa (the "KCC Website"). The Debtors reserve the right to modify, amend, supplement, restate or withdraw the exhibits after they are filed and will promptly make such changes available on the KCC Website.

# I. SUMMARY[3]

## A. The Purpose of the Disclosure Statement

Before soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires the debtor (or other plan proponent) to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the chapter 11 plan. Pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rules 3016 and 3017, the Debtors submit this Disclosure Statement to holders of Claims and Equity Interests in connection with the solicitation of votes to accept or reject the Plan.

The Debtors submit that this Disclosure Statement has been prepared in accordance with the requirements of section 1125 of the Bankruptcy Code. The Debtors have requested that the Bankruptcy Court approve this Disclosure Statement on a preliminary basis for the solicitation of votes on the Plan, subject to final approval of the adequacy of the information contained herein. The Bankruptcy Court will consider final approval of the Disclosure Statement under section 1125 of the Bankruptcy Code, along with Confirmation of the Plan, at the Combined Hearing, which is scheduled for [_________], 2014 at [__:__] [_].m., Eastern Time. **[To be updated after initial hearing.]**

## B. The Purpose of the Plan

On December 24, 2013, the Debtors filed the Plan with the Bankruptcy Court to facilitate the continued liquidation and distribution of the Debtors' remaining and the wind down of these Estates, consistent with the Global Settlement previously approved by the Bankruptcy Court. The Debtor's remaining assets consist mainly of sale proceeds and certain Causes of Action, as explained further below. A copy of the Plan is attached hereto as **Annex A** and incorporated herein by reference.

The Debtors believe the Plan provides the best recoveries possible for those holders of Allowed Claims anticipated to receive distributions under the Plan. The Debtors strongly recommend that all such holders who are entitled to vote should vote to accept the Plan.

Pursuant to section 1141(d)(3) of the Bankruptcy Code, the Plan does not contain a discharge for the Debtors because: (1) the Plan is a liquidating plan, (2) the Debtors will not engage in business after the consummation of the Plan and (3) the Debtors are not entitled to a discharge under section 727(a) of the Bankruptcy Code.

The following summary of certain key terms of the Plan is qualified in its entirety by the Plan itself and by the more detailed information contained elsewhere in this Disclosure Statement.

## C. Treatment of Claims and Equity Interests

THE FOLLOWING CHART IS A SUMMARY OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS AND THE POTENTIAL DISTRIBUTIONS UNDER THE PLAN. THE AMOUNTS SET FORTH BELOW ARE ESTIMATES ONLY. REFERENCE SHOULD BE MADE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN FOR A COMPLETE DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS. THE RECOVERIES SET FORTH BELOW ARE PROJECTED RECOVERIES AND ARE SUBJECT TO CHANGE. ACTUAL RECOVERIES COULD VARY MATERIALLY FROM THOSE PROJECTED BELOW. IN ADDITION, THE ALLOWANCE OF CLAIMS MAY BE SUBJECT TO LITIGATION OR OTHER ADJUSTMENTS, AND ACTUAL ALLOWED CLAIM AMOUNTS MAY DIFFER MATERIALLY FROM THE ESTIMATED AMOUNTS USED TO PROJECT RECOVERIES UNDER THE PLAN.

[3] Capitalized terms not otherwise defined herein have the meanings given to them in the Plan.

| Class/Type of Claim or Interest | Plan Treatment of Class | Projected Estimated Recovery Under Plan |
|---|---|---|
| Administrative Claims | Unless otherwise agreed by the holder of an Allowed Administrative Claim and the Debtors or the Liquidating Debtors, or unless a Final Order of the Bankruptcy Court provides otherwise, each holder of an Allowed Administrative Claim will receive, in full satisfaction of its Allowed Administrative Claim, Cash equal to the full unpaid amount of such Allowed Administrative Claim, from the Plan Reserve and, only if and to the extent that the Plan Reserve has insufficient funds and after consultation with the Creditor Advisory Board, then from the Creditor Recovery Pool, either: (a) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (b) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due); (c) at such time and upon such terms as may be agreed upon by the Debtors or the Liquidating Debtors and the holder of an Allowed Administrative Claim; or (d) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court. **For the avoidance of doubt, Administrative Claims do not include Twenty-Day Claims, WARN Claims and Reclamation Claims.** | 100% |
| Priority Tax Claims | Each Holder of an Allowed Priority Tax Claim will be paid in respect of such Allowed Priority Tax Claim, from the Plan Reserve and, only if and to the extent that the Plan Reserve has insufficient funds and after consultation with the Creditor Advisory Board, then from the Creditor Recovery Pool, either (a) the full amount thereof, without postpetition interest or penalty, in Cash, as soon as practicable after the later of (i) the Effective Date or (ii) ten Business Days after the date on which such Claim becomes an Allowed Priority Tax Claim, or (b) such lesser amount as to which the holder of an Allowed Priority Tax Claim and the Debtors might otherwise agree. | 100% |

| Class/Type of Claim or Interest | Plan Treatment of Class | Projected Estimated Recovery Under Plan |
|---|---|---|
| WARN Claims | WARN Claims will be satisfied pursuant to the terms of the Final WARN Settlement Order, solely from Avoidance Action Recoveries (as such term is defined in the Global Settlement). Total recovery for the WARN Claims is capped at $1,650,000.00 per the Global Settlement. | 80% to 100% of the maximum negotiated settlement amount provided for in the Global Settlement Approval Order and the Final WARN Settlement Order |
| Class 1 – Non-Tax Priority Claims | Unless otherwise agreed to by a holder of an Allowed Non-Tax Priority Claim and, as applicable, the Debtors or the Liquidating Debtors, as soon as practicable after the later of (a) the Effective Date and (b) the date on which the subject Non-Tax Priority Claim becomes Allowed, each holder of an Allowed Claim in Class 1 will receive, in full and final satisfaction of its Allowed Non-Tax Priority Claim, Cash equal to the full unpaid amount of such Allowed Class 1 Claim, from the Plan Reserve and, only if and to the extent that the Plan Reserve has insufficient funds and after consultation with the Creditor Advisory Board, then from the Creditor Recovery Pool, after the payment of or reserve for, in full, all Administrative Claims and Priority Tax Claims. | 100% |
| Class 2 – Second Lien Lender Secured Claims | Each holder of Allowed Claims in Class 2 will receive, in full and final satisfaction of its Allowed Second Lien Lender Secured Claim, the applicable amount(s) provided for such holder under the Global Settlement and Global Settlement Approval Order, pursuant to the terms thereof, to the extent not previously paid. The Liquidating Debtors shall pay such amounts solely to the party specified under the Global Settlement (*i.e.*, ACAS or the SPV, as applicable), on behalf of the holder of the Allowed Claim. Such payments shall be made as soon as practicable after the Effective Date, or as otherwise provided in the Global Settlement. Additional details concerning the Second Lien Lender Secured Claims and the amounts allocated to them can be found in the Global Settlement Term Sheet included as an exhibit to the Plan, in the discussions of the Debtors' prepetition and postpetition secured indebtedness in Sections II.D, III.B.1, III.G and III.H below and in the discussion of the Global Settlement in Section III.M below. | Impaired recoveries vary per Claimant as negotiated and allocated in the Global Settlement, with no Claimant receiving full recovery |

| Class/Type of Claim or Interest | Plan Treatment of Class | Projected Estimated Recovery Under Plan |
| --- | --- | --- |
| Class 3 – Other Secured Claims | Unless otherwise agreed to by a holder of an Allowed Other Secured Claim and, as applicable, the Debtors or Liquidating Debtors, as soon as practicable after the later of (a) the Effective Date and (b) the date on which the subject Other Secured Claim becomes Allowed, each holder of an Allowed Claim in Class 3 will receive a Cash payment, from the Plan Reserve and, only if and to the extent that the Plan Reserve has insufficient funds and after consultation with the Creditor Advisory Board, then from the Creditor Recovery Pool, equal to the amount of its Allowed Other Secured Claim, in full and final satisfaction of such Allowed Claim. | 100% |
| Class 4 – Twenty-Day Claims | As soon as practicable after the Effective Date, subject to the funding of the Creditor Recovery Pool consistent with the Global Settlement, the Liquidating Debtors shall pay each holder of an Allowed Twenty-Day Claim, in full and final satisfaction of such Allowed Twenty-Day Claim, its Pro Rata share of the Creditor Recovery Pool (after the payment of or reserve for, in full, Administrative Claims, Priority Tax Claims and Other Secured Claims to the extent such Allowed Claims are payable from the Creditor Recovery Pool), up to the full amount of such Allowed Claim. The Creditor Recovery Pool will be funded as set forth in the Global Settlement Term Sheet from a portion of (a) the Miscellaneous Assets (or proceeds thereof); (b) Litigation Claim Recoveries, if any; and (c) Avoidance Action Recoveries, if any. Additional details can be found in the Global Settlement Term Sheet included as an exhibit to the Plan, in the discussion of the Global Settlement in Section III.M below and in the discussion of Twenty-Day Claims in | 5% to 58%[4] |

4 The recovery for holders of Allowed Twenty-Day Claims will depend on, among other things, (a) the amount of other Allowed Administrative Claims, Priority Tax Claims and costs of administering the Plan; and (b) the recoveries on Avoidance Actions and Causes of Action. The Debtors believe that Distributions of materially more than 5% for Twenty-Day Claims are unlikely unless the Debtors achieve substantial recoveries in the Litigation Claims and Avoidance Actions. The Litigation Claims and Avoidance Actions are subject to significant contingencies and uncertainties, many of which are outside the Debtors' control. Likewise, the timing of those matters is uncertain. Even if the Debtors are successful in these matters, recoveries to Allowed Twenty-Day Claims could be delayed. There is no assurance of any particular recovery, and recoveries could fall outside of the projected range. These matters are discussed further in Sections II.E, III.K and XI.B below.

| Class/Type of Claim or Interest | Plan Treatment of Class | Projected Estimated Recovery Under Plan |
|---|---|---|
| | Section III.B.2 below. | |
| Class 5 – General Unsecured Claims | As soon as practicable after the payment in full of, or reserve for, all other Allowed Claims payable from, and expenses funded by, the Creditor Recovery Pool, the Liquidating Debtors shall pay each holder of an Allowed General Unsecured Claim, in full and final satisfaction of such Allowed General Unsecured Claim, its Pro Rata share of any remaining amounts in the Creditor Recovery Pool, subject to the terms and conditions set forth in the Global Settlement and Global Settlement Approval Order. **No distribution to Class 5 General Unsecured Claims is anticipated.** | 0% |
| Class 6 – Equity Interests | Holders of Equity Interests shall neither receive nor retain any property under the Plan on account of such Equity Interests. On the Effective Date or on such later date as determined by the Plan Administrator, all Class 6 Equity Interests shall be deemed canceled, null and void and of no force and effect. | 0% |

## D. Entities Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against, and interests in, a debtor are entitled to vote on a chapter 11 plan. Holders of Claims that are not Impaired by the Plan are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code and therefore are not entitled to vote on the Plan. Holders of claims that will not receive a distribution under the Plan are deemed conclusively to reject the Plan and therefore are not entitled to vote on the Plan.

Claims and Equity Interests are classified for all purposes, including voting, confirmation and Distribution pursuant to the Plan and sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or an Equity Interest to be classified in a particular Class only to the extent that the Claim or the Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of the Claim or Equity Interest qualifies within the description of a different Class.

The following sets forth the Classes that are entitled to vote on the Plan and the Classes that are not entitled to vote on the Plan:

| SUMMARY OF STATUS AND VOTING RIGHTS | | | |
|---|---|---|---|
| **Class** | **Claim** | **Status** | **Voting Rights** |
| 1 | Non-Tax Priority Claims | Unimpaired | Not entitled to vote; deemed to accept |
| 2 | Second Lien Lender Secured Claims | Impaired | Entitled to vote |
| 3 | Other Secured Claims | Unimpaired | Not entitled to vote; deemed to accept |
| 4 | Twenty-Day Claims | Impaired | Entitled to vote |
| 5 | General Unsecured Claims | Impaired | To preserve estate resources and because no distribution to holders of Class 5 Claims is anticipated, the Debtors have determined (i) not to solicit votes from Class 5, (ii) to deem Class 5 to reject the Plan and (iii) to seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code |
| 6 | Equity Interests | Impaired | Not entitled to vote; deemed to reject |

THE DEBTORS ARE SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN FROM HOLDERS OF CLAIMS IN **CLASSES 2 AND 4** BECAUSE SUCH CLAIMS ARE IMPAIRED AND WILL POTENTIALLY RECEIVE DISTRIBUTIONS UNDER THE PLAN. ACCORDINGLY, HOLDERS OF CLAIMS IN **CLASSES 2 AND 4** HAVE THE RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS ARE NOT SOLICITING VOTES FROM THE HOLDERS OF CLAIMS IN **CLASSES 1 AND 3** BECAUSE SUCH CLAIMS ARE UNIMPAIRED AND DEEMED TO ACCEPT THE PLAN.

THE DEBTORS ARE NOT SOLICITING VOTES FROM THE HOLDERS OF CLAIMS IN **CLASS 5** BECAUSE NO DISTRIBUTION IS ANTICIPATED TO THE HOLDERS OF SUCH CLAIMS AND THEY ARE DEEMED TO REJECT UNDER THE TERMS OF THE PLAN.

THE DEBTORS ARE NOT SOLICITING VOTES FROM THE HOLDERS OF EQUITY INTERESTS IN **CLASS 6** BECAUSE THE SUCH HOLDERS WILL RECEIVE NO DISTRIBUTION UNDER THE PLAN AND ARE DEEMED TO REJECT THE PLAN.

For a detailed description of the Classes of Claims and Equity Interests, as well as their respective treatment under the Plan, see Article III of the Plan.

**E. Solicitation**

The following documents and materials constitute the Debtors' solicitation package (the "Solicitation Package"), which will be sent **solely** to the holders of Claims in Classes 2 and 4:

THE PLAN;

THE DISCLOSURE STATEMENT;

NOTICE OF THE HEARING AT WHICH APPROVAL OF THE DISCLOSURE STATEMENT AND CONFIRMATION OF THE PLAN WILL BE CONSIDERED ("COMBINED HEARING NOTICE");

AN APPROPRIATE BALLOT AND VOTING INSTRUCTIONS; AND

A PRE-ADDRESSED, POSTAGE PREPAID ENVELOPE FOR RETURNING THE BALLOT.

**All other interested parties will be sent solely the Combined Hearing Notice and can review or obtain copies of the Plan and the Disclosure Statement on the KCC Website or, upon written request, from counsel for the Debtors.**

## F. Voting Procedures

**The Voting Record Date is [ ], 2014.** The Voting Record Date is the date on which the holders of Claims that are entitled to vote to accept or reject the Plan will be determined.

**The Voting Deadline is 4:00 p.m., Eastern Time, on [ ], 2014**. To ensure that a vote is counted, holders of Claims in **Classes 2 and 4** must: (1) complete the Ballot; (2) indicate a decision either to accept or reject the Plan; and (3) sign and return the Ballot to KCC at the address set forth below and on the pre-addressed envelope provided in the Solicitation Package or by delivery by first-class mail, overnight courier or personal delivery, so that all Ballots are **actually received** by KCC no later than the Voting Deadline.

ANY BALLOT THAT IS NOT RECEIVED BY THE VOTING DEADLINE WILL NOT BE COUNTED.

ANY BALLOT THAT IS PROPERLY EXECUTED BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED.

EACH HOLDER OF A CLAIM THAT IS ENTITLED TO VOTE MUST VOTE ALL OF ITS CLAIM WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT ITS VOTE(S). IF YOU CAST MORE THAN ONE BALLOT VOTING THE SAME CLAIM ON OR BEFORE THE VOTING DEADLINE, THE LAST BALLOT RECEIVED BEFORE THE VOTING DEADLINE WILL BE DEEMED TO REFLECT YOUR INTENT AND THUS WILL SUPERSEDE ANY PRIOR BALLOTS.

| **BALLOTS** |
|---|
| Ballots must be **actually received** by KCC<br>by the Voting Deadline at the following address: |
| AFA Ballot Processing Center<br>c/o Kurtzman Carson Consultants LLC<br>2335 Alaska Avenue<br>El Segundo, CA 90245 |

Prior to deciding whether and how to vote on the Plan, holders of Claims in **Classes 2 and 4** under the Plan should consider carefully all of the information in this Disclosure Statement, especially the risk factors described herein.

## G. Combined Disclosure Statement Approval and Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan. Pursuant to section 105(d)(2)(B)(vi) of the Bankruptcy Code, the hearing on Confirmation of the Plan may be combined with the hearing on approval of the Disclosure Statement under section 1125 of the Bankruptcy Code. The Debtors have requested that the Bankruptcy Court enter the Solicitation Procedures Order to, among other things, combine the hearings on final approval of the Disclosure Statement and Confirmation of the Plan as permitted by section 105(d)(2)(B)(vi) of the Bankruptcy Code. **[To be updated after initial hearing.]**

**The Combined Hearing will commence on [ ], 2014 at [ ], Eastern Time**, before the Honorable Mary F. Walrath, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 5th Floor, Courtroom #4, Wilmington, Delaware 19801. The Combined Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Combined Hearing or any adjournment thereof.

**The deadline to File objections to the final approval of the Disclosure Statement or the Confirmation of the Plan is 4:00 p.m., Eastern Time, on [ ], 2014 (the "Objection Deadline").** All objections to final approval of the Disclosure Statement or Confirmation of the Plan must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in accordance with the Solicitation Procedures Order on or before the Objection Deadline. In accordance with the Solicitation Procedures Order, objections to final approval of the Disclosure Statement or Confirmation of the Plan must:

BE IN WRITING;

CONFORM TO THE BANKRUPTCY RULES AND THE LOCAL BANKRUPTCY RULES;

STATE THE NAME AND ADDRESS OF THE OBJECTING ENTITY AND THE AMOUNT AND NATURE OF THE CLAIM OR INTEREST OF SUCH ENTITY;

STATE WITH PARTICULARITY THE BASIS AND NATURE OF THE OBJECTION TO FINAL APPROVAL OF THE DISCLOSURE STATEMENT OR CONFIRMATION OF THE PLAN; AND

BE FILED, CONTEMPORANEOUSLY WITH A PROOF OF SERVICE, WITH THE BANKRUPTCY COURT AND SERVED SO THAT IT IS **ACTUALLY RECEIVED** BY THE NOTICE PARTIES IDENTIFIED IN THE COMBINED HEARING NOTICE ON OR PRIOR TO THE OBJECTION DEADLINE.

**THE BANKRUPTCY COURT MAY NOT CONSIDER OBJECTIONS TO FINAL APPROVAL OF THE DISCLOSURE STATEMENT OR CONFIRMATION OF THE PLAN UNLESS THEY ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE PROCEDURES SET FORTH IN THE SOLICITATION PROCEDURES ORDER.**

## II. BACKGROUND TO THESE CHAPTER 11 CASES

### A. Events Leading to the Commencement of the Chapter 11 Cases

On April 2, 2012 (the "Petition Date"), the Debtors commenced these chapter 11 cases on an emergency basis to pursue the prompt sale of substantially all of their assets.

The Debtors operated in a highly competitive industry, characterized by narrow margins and growing overcapacity. For several years preceding the Petition Date, the Debtors had been unable to maintain a reasonable level of profitability for various reasons, including: (1) decreasing retail demand, (2) costly customer-specified requirements for finished product testing and (3) lower sales in certain foodservice outlets.

In response to these challenges, the Debtors pursued a strategy to increase sales to retail customers. This transition further strained the Debtors' resources, but was successfully being implemented until unanticipated market developments jeopardized the Debtors' liquidity, including (1) an unfounded public outcry over the use of boneless lean beef trimmings (derogatively referred to in press reports as "pink slime") and (2) changes in the imported meat market.

The Debtors took aggressive action to increase productivity and decrease costs, working with their lenders cooperatively to address potential defaults and provide for the liquidity needs of the Debtors. To that end, the Debtors entered into, among other things, a series of four amendments and forbearance agreements with their First Lien Lenders (as defined below) during 2011 and 2012. To further assist in their restructuring efforts, the Debtors

also obtained (1) $14 million (including forgiveness of certain trade receivables) from an equity issuance to certain of the Debtors' prepetition first and second lien lenders in August 2011; and (2) $10 million (in the form of additional debt under the Debtors' prepetition second lien credit facility in December 2011).

After evaluating all potential options, the Debtors ultimately determined that the sale of their businesses would provide the best opportunity to maximize the value of their assets and address the business challenges that they faced. To that end, on March 23, 2012, the Debtors hired Imperial Capital LLC ("Imperial Capital") to market the Debtors' assets for sale. From its preliminary work, Imperial Capital determined that there potentially would be significant interest in the Debtors' assets.

The Debtors, however, faced an immediate, unanticipated and growing liquidity crisis. As such, they determined that they would not be able to maintain operations in the near term absent an additional infusion of liquidity. When it became apparent that no additional lending would be available outside of bankruptcy, the Debtors explored the possibility of bankruptcy financing with their lenders and initiated preparations for an emergency chapter 11 filing.

Within approximately six months after the Petition Date, the Debtors closed sales of the assets associated with each of their five former production facilities (collectively, the "Facilities"), which comprised substantially all of the realizable value in their estates apart from any potential realizable value from Causes of Action and other miscellaneous assets. Summaries of the sale processes for the Debtors' assets associated with each of the Facilities are set forth below. Pursuant to the sales of the Facilities, the Debtors' first lien debt was paid in full, as discussed in Section III.G below.

## B. The Debtors' Former Business

### 1. The Debtors' Former Operations

As of the Petition Date, the Debtors were among the largest ground beef processing enterprises in the United States, operating beef processing Facilities in California, Georgia, New York, Pennsylvania and Texas. The Debtors maintained their headquarters in King of Prussia, Pennsylvania.

The Debtors' books and records reflected approximately $958 million in annual revenues on a consolidated basis as of December 31, 2011. As of February 29, 2012, on a consolidated basis, the Debtors' books and records reflected approximately $219 million in assets and $197 million in liabilities.

The Debtors produced case-ready ground beef and individually quick frozen hamburger patties for sale to customers across a national retail and foodservice market. Annually, the Debtors processed more than 500 million pounds of ground beef products, which the Debtors distributed primarily to restaurants and retail grocery stores across the United States. In the ordinary course of their businesses, the Debtors purchased large quantities of meat and meat products to be processed through the Debtors' value-added production operations and then distributed to their customers. Given their perishable nature, these and other goods were received by the Debtors on a regular basis. Substantial amounts of such goods were received by the Debtors within 20 days immediately prior to the Petition Date.

### 2. Employees

As of the Petition Date, the Debtors employed approximately 850 full time employees.

Following the sales of the Debtors' assets, the Debtors transitioned for a short time with approximately one dozen employees and entered into consulting arrangements with certain former employees.

Presently, the Debtors have only one remaining employee — their Chief Restructuring Officer, David Beckman (the "CRO"). The CRO is supported from time to time by certain additional personnel from the Debtors' Court approved financial advisors, FTI Consulting, Inc. ("FTI"), pursuant to the CRO's and FTI's retention terms.

The Debtors also continue to maintain consulting arrangements for limited as-needed services from four key former employees: Ronald Allen, Timothy Biela, Richard Fahle and Barry Renninger.

### 3. Directors

The current board of directors of Debtor AFA Investment Inc. ("AFA Investment") consists of Tom Dahlen, Eric Holoman, Carlton Jenkins, Bradford Nugent and Barry Renninger. As noted below, AFA Investment is the direct or indirect parent of each of the other Debtors.

## C. The Debtors' Corporate Structure

AFA Investment is a private company, owned primarily by funds or entities managed by Yucaipa Corporate Initiatives Fund II, LLC, with minority shares owned by certain members of former management. In addition, equity warrants and indirect preferred equity interests are held by NBPCo Holdings, LLC ("NBPCo"), an affiliate of Beef Products Inc. ("BPI"). The remaining Debtors are direct or indirect subsidiaries of AFA Investment.

## D. Summary of Prepetition Indebtedness

### 1. The First Lien Credit Facility

Prior to the Petition Date, the Debtors (some as borrowers and some as guarantors) entered into the Amended and Restated Credit Agreement, dated as of February 9, 2010 (as modified from time to time, the "First Lien Credit Facility") among: (a) the Debtors; (b) General Electric Capital Corporation ("GE Capital"), as lender, letter of credit issuer (the "First Lien L/C Issuer") and agent (the "First Lien Agent"); and (c) Bank of America, N.A., as lender (together with GE Capital in its capacity as lender, the "First Lien Lenders").

Pursuant to that certain Forbearance Agreement and Amendment No. 1, dated April 5, 2011, Yucaipa Corporate Initiatives Fund II, L.P. ("YCIF II") and Yucaipa Corporate Initiatives (Parallel) Fund II, L.P. ("YCIF II Parallel")[5] assisted the Debtors' efforts to obtain a forbearance under the First Lien Credit Facility by purchasing $1,400,000.00 of the outstanding revolving loans and commitments from the First Lien Lenders. Upon being purchased, these revolving loans and commitments were converted into Term B Loans.

As of the Petition Date, the Debtors were indebted to the First Lien Agent, the First Lien L/C Issuer and the other First Lien Lenders (collectively, the "First Lien Secured Parties") pursuant to the First Lien Credit Facility: (a) in the aggregate principal amount of $47,855,725.94 in respect of revolving loans (collectively, the "Prepetition Revolving Loans"); (b) in the aggregate principal amount of $11,511,196.00 in respect of term loans (including Term A Loans in the amount of $10,111,196.00 and Term B Loans in the amount of $1,400,000.00); (c) in the aggregate principal amount of $3,103,451.61 in respect of letters of credit issued (collectively, the "Prepetition Letters of Credit"); plus (d) accrued and unpaid interest with respect thereto and any additional fees, costs and expenses due thereunder.

Pursuant to the First Lien Credit Facility, the First Lien Agent and the other First Lien Secured Parties held first priority valid, perfected and enforceable security interests (the "Prepetition First Priority Liens") in substantially all of the Debtors' assets.

As discussed further below, during these cases, the Debtors utilized a portion of the aggregate proceeds of the sales of assets that constituted collateral of the First Lien Secured Parties to satisfy, in full, the DIP Facility (as defined below), which, based on the terms of the DIP Facility, had the effect of satisfying, in full, the Debtors' obligations under the First Lien Credit Facility and satisfying the Prepetition First Priority Liens.

---

5 YCIF II and YCIF II Parallel, collectively with their general partner, Yucaipa Corporate Initiatives Fund II, LLC (the "Yucaipa General Partner") are referred to herein as "Yucaipa."

### 2. The Second Lien Credit Facility

Prior to the Petition Date, the Debtors (some as borrowers and some as guarantors) entered into that certain Second Lien Credit Agreement, dated as of February 9, 2010 (as amended from time to time, the "Second Lien Credit Facility") among (a) the Debtors, (b) certain subordinated second lien creditors (collectively, the "Second Lien Lenders") and (c) Yucaipa Corporate Initiatives Fund II, LLC, as administrative agent (in such capacity, the "Second Lien Agent").

The Second Lien Lenders consist of: (a) YCIF II Second Lien Holdings LLC (the "SPV"), whose members are YCIF II, YCIF II Parallel and NBPCo; and (b) American Capital, Ltd. (together with its transferees, successors or assigns, "ACAS"), the ultimate parent of the entity that sold Debtor United Food Group LLC ("UFG") to AFA Investment.

As of the Petition Date, the Debtors were indebted to the Second Lien Agent and the Second Lien Lenders pursuant to the Second Lien Credit Facility, (a) in the approximate amount of $71,595,210 in respect of loans made; plus (b) accrued and unpaid interest with respect thereto and any additional fees, costs and expenses due thereunder. ACAS is a Second Lien Lender under the Second Lien Credit Facility with respect to certain obligations owed to ACAS under an ACAS Second Lien Note in the original principal amount of $4,725,000.

In addition to the ACAS Second Lien Note, AFA Investment executed and delivered to an offset note to ACAS in the original principal amount of $7,275,000 (the "ACAS Offset Note"). The ACAS Offset Note is pledged to AFA Investment and UFG to secure the satisfaction of certain indemnification obligations of ACAS under that certain Securities Purchase Agreement dated as of February 9, 2010, by and among UFG Intermediate Holding Corp. (seller), ACAS and AFA Investment.

Pursuant to the Second Lien Credit Facility, principal payments owed to ACAS and the other Second Lien Lenders are split between them on a percentage basis. In addition, Second Lien Lender NBPCo is entitled contractually to the first $14 million of recoveries on the Second Lien Obligations by the SPV, and recoveries above $14 million are owed contractually to Yucaipa.

Pursuant to the Second Lien Credit Facility, the Second Lien Agent and the other Second Lien Lenders hold priority security interests and liens in substantially all of the Debtors' assets, including Cash Collateral, and which, as of the Petition Date, held second priority behind the Prepetition First Priority Liens (the "Prepetition Second Priority Liens" and, together with the Prepetition First Priority Liens, the "Prepetition Liens"). As a result of the satisfaction of the Prepetition First Priority Liens during the Chapter 11 Cases, the Prepetition Second Priority Liens currently are the most senior liens in substantially all of the Debtors' assets.

### 3. Municipal Development Bond Financing

As of the Petition Date, Debtor American Fresh Foods, L.P. was party to a $1,000,000 bond issuance by the Thomasville Payroll Development Authority (the "Issuer"). The Series 2005-A bonds were Tax-Exempt Variable Rate Demand/Fixed Rate Revenue Bonds issued to finance the: (a) construction of a Facility located in Thomasville, Georgia; (b) acquisition and installation of equipment at the Georgia Facility; (c) payment of a portion of the costs and expenses of the financing; and (d) lease of the Facility by the Issuer. The payment of the principal and interest on the Series 2005-A bonds was secured by an irrevocable Letter of Credit issued by Wachovia Bank, N.A. n/k/a Wells Fargo Bank, N.A. (the "Credit Issuer"), pursuant to a Reimbursement and Security Agreement dated as of April 1, 2005 between American Fresh Foods, L.P. and the Credit Issuer. The Letter of Credit, in the approximate amount of $1,014,000, remained outstanding as of the Petition Date.

### 4. Unsecured Trade Debt

In the ordinary course of operating their beef processing business, the Debtors purchased goods and services from, or otherwise accrued payables to, over 2,000 vendors and other creditors. The major categories of goods and services that the Debtors purchased from these creditors included raw materials (meat), packaging,

cryogenic gases and freight services used in the Debtors' former operations. The Debtors estimate that they owed, as of the Petition Date, approximately $60 million in unsecured obligations for these and related goods and services.

The largest component of this unsecured trade debt consisted of obligations to beef vendors, who historically were paid by the Debtors on 14-day terms. During the several months prior to the Petition Date, however, there was a severe contraction in the amount and length of credit terms the Debtors' vendors were willing to extend. From the outset of these Chapter 11 Cases, the Debtors recognized that they would face substantial liability for Twenty-Day Claims under section 503(b)(9) of the Bankruptcy Code because, by then, most of the Debtors' vendors supplied goods on less than 14-day terms.

#### 5. Lease Obligations

The Debtors' New York and California Facilities were leased. Prior to the Petition Date, the Debtors' annual expense for these leases was approximately $2.8 million.

### E. The Prepetition Product Recalls and Related Litigation

#### 1. The Northeast Outbreak and Related Litigation with GOPAC

Debtor Fairbank Reconstruction Corporation d/b/a Fairbank Farms ("Fairbank") was an active participant in the Debtors' former business of processing and selling ground beef products, utilizing the Debtors' former Facility in New York State. In producing the Debtors' products at the New York Facility, Fairbank obtained and utilized, among other ingredients, raw beef trim it received from beef-packing companies. One of these former suppliers is nondebtor third party Greater Omaha Packing Co., Inc. ("GOPAC"), which operates a beef slaughter and fabrication business.

In early September 2009, Fairbank received raw beef trim from GOPAC that was later determined to contain *E. coli* O157:H7 bacteria. On or about September 14-16, 2009, Fairbank unknowingly used this tainted raw beef trim from GOPAC to produce certain of the Debtors' ground beef products distributed in the northeastern United States. The tainted GOPAC beef resulted in an outbreak of "*E. coli*" illnesses and deaths (the "Northeast Outbreak") among approximately two dozen individuals who had consumed the beef (collectively, the "Northeast Consumers"). On October 31, 2009, Fairbank voluntarily recalled 545,600 pounds of ground beef products that had been manufactured using the tainted raw beef trim from GOPAC.

Multiple Northeast Consumers who had fallen ill after eating the tainted beef, or their family members or other representatives acting on the Northeast Consumers' behalves and/or on their own behalves (together, the "Northeast Consumer Plaintiffs"), brought lawsuits against Fairbank, asserting tort claims for their alleged injuries. In most of these lawsuits (collectively, the "Northeast Outbreak Lawsuits"), either the Northeast Consumer Plaintiffs or Fairbank also asserted related claims against GOPAC based on its role in the Northeast Outbreak. The Northeast Outbreak Lawsuits include or have included the following actions in state and federal courts in Maine, Connecticut, New York and New Hampshire:

(a) LouAnn Cannella and Joseph Cannella v. Fairbank Reconstruction Corp. and Greater Omaha Packing Co., Inc., Case No. 3:11-cv-01396-CFD (D. Conn.);

(b) Martena Campanelli v. Fairbank Reconstruction Corp.; Greater Omaha Packing Co., Inc.; and Supervalu, Inc., Case No. 11-cv-01618-MRK (D. Conn.);

(c) Donald R. Cohen Individually and as Executor of the Estate of Susan G. Cohen v. Fairbank Reconstruction Corp.; The Price Chopper, Inc.; Price Chopper Operating Co., Inc.; The Golub Corp.; and Greater Omaha Packing Co., Inc., Case No. 4087-10 (N.Y. Sup. Ct., Albany County);

(d) Margaret Long v. Fairbank Reconstruction Corp., Case No. 1:09-cv-592-GZS (D. Me.) (the "Long Case");

(e) Alice Smith v. Fairbank Reconstruction Corp., Case No. 2:10-cv-60-GZS (D. Me.), which was administratively consolidated with the Long Case (together with the Long Case, the "Long/Smith Cases");

(f) Emmie Jones as parent and natural guardian of M.J. v. Fairbank Reconstruction Corp. and Greater Omaha Packing Co., Inc., Case No. 2:11-cv-00437-GZS (D. Me.); and

(g) Lori Precourt, Administrator of the Estate of Carolyn Black v. Fairbank Reconstruction Corp.; Greater Omaha Packing Co., Inc. and Shaw's Supermarkets, Inc., Case No. 1:10-cv-337-LM (D. N.H.).

In each of the Northeast Outbreak Lawsuits, Fairbank has filed cross-claims or third party claims asserting that it is entitled to indemnification in full or, in the alternative, contribution, from GOPAC for any liability Fairbank may satisfy or be found to owe to any of the Northeast Consumer Plaintiffs for claims associated with the Northeast Outbreak. In turn, in response to the claims against it, GOPAC and its insurers[6] have asserted claims against Fairbank in the Northeast Outbreak Lawsuits for contribution, indemnification and/or reimbursement if GOPAC is found to be liable to any of the Northeast Consumer Plaintiffs.

In the Long/Smith Cases, the trial court determined on summary judgment that Fairbank held viable contractual indemnification claims against GOPAC, and that GOPAC could not, in defense, assert comparative or contributory negligence as a means to avoid or limit its indemnification obligations to Fairbank. Long v. Fairbank Farms Reconstruction Corp., 824 F.Supp.2d 197, 202-04 (D. Me. 2011). Following a jury trial, the United States District Court in Maine entered judgment for Fairbank against GOPAC, based on the jury's determinations that (a) GOPAC had delivered contaminated meat to Fairbank in violation of its obligations not to do so and (b) Fairbank acted reasonably in processing and distributing the meat without first detecting the contamination. The judgment in the Long/Smith Cases survived three post-judgment motions by GOPAC attacking it and seeking a new trial. In addition, the United States Court of Appeals for the First Circuit affirmed the Long/Smith Cases judgment in November 2012. See Long and Smith v. Fairbank Reconstruction Corp., 701 F.3d 1 (1st Cir. 2012). On November 22, 2013, GOPAC commenced a new lawsuit, Greater Omaha Packing Co., Inc. v. Fairbank Reconstruction Corp. d/b/a Fairbank Farms, Civil Action No. 2:13-cv-00436-GZS (D. Me.) (the "GOPAC Civil Rule 60 Action"), seeking, among related relief, an order vacating the Long/Smith Cases judgment under Rule 60 of the Federal Rules of Civil Procedure. The Debtors intend to contest the GOPAC Civil Rule 60 Action and will answer or otherwise respond to the complaint in the near term.

On September 6, 2013, Fairbank commenced a new, standalone lawsuit against GOPAC in the United States District Court for the Western District of New York, captioned Fairbank Reconstruction Corp., d/b/a Fairbank Farms v. Greater Omaha Packing Co., Inc., Case No. 1:13-cv-00907 (W.D. N.Y.) (the "GOPAC Commercial Claims Litigation"). In the GOPAC Commercial Claims Litigation, the Debtors are asserting multi-million dollar claims against GOPAC for commercial damages that Fairbank suffered, including lost profits, in connection with performing the Northeast Outbreak product recall in October and November 2009 (the "GOPAC Product Recall Claims"). Based on the Debtors' and their litigation experts' analysis of the facts and circumstances and the relevant known evidence concerning the GOPAC Product Recall Claims, the Debtors preliminarily anticipate asserting damages amounts in the range of approximately $23 million in connection with the GOPAC Product Recall Claims. GOPAC has filed an answer to the complaint, and the Debtors expect the GOPAC Commercial Claims Litigation to proceed in due course.

GOPAC has vigorously contested all of the allegations raised by the Debtors in these various lawsuits. The Debtors anticipate that GOPAC will continue to vigorously defend itself in these matters. As such, there are no assurances that the Debtors will be able to successfully prosecute this litigation to judgment, or collect any of the asserted damages.

---

6 Where appropriate in context, the term "GOPAC" herein refers collectively to GOPAC and its insurers, including Continental Casualty Co.

### 2. The Western States Outbreak and Related Litigation with Cargill

UFG utilized the Debtors' former California Facility to manufacture the Debtors' ground beef products. Among UFG's former raw beef trim suppliers at the California Facility were Cargill, Inc. and certain of its affiliates (collectively, "Cargill"). In or about June 2007, before UFG became affiliated with the Debtors, it received raw beef trim from Cargill that was later determined to contain *E. coli* O157:H7 bacteria. Similar to the Northeast Outbreak, the Debtors' products containing the contaminated meat from Cargill led to a multi-state outbreak of alleged illnesses among numerous consumer claimants (the "Western States Outbreak"). In connection with the Western States Outbreak, UFG performed a product recall of approximately 5.7 million pounds of ground beef that it had distributed to eleven western states.

In July 2011, UFG commenced a lawsuit against Cargill (the "Cargill Litigation") in the United States District Court for the Central District of California, captioned as United Food Group LLC v. Cargill, Inc., *et al.*, Civil Action No. CV11-7752 MWF (AJWx) (C.D. Calif.). In the Cargill Litigation, UFG asserts that Cargill was the source of the contaminated meat leading to the Western States Outbreak. On those grounds, UFG seeks (a) indemnification of the amounts paid to resolve numerous consumer claims against it; and (b) damages that it suffered, including lost profits, in connection with performing the product recall. Fact and expert discovery in the liability phase of the Cargill Litigation has been completed, and the parties are waiting for the trial court to set a trial date for the liability phase. Based on the Debtors' and their litigation experts' analysis of the facts and circumstances and the relevant known evidence concerning the Debtors' claims against Cargill, the Debtors preliminarily anticipate asserting damages amounts in the range of approximately $9.9 million in connection with these claims.

Cargill has vigorously contested the allegations raised by the Debtors in the Cargill Litigation. The Debtors anticipate that Cargill will continue to vigorously defend itself in the Cargill Litigation. As such, there are no assurances that the Debtors will be able to successfully prosecute this litigation to judgment, or collect any of the asserted damages.

## III. ADMINISTRATION OF THE CHAPTER 11 CASES

### A. Overview of Chapter 11

Chapter 11 of the Bankruptcy Code provides for the reorganization of entities qualified to commence a case under this chapter. In addition to permitting debtor rehabilitation, chapter 11 allows for corporate liquidations that promote maximization of value and equality of treatment for similarly situated holders of claims and equity interests, subject to the priority scheme set forth in the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the commencement of the case. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession." The Bankruptcy Code also provides means by which a debtor can sell some or all of the assets of its estate.

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim against or equity interest in the debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code, to the terms and conditions of the confirmed plan. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of claims and equity interests in accordance with the terms of the confirmed plan.

In these Chapter 11 Cases, the Debtors seek to obtain sufficient votes to accept the Plan and to obtain an order of the Bankruptcy Court confirming the Plan.

### B. Initial Motions and Certain Related Relief

Upon and immediately following the Petition Date, the Debtors devoted substantial effort to stabilizing their business operations and preserving and restoring their relationships with vendors and customers pending the

sale of substantially all of their assets. To that end, the Debtors sought and obtained a number of orders from the Bankruptcy Court to minimize disruption to their operations and to facilitate the administration of these Chapter 11 Cases. Several of these orders are summarized briefly below.

### 1. Motion to Approve the Debtor in Possession Financing Facility

On the Petition Date, the Debtors requested authority to obtain postpetition financing (the "DIP Facility") from their existing First Lien Lenders and to use the cash collateral of their First Lien Lenders and Second Lien Lenders and to provide adequate protection to these lenders (Docket No. 11) (the "DIP Financing Motion"). The DIP Credit Agreement governing the proposed DIP Facility was attached as Exhibit 1 to the Notice of Filing of Executed DIP Credit Agreement (Docket No. 180), filed on April 24, 2012.

Pursuant to the DIP Motion, the Debtors requested authorization, among other things, for (a) the Debtors (in their capacities as borrowers or guarantors) to borrow under a revolving credit facility up to an aggregate principal amount not to exceed $60,000,000 and (b) the Debtors to use the proceeds of the loans and cash collateral in the operation of their businesses and to administer these cases and to pursue a process to sell substantially all of their assets.

The Debtors further requested that (a) GE Capital, as DIP Facility agent (the "DIP Agent") and letter of credit issuer and (b) the lenders under the DIP Facility (collectively, the "DIP Lenders") be granted, subject only to the Carve-Out (as defined in the DIP Financing Motion) for certain fees and costs, including, without limitation, the Debtors' court-approved professionals: (a) valid, binding and fully perfected security interests in, and liens upon, all of the Debtors' rights in property of the Debtors' estates as of the Petition Date, and all of the Debtors' rights in property acquired postpetition (collectively, the "DIP Collateral"); and (b) superpriority administrative claims with priority in payment over, among other things, any and all administrative expenses allowed in these chapter 11 cases on account of the obligations of the Debtors under the DIP Facility (the "DIP Obligations"). As adequate protection for the First Lien Lenders' and the Second Lien Lenders' prepetition security interests, the Debtors requested that the First Lien Lenders and the Second Lien Lenders separately be granted certain superpriority claims and liens with respect to the DIP Collateral, solely to the extent of the diminution in value of each of their prepetition liens and subject and subordinate to the claims and liens supporting the DIP Obligations.

The DIP Financing Motion further provided that, from the Petition Date until the DIP Obligations were paid in full in cash, all cash receipts, cash collateral and all proceeds from the sale or other disposition of the DIP Collateral and all other proceeds would be transferred to the DIP Agent and, subject to the Carve-Out, applied to the payment of the following, in order of priority: (a) certain costs and expenses of the DIP Agent; (b) certain attorney costs of the DIP Lenders; (c) all unpaid interest and fees under the DIP Facility; (d) principal of the Prepetition Revolving Loans; (e) principal under the DIP Facility, including pursuant to the Prepetition Letters of Credit; and (f) any other amounts under the DIP Facility.

The DIP Credit Agreement provided for certain milestones for the sale of substantially all of the Debtors' assets. The failure to accomplish any of these milestones would constitute an additional Event of Default under the DIP Credit Agreement that, absent waiver or amendment, would entitle the DIP Agent to exercise its remedies under the DIP Credit Agreement.

On April 3, 2012, the Bankruptcy Court entered an order approving the DIP Financing Motion on an interim basis (Docket No. 42). On April 30, 2012, the Court entered an order (Docket No. 199) approving the DIP Facility on a final basis with certain modifications negotiated by the Debtors, the DIP Agent, the First Lien Agent, the Second Lien Agent and the official committee of unsecured creditors appointed in these Chapter 11 Cases (as discussed further in Section III.C below, the "Committee"), among other parties. These negotiated modifications included, among other things, provisions preserving, for the Committee, the right to review and potentially challenge the validity and priority of certain of the prepetition liens against certain of the Debtors' assets asserted by the Second Lien Lenders, and a time period in which to exercise such rights (the "Challenge Period").

### 2. Motion to Authorize Procedures for the Assertion of Twenty-Day Claims

As noted above, at the commencement of these Chapter 11 Cases, the Debtors faced a substantial number and amount of Twenty-Day Claims. On the Petition Date the Debtors filed a motion (Docket No. 12) seeking to establish certain procedures with respect to Twenty-Day Claims as a means to provide the Debtors with the opportunity to obtain and review asserted Twenty-Day Claims in an orderly and efficient manner. Following negotiations between the Debtors, the Committee and certain holders of Twenty-Day Claims, among other parties, on May 8, 2012, the Court entered an order (Docket No. 236) establishing: (a) procedures for the assertion of Twenty-Day Claims; and (b) June 11, 2012 as the deadline for the assertion of Twenty-Day Claims (the "Twenty-Day Claims Bar Date").

In response to the Twenty-Day Claims Bar Date, approximately 157 Twenty-Day Claims were asserted against the Debtors' estates by more than 100 separate claimants. Following an initial reconciliation of the Twenty-Day Claims against their books and records, the Debtors preliminarily determined, and reported orally to the Bankruptcy Court at a hearing on July 12, 2012, that they may have obligations on account of Twenty-Day Claims in an amount of more than $29 million (subject to additional reconciliation and defenses).

### 3. Applications to Retain Professionals

To assist the Debtors in carrying out their duties as debtors-in-possession and to represent the Debtors' interests in the Chapter 11 Cases, the Debtors filed applications at the outset of these Chapter 11 Cases to retain: (a) Jones Day, as the Debtors' general bankruptcy counsel; (b) Pachulski Stang Ziehl and Jones LLP ("PSZJ"), as their Delaware co-counsel; (c) FTI, to provide a chief restructuring officer and additional personnel; and (d) Imperial Capital, as the Debtors' investment banker. On April 20, 2012, the Bankruptcy Court approved the retention of Jones Day, PSZJ and Imperial Capital. On April 24, 2012, the Bankruptcy Court approved the retention of FTI. In each case, the retention of the applicable professional was made effective as of the Petition Date.

More recently, the Debtors also filed applications (a) to retain ASK LLP as special litigation counsel, and the Rosner Law Group LLC as special local Delaware counsel, to pursue avoidance actions on behalf of the Debtors' estates; and (b) to expand the scope of their retention of Davis Wright Tremaine LLP, from an ordinary course professional solely for the Cargill Litigation[7] to special litigation counsel for both the Cargill Litigation and the GOPAC Commercial Claims Litigation. On November 4 and 12, 2013, the Bankruptcy Court entered orders approving the retention of ASK LLP (Docket No. 1233) and the Rosner Law Group LLC (Docket No. 1247), respectively. On November 13, 2013 (Docket No. 1249), the Bankruptcy Court entered an order approving the expanded retention of Davis Wright Tremaine LLP.

### 4. First Day Relief

On April 3, 2012, the Bankruptcy Court entered orders (a) approving the continued use of the Debtors' cash management system, (b) authorizing the Debtors to pay the prepetition claims of certain essential suppliers, (c) authorizing the Debtors to pay prepetition employee wages and to continue employee benefit programs, (d) authorizing the Debtors to pay certain prepetition taxes, (e) authorizing the Debtors to continue certain customer programs and honor certain prepetition claims in connection therewith and (f) authorizing the Debtors to continue their insurance programs and pay related obligations. The Court also entered an interim order prohibiting utilities from discontinuing service to the Debtors on account of their bankruptcy filing and granting to certain of the Debtors' utility providers two-week deposits as adequate assurance. The Court entered a final utilities order on April 24, 2012. The relief granted in these orders helped to stabilize the Debtors' business in the initial days of these Chapter 11 Cases.

---

7 By an order entered on April 20, 2012 (Docket No. 163), the Bankruptcy Court authorized the Debtors to retain and pay certain "ordinary course professionals" in the ordinary course of the Debtors' businesses and pursuant to the terms of that order.

## C. Official Committee of Unsecured Creditors

On April 12, 2012, the U.S. Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code. The members of the Committee are: Orleans International, Inc.; JBS USA, LLC; San Angelo Packing Co., Inc.; ASC-Meyners, Inc.; International Paper Co.; Lawrence Wholesale, LLC; and Sealed Air Corporation. On May 24, 2012, the Bankruptcy Court entered orders approving the retention of McDonald Hopkins LLC and Potter Anderson and Corroon LLP as co-counsel to the Committee, effective as of April 12, 2012, and J.H. Cohn LLP as its financial advisor, effective as of April 13, 2012.

## D. Filing of Schedules and Setting of Bar Dates

The Debtors filed their Schedules on April 24, 2012. During the course of these cases, the Bankruptcy Court has entered orders (Docket Nos. 236 and 596) (together, the "Bar Date Orders") establishing the following dates (together, the "Bar Dates") by which certain proofs of claim were required to be filed:

(1) Twenty-Day Claims Bar Date: June 11, 2012; and

(2) Prepetition Secured and Priority Claims and Postpetition Administrative Claims Bar Date: October 9, 2012.[8]

In accordance with the Bar Date Orders, written notice of the Bar Dates and a proof of claim form were mailed to, among others, all known claimants holding actual or potential Claims impacted by, and other parties identified in, the applicable Bar Date Order. Pursuant to the Bar Date Orders, any entity that was required to file a proof of claim in these cases but failed to do so by the applicable Bar Date became forever barred, estopped and enjoined from:

(1) asserting any Claim against the Debtors that the entity has that (a) is in an amount that exceeds the amount, if any, that is identified in the Schedules on behalf of such entity as undisputed, noncontingent and liquidated, or (b) is of a different nature, classification or priority (including any Administrative Claim) than any claim identified in the Schedules on behalf of such entity (any such claim under this subparagraph, an "Unscheduled Claim"); or

(2) voting upon, or receiving distributions under, any (a) liquidating plan or plans that may be confirmed by the Court in these Chapter 11 Cases in respect of an Unscheduled Claim, or (b) any other order that authorizes the winding down of the Debtors' chapter 11 estates.

## E. Asset Sales

### 1. The Marketing Process

On April 16, 2012, the Debtors filed a motion (Docket No. 111) (the "Sale Motion") seeking approval of certain Sale Procedures (as defined in the Sale Motion) to conduct the sale or sales of substantially all of the Debtors' assets at their Facilities. On May 9, 2012, the Court entered an order (Docket No. 242) approving the Sale Procedures.

With the assistance of Imperial Capital and the Debtors' other professional advisors, the Debtors marketed and pursued sales of their assets. Ultimately, based on the expressions of interest received and after discussions with the Consultation Parties (as defined in the Sale Procedures), the Debtors determined that the best approach to maximize value was to pursue separate sales of assets associated with each of the Debtors' five Facilities.

---

8 With respect to Administrative Claims, this Bar Date applied to such claims that arose or are deemed to have arisen on or after the Petition Date through and including September 4, 2012.

### 2. The Sales of the California Assets and the Georgia Assets

The Debtors scheduled an auction of the assets associated with their California Facility (collectively, the "California Assets") and their Georgia Facility (collectively, the "Georgia Assets") for June 21, 2012.

California Assets. After receiving only one qualified bid for the California Assets, the Debtors filed a notice on June 20, 2012 (Docket No. 372) (a) cancelling the auction of the California Assets and (b) designating Tri West Investment LLC as the successful bidder for the California Assets for a cash purchase price of $4,400,000. On June 26, 2012, the Court entered an order (Docket No. 393) approving the sale of the California Assets, which closed on June 29, 2012. The California Facility subsequently resumed operations under its new ownership on September 4, 2012.

Georgia Assets. The Debtors proceeded with the scheduled auction of the Georgia Assets on June 21, 2012. Following the auction, the Debtors filed a notice (Docket No. 378) designating FPL Food LLC as the successful bidder for the Georgia Assets for a cash purchase price of $7,200,000. On June 26, 2012, the Court entered an order (Docket No. 394) approving the sale of the Georgia Assets, which closed on July 9, 2012.

All proceeds of the sales of the California Assets and the Georgia Assets were escrowed pending further order of the Bankruptcy Court.

### 3. The Sales of the Pennsylvania Assets, the Texas Assets and the New York Assets

The Debtors scheduled an auction of the assets associated with their Pennsylvania Facility (collectively, the "Pennsylvania Assets"), their Texas Facility (collectively, the "Texas Assets") and their New York Facility (collectively, the "New York Assets") for July 10, 2012.

Pennsylvania Assets. The Debtors received only one qualified bid for the Pennsylvania Assets. On July 10, 2012, the Debtors filed a notice (Docket No. 436) designating CTI King of Prussia LLC as the successful bidder for the Pennsylvania Assets for an estimated cash purchase price of $16,800,000 after certain adjustments. On July 13, 2012, the Court entered an order (Docket No. 464) approving the sale of the Pennsylvania Assets, which closed on July 16, 2012.

Texas Assets. The Debtors conducted the auction of the Texas Assets on July 10, 2012, as scheduled. Following the auction, the Debtors filed a notice (Docket No. 437) designating Cargill Meat Solutions Corporation as the successful bidder for the Texas Assets for an estimated cash purchase price of $38,800,000. On July 13, 2012, the Court entered an order (Docket No. 463) approving the sale of the Texas Assets, which closed on July 20, 2012.

New York Assets. The Debtors did not receive any qualified bids for the New York Assets by the time of the auction. Accordingly, the Debtors did not conduct the auction for the New York Assets on July 20, 2012 as originally intended. Instead, in consultation with the Consultation Parties, as permitted by the Sale Procedures, the Debtors determined to extend the Sales Process for the New York Assets to continue marketing the assets. On August 22, 2012, the Debtors filed a notice (a) designating a stalking horse with respect to the New York Assets and (b) setting new dates for the remainder of the Sale Process with respect to the New York Assets, including scheduling an auction for August 28, 2012. The Debtors conducted the auction at the rescheduled date. Following the auction, the Debtors filed a notice (Docket No. 601) designating a joint venture of Counsel RB Capital, LLC; Harry Davis & Co.; and BiditUp Auctions Worldwide, Inc. as the successful bidder for the New York Assets for a cash purchase price of $2,500,000. On August 29, 2012, the Court entered an order (Docket No. 604) approving the sale of the New York Assets, which closed on September 19, 2012.

## F. Assets Remaining After the Sales of the Facilities

The sales of the Debtors' Assets associated with each of their former Facilities, as summarized above, comprised substantially all of the physical Assets of the Estates. Following the sales, the remaining notable Assets include:

Asset Sale Proceeds. Following the satisfaction of the DIP Facility and the subsequent use of the Second Lien Lenders' cash collateral for the administration of their Estates, as discussed further below, the remaining net Cash proceeds of the Debtors' sales of substantially all of their Assets totaled approximately $14.4 million as of November 30, 2013.

Churchill Casualty Share. The Debtors own an equity interest (the "Churchill Share") in Churchill Casualty Ltd. ("Churchill"), an offshore insurance company — a "member-owned heterogeneous group captive" — domiciled in the Cayman Islands. Through Churchill, the Debtors maintained certain layers of insurance coverage for general liability, workers compensation and automobile. For each standalone underwriting year, Churchill charges its members a premium and members post collateral. Under Churchill's premium formula, the members may receive disbursements of net equity balances and excess collateral, based on the actual loss history for each underwriting year, following a five-year accounting cycle. Conversely, it also is possible that the loss history could result in the assessment of additional premiums at the end of an accounting cycle instead of a disbursement. Solely by way of example, during 2013, the Debtors received disbursements of approximately $716,000 from Churchill, comprising: (1) a one-time, post-audit reimbursement of approximately $418,000 of premiums paid during 2012, which was paid based on the Debtors' withdrawal from the Churchill program; (2) a release of approximately $237,000 in previously posted excess collateral; and (3) a dividend of approximately $61,000. Additional information concerning Churchill and its premium formula is available at www.churchillcasualty.com. Simply put, the Churchill Share has value, but (1) such value cannot be determined with certainty because it depends upon unknown factors such as loss history and administrative expenses and (2) Churchill will not disburse the bulk of such remaining value (if any) until 2018 or possibly 2019. Although, as noted, the actual value of the Churchill Share is speculative and difficult to calculate, and depends on factors outside of the Debtors' control, the Debtors estimate that, in 2018-2019, such value may be approximately $1.3 million to $1.49 million.

Non-Cash Personal Property. The Debtors possess a small amount of furniture, business equipment, vehicles and similar personal property, primarily associated with their former headquarters offices, which the Debtors estimate to be of *de minimis* value.

Cash. Other than asset sale proceeds, the Debtors possess a *de minimis* amount of cash and potential residual rights in certain deposits and retainers.

Causes of Action. The Causes of Action include:

(1) The Debtors' claims in the Cargill Litigation, discussed above in Section II.E.2.

(2) The Debtors' GOPAC Product Recall Claims in the GOPAC Commercial Claims Litigation, discussed above in Section II.E.1.

(3) All Avoidance Actions, discussed below in Section III.K.

(4) Any and all other causes of action that the Estates may possess or that may arise before the Estates cease to exist, including, without limitation, any prepetition and postpetition causes of action related to breaches of contract and/or warranty, or related theories, against the Debtors' former suppliers and contract counterparties.

## G. Satisfaction of the DIP Facility

At a hearing held on July 12, 2012 to consider, among other things, approval of the sales of the Pennsylvania Assets and the Texas Assets, the Court ordered on the record that the net sale proceeds, or the necessary portion thereof, be distributed (1) in full and final (i.e., non-provisional) satisfaction of the DIP Facility and the First Lien Credit Facility, other than the Term B Loans held by Yucaipa; and (2) in provisional (i.e., subject to potential claw-back) satisfaction of the Term B Loans, which remained subject to the Committee's investigation and Challenge Period. Following these distributions, the Debtors were prohibited from using any of the remaining net sale proceeds except pursuant to an order of the Court or by consent.

Pursuant to the foregoing ruling of the Bankruptcy Court, the Debtors paid and satisfied in full the DIP Obligations and the First Lien Obligations on July 24, 2012.

### H. The Debtors' Use of Cash Collateral After Satisfying the DIP Facility

Shortly after the satisfaction in full of the DIP Facility, the Debtors' rights to use Cash Collateral under the Final DIP Order expired at the end of the day on July 31, 2012. As the expiration approached, the Debtors promptly initiated discussions with the Second Lien Agent for a consensual cash collateral agreement. The Debtors continued to use Cash Collateral for several weeks under an informal agreement with the Second Lien Agent as they maintained their wind-down efforts and engaged in negotiations with the Second Lien Agent on a formal cash collateral stipulation.

Ultimately, the discussions of a cash collateral agreement were expanded to include discussions of a global settlement of the key remaining disputes in these cases, with the goal of promoting a prompt and efficient conclusion to these cases. Those discussions developed into an agreement that became the Global Settlement that is described further below. Conditioned on the Global Settlement parties' agreement to and implementation of the Global Settlement, the Second Lien Agent agreed to permit the Debtors' continued use of Cash Collateral.

Specifically, following the expiration of the Debtors' rights to use Cash Collateral under the Final DIP Order, the Debtors and the Second Lien Agent entered into and submitted to the Bankruptcy Court the Interim Order (I) Authorizing the Debtors to Use Cash Collateral of the Second Lien Secured Parties and (II) Providing Adequate Protection to the Second Lien Secured Parties (the "Interim Cash Collateral Order"). The Bankruptcy Court entered the Interim Cash Collateral Order on September 19, 2012 (Docket No. 662). Thereafter, to date, the Debtors and the Second Lien Agent have entered into, and submitted to the Bankruptcy Court, a series of 28 extensions of the deadlines and termination date associated with the Debtors' use of Cash Collateral under the Interim Cash Collateral Order. (Docket Nos. 734, 752, 766, 772, 781, 810, 825, 842, 854, 869, 903, 922, 949, 983, 1004, 1016, 1025, 1032, 1044, 1053, 1060, 1066, 1086, 1115, 1203, 1212, 1260 and 1318.)

Among other things, the Interim Cash Collateral Order determined that the Second Lien Agent, for the benefit of itself and the Second Lien Lenders, is entitled to adequate protection of its interests in its collateral, for any diminution in the value of such interests resulting from the sale, use, market value decline and the automatic stay of any acts against the collateral. Accordingly, under the Interim Cash Collateral Order, the Second Lien Agent, for the benefit of itself and the Second Lien Lenders, was granted adequate protection liens and superpriority claims (subject to the Carve-Out) and the right to payment by the Debtors of its reasonable fees, costs and expenses. The Interim Cash Collateral Order also contained typical stipulations concerning the validity and priority of the Second Lien Lenders' liens, subject only to the Committee's rights with respect to the Challenge Period and the Committee Challenge Assets (defined below).

In that regard, in connection with the entry of the Interim Cash Collateral Order, the Committee negotiated for and obtained provisions in the order to extend the Challenge Period with respect to certain matters, as discussed in Section III.B.1 above and Section III.I below. The Challenge Period has been extended with each extension of the Interim Cash Collateral Order. Currently, the Challenge Period has been extended to January 31, 2014 by agreement of the Second Lien Agent and the Committee.

### I. The Committee Investigation of the Second Lien Lenders' Liens

In connection with its Challenge Period rights, the Committee reviewed the claims and prepetition liens of the Second Lien Lenders. Following this analysis, the Committee took the position, in an objection filed in connection with the Bankruptcy Court's approval of the Asset sales (Docket No. 427) (the "Committee Sale Objection"), that "the claims of the Second Lien Lenders are subject to challenge on a number of grounds." Primarily, the Committee maintained that the Debtors' obligations to the Second Lien Lenders constitute equity interests, rather than debt, and could be recharacterized as such by the Bankruptcy Court. In addition, as detailed in the Committee Sale Objection, the Committee maintained that certain components of the Debtors' obligations to certain of the Second Lien Lenders should be further reviewed and could be challenged under insider transaction theories, lender liability theories, "the instrumentality theory" and fraudulent conveyance statutes. Moreover, the Committee contended that "[t]here may be traditional director and officer fiduciary duty breach claims against

Yucaipa designated board members related to the priority given to Yucaipa through the [obligations to the Second Lien Lenders] or otherwise." Finally, based on its investigation, the Committee asserted that neither the Second Lien Agent nor any of the Second Lien Lenders has a perfected security interest in, or lien on, the following Assets of the Debtors (collectively, the "Committee Challenge Assets"):

(1) Cash in the possession of any Debtor as of the Petition Date;

(2) Cash retainers held as of the Petition Date by any professional retained by any of the Debtors in these Chapter 11 Cases;

(3) the Churchill Share;

(4) any and all automobiles, trucks, trailers, lifts or other vehicles owned by any of the Debtors;

(5) any and all of the Debtors' present or future commercial tort claims, as such term is defined in Article 9-102(13) of the Uniform Commercial Code; and

(6) any sale proceeds in excess of $2.3 million attributable to the real property portion of the Pennsylvania Assets sold in July 2012, as discussed above in Section III.E.3.

The Second Lien Lenders disputed the Committee's position with respect to the Committee Challenge Assets.

In connection with the Debtors' sales of their Facilities, the Committee took the position that the Second Lien Lenders should not receive any distribution from the sale proceeds pending resolution of potential disputes regarding potential claims against the Second Lien Lenders and the treatment of the Committee Challenge Assets. As explained below, the Global Settlement constitutes a resolution of these issues.

**J. The WARN Action**

On May 10, 2012, Nadia Sanchez, as a putative representative for a putative class of former employees of the Debtors (the "WARN Class"), filed a complaint (the "WARN Complaint") in the Bankruptcy Court commencing a putative class action adversary proceeding (Case No. 12-50710) (the "WARN Action"). The defendants in the WARN Action were: (1) Debtor AFA Investment; (2) Debtor AFA Foods, Inc.; and (3) the Yucaipa General Partner (in its capacity as the majority shareholder of AFA Investment). In the WARN Action, the WARN Class alleged that the defendants ordered mass layoffs and/or plant closings on or about April 6, 2012 at certain of the Debtors' former Facilities without providing notices required by the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101, *et seq.*; the California Worker Adjustment and Retraining Notification Act, Cal. Labor Code §§ 1400, *et seq.*; and the New York State Worker Adjustment and Retraining Notification Act (Chapter 475 of the laws of 2008), as set forth in § 860, *et seq.*, of the New York State Labor Law. The WARN Complaint asserted that the WARN Class members' alleged damages were entitled to first administrative priority status pursuant to section 503(b)(1)(A) of the Bankruptcy Code.

By agreement of the parties, the deadline for the defendants to answer the WARN Complaint was extended through August 10, 2012. On August 8, 2012, the Yucaipa General Partner filed a motion to dismiss the WARN Complaint (Adv. Proc. Docket No. 18). On August 10, 2012, the Debtor defendants filed an answer to the WARN Complaint (Adv. Proc. Docket No. 20), denying the allegations in, and asserting certain affirmative defenses to, the WARN Complaint. On December 14, 2012, the Bankruptcy Court entered an order (Adv. Proc. Docket No. 30) granting the Yucaipa General Partner's motion to dismiss without prejudice to a potential repleading of the WARN Complaint with respect to the allegations against it.

As part of the Global Settlement, described further below, the defendants and the WARN Class Representative (as defined below) agreed on a resolution of the WARN Action and the underlying claims of the WARN Class (the "WARN Settlement"). Following the Bankruptcy Court's approval of the Global Settlement as described further below, the Debtors became authorized to enter into the WARN Settlement pursuant to Bankruptcy

Rule 9019, subject to the Bankruptcy Court's separate approval of the WARN Settlement as an appropriate class action settlement in the WARN Action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, made applicable in the WARN Action by Bankruptcy Rule 7023. Upon a joint motion of the parties to the WARN Settlement (Adv. Proc. Docket No. 32), the Bankruptcy Court entered an order in the WARN Action on June 25, 2013 (Adv. Proc. Docket No. 37) granting preliminary approval of the WARN Settlement, conditionally certifying the WARN Class, appointing class counsel for the WARN Class and appointing Nadia Sanchez as the class representative of the WARN Class (the "WARN Class Representative"). Following notice to the WARN Class concerning the WARN Settlement, in response to which no members of the WARN Class opted out of or objected to the WARN Settlement, the Bankruptcy Court entered an order in the WARN Action on October 9, 2013 (Adv. Proc. Docket No. 44) approving of the WARN Settlement on a final basis. The WARN Action was then dismissed on October 15, 2013 (Adv. Proc. Docket No. 46) and closed on October 30, 2013.

**K. Avoidance Actions**

Chapter 5 of the Bankruptcy Code confers upon debtors the right to assert claims to avoid and recover certain transfers, such as, among others, preferential transfers under sections 547 and 550 of the Bankruptcy Code ("Preferences").[9] The Plan and the Global Settlement define Preferences and certain other chapter 5 claims as Avoidance Actions.

In connection with seeking approval of the Original Settlement (defined and discussed in Section III.M.2 below) that was a precursor to the Global Settlement, the Debtors proposed to waive the Estates' rights to pursue Preferences. At that time, the Debtors presented testimony to the Bankruptcy Court concerning their preliminary analysis of Avoidance Actions to avoid and recover Preferences. Specifically, the Debtors' CRO testified that: (1) the Debtors' disbursements during the 90 days before the Petition Date totaled approximately $223 million; but (2) based on the Debtors' analysis of the timing of payments, payment histories and other facts and circumstances bearing on the *prima facie* satisfaction of necessary statutory elements and the application of the primary available defenses, and considering only transfers above a materiality threshold of $400,000.00, only approximately $2 million in relevant prepetition disbursements appeared likely to be avoidable as Preferences.

The Original Settlement and the waiver of Preferences was not approved by the Bankruptcy Court. As described below in Section III.M, the Preferences and other potential Avoidance Actions have been preserved to fund creditor recoveries under the Global Settlement.

As noted above, in November 2013, the Bankruptcy Court approved the Debtors' retention of ASK LLP as special counsel to pursue Avoidance Actions. ASK LLP is in the process of analyzing potential Preferences and asserting preliminary demands for recoveries. This process is in its early stages and, as of the date hereof, the Debtors have not commenced any Avoidance Actions in the Bankruptcy Court. Based on its analysis to date, ASK LLP believes that the value of the Preferences could equal or exceed the Debtors' preliminary estimates. As the process advances and the potential Preference defendants respond to the preliminary demands and/or formal litigation, the projected Preference recoveries could differ materially, either positively or negatively, in comparison to the Debtors' preliminary estimate of approximately $2 million in Preferences.

---

9 As provided in greater detail in section 547 of the Bankruptcy Code, a Preference is (1) a transfer of an interest of the debtor in property, (2) made to or for the benefit of a creditor while the debtor was insolvent, (3) for or on account of an antecedent debt, (4) made on or within 90 days before the commencement of the bankruptcy case (or within one year before, if made to or for an insider), (5) which enables the creditor to receive more than the creditor would receive in a hypothetical chapter 7 liquidation of the debtor if the transfer had not been made. See 11 U.S.C. § 547(b). As provided in section 547 of the Bankruptcy Code and related case law, avoidance of Preferences is subject to a variety of potential defenses, including, among others, defenses for (1) transfers made in the ordinary course of business, (2) transfers made as a contemporaneous exchange for new value or (3) transfers to a creditor that subsequently provided new value to the debtor. See 11 U.S.C. § 547(c). Each defense is subject to various legal requirements, conditions and limitations.

**L. Disallowance of the GOPAC Claims**

As noted above in the summary of the Northeast Outbreak Lawsuits, GOPAC asserts claims against Debtor Fairbank in those actions for contribution, indemnification and/or reimbursement if GOPAC is found to be liable to any of the Northeast Consumer Plaintiffs. In these Chapter 11 Cases, GOPAC also filed corresponding proofs of claim making the same assertions (the "GOPAC Bankruptcy Claims"). On September 4, 2013, the Debtors filed objections to the GOPAC Bankruptcy Claims, pursuant to section 502(e)(1)(B) of the Bankruptcy Code, seeking disallowance of these claims on the grounds that they were contingent and unliquidated claims for contribution and/or reimbursement (Docket No. 1169). GOPAC contested the Debtors' objections on various grounds (Docket No. 1190), and the Debtors filed a reply in support of their objections (Docket No. 1236). On November 14, 2013, following a hearing on this matter, the Bankruptcy Court entered an order (Docket No. 1253) (the "GOPAC Claims Order") disallowing the GOPAC Bankruptcy Claims, as requested, pursuant to section 502(e)(1)(B) of the Bankruptcy Code GOPAC has appealed the GOPAC Claims Order, and the Debtors intend to defend the appeal. This appeal is in its initial stages and has not yet been docketed in the appellate court.

**M. The Global Settlement**

**1. Summary of the Underlying Disputes**

From the earliest stages of these Chapter 11 Cases, several critical overarching disputes arose concerning the claims, interests and priority of certain of the Debtors' major stakeholders. These disputes included: (a) potential challenges by the Committee to the validity and priority of certain of the liens asserted by the Second Lien Lenders; (b) the threatened assertion by the Committee of certain Estate claims against certain of the Second Lien Lenders and the Term B Loan Lenders in their capacity as potential insiders of certain of the Debtors; and (c) arguments by the Committee that the Debtors (or their lenders) were obligated to satisfy Twenty-Day Claims in full as a condition to utilizing the chapter 11 process to maximize value. Certain aspects of these matters also are discussed above in Sections II.D.2, III.B.1, III.B.2, III.G, III.H and III.I.

For example, in connection with the Bankruptcy Court's consideration of the DIP Facility, the Committee asserted, among other objections, that the provisions of the DIP Facility, as originally proposed, afforded the Committee an inadequate Challenge Period for it to investigate the prepetition liens and claims, including claims against potential insiders. As noted above, following negotiations among the Debtors, the Committee, the DIP Agent, the First Lien Agent and the Second Lien Agent, among other parties, the interim and final orders approving the DIP Facility provided an extended Challenge Period for the Committee. In addition, all subsequent orders and notices extending the Debtors' authority to use Cash Collateral have further extended the Committee's Challenge Period. As also discussed above in Section III.I, the Committee has taken the position that it has identified grounds supporting significant claims against certain of the Second Lien Lenders and potential challenges to the Second Lien Agent's liens.

In addition, also in objecting to the DIP Facility, the Committee as well as certain claimants asserting Twenty-Day Claims objected on the grounds that the proposed DIP Facility would not provide for the full satisfaction of asserted Twenty-Day Claims. As noted above in Section III.B.2, more than 100 distinct claimants asserted Twenty-Day Claims that the Debtors estimate may amount to more than $29 million in liability (subject to further review and defenses).

The Debtors, the DIP Agent, the First Lien Agent, the Second Lien Agent and the Committee deferred their asserted and potential disputes concerning the foregoing issues to allow these Chapter 11 Cases to progress through their initial stages and through the sale of substantially all of the Debtors' assets without the delay, distraction and costs of litigation. The process of selling substantially all of the Debtors' assets fundamentally confirmed that the value of the Debtors' remaining assets after satisfying the DIP Facility is not sufficient to satisfy the asserted secured claims of the Second Lien Lenders. Further, once the aggregate amount of sale proceeds for the Debtors' Facilities became clear, the Committee asserted its Committee Sale Objection, arguing that, to the extent that the sales would cause the Debtors' Estates to become administratively insolvent, the Bankruptcy Court should approve the sales only if all of the key parties could agree, or if the Bankruptcy Court would order, that the proceeds would be set aside in a sufficient amount to pay all administrative priority claims, including Twenty-Day Claims, in full. Ultimately, by agreement of the Debtors, the Second Lien Agent and the Committee, that issue was deferred and not adjudicated in

connection with final approval of the sales. Instead, the asset sales were approved and consummated, with significant asset sale proceeds deposited into escrow and not distributed to the Second Lien Lenders.

Under these circumstances, and given (a) the findings in the Final DIP Order and the Interim Cash Collateral Order concerning the validity of the Second Lien Lenders' liens, (b) the adequate protection granted to the Second Lien Lenders under the Interim Cash Collateral Order and (c) the challenges identified by the Committee and the risks and uncertainties of the Committee's potential actions against the Second Lien Lenders, a global resolution of disputes offered the only viable alternative to provide value to creditors and permit the Debtors to pursue a chapter 11 plan. Certain aspects of these matters also are discussed in Sections II.D.2, III.B.1, III.B.2, III.G, III.H and III.I above. Indeed, the Debtors believed that achieving a global settlement was necessary to enable them to (a) obtain agreements for the ongoing consensual use of Cash Collateral; (b) continue their efforts, after the sale of the Facilities, to wind down their Estates and maximize the value of their remaining assets for the benefit of their stakeholders; (c) provide an opportunity to propose and confirm a chapter 11 plan; and (d) ultimately, seek to bring these Chapter 11 Cases to a successful conclusion.

### 2. The Original Settlement

Based on the foregoing, the Debtors pursued a settlement with the Second Lien Agent and the Committee. On September 18, 2012, the Debtors, the Committee, YCIF II, YCIF II Parallel, the Second Lien Agent, the SPV, NBPCo and BPI filed a joint motion (Docket No. 660) (the "Initial Settlement Approval Motion") seeking approval of, and authorization to enter into, a settlement agreement (the "Original Settlement"), pursuant to Bankruptcy Rule 9019. ACAS, GOPAC and the WARN Class Representative, on behalf of the WARN Class, objected to approval of the Original Settlement. (Docket Nos. 681, 687 and 679, respectively.) At a hearing on October 11, 2012, the Bankruptcy Court expressed concern with several aspects of the Original Settlement, as proposed, and declined to grant the relief requested in the Initial Global Settlement Approval Motion. Notably, the Court indicated that the waiver of all Avoidance Actions and the proposed nonconsensual treatment of the claims of ACAS under the Original Settlement could not be approved absent the disclosures, voting and other protections of a chapter 11 plan (*i.e.*, that the Original Settlement was a so-called *sub rosa* plan). On October 18, 2012, the Court entered a written order (Docket No. 728) formalizing the ruling stated at the hearing.

### 3. Renegotiation to Reach the Global Settlement

Following the Bankruptcy Court's decision not to authorize the Debtors to enter into the Original Settlement, the Debtors and the other parties to the Original Settlement engaged ACAS and the WARN Class Representative, on behalf of the WARN Class, in negotiations to revise the terms of the Original Settlement to address the concerns stated in the latter parties' objections and by the Bankruptcy Court. In the following weeks, the Debtors, the Committee, the Term B Loan Lenders, the Second Lien Agent, BPI, ACAS, the other Second Lien Lenders and the WARN Class Representative on behalf of the WARN Class (collectively, the "Global Settlement Parties") negotiated the terms of a revised settlement resolving substantially all of the key disputes among them. Counsel to the Second Lien Agent announced the agreement in principle to a revised settlement agreement at a hearing before the Court on December 17, 2012. Thereafter, following months of arms' length negotiations, the Global Settlement Parties entered into a term sheet (the "Global Settlement Term Sheet") outlining the detailed terms of the revised global settlement (the "Global Settlement"), which provides the foundation for conclusion of these cases.

The Global Settlement retains much of the economic structure of the Original Settlement but omits elements that the Bankruptcy Court determined are appropriately reserved for a chapter 11 plan or otherwise were improper. For example, among other material differences between the Global Settlement and the Original Settlement, the Global Settlement contains no waiver of Avoidance Actions. Rather, the Global Settlement provides for, and the Plan provides one means of implementing, the pursuit of such claims by the Avoidance Action Committee and the distribution of any net proceeds of such claims.

In addition, the Global Settlement resolved critical disputes concerning the claims of ACAS and the WARN Class. By resolving issues with ACAS, the Global Settlement provides a complete settlement with all of the Second Lien Lenders and eliminates any arguments of disparate treatment among that group.

#### 4. The Settlement Hearing and Approval of the Global Settlement

On June 14, 3013, the Global Settlement Parties Filed an amended joint motion (Docket No. 1070) (the "Global Settlement Approval Motion") seeking approval of and authorization to enter into the Global Settlement, pursuant to Bankruptcy Rule 9019. GOPAC again objected (Docket No. 1094), arguing that (a) the Global Settlement Parties failed to meet their burdens of disclosure and proof for approval of the Global Settlement and (b) the Global Settlement constitutes an impermissible *sub rosa* plan. Following the conclusion of an evidentiary hearing (the "Settlement Hearing"), on July 2, 2013, the Bankruptcy Court entered an order (Docket No. 1114) (the "Global Settlement Approval Order"), granting the Global Settlement Approval Motion, approving the Global Settlement pursuant to Bankruptcy Rule 9019, authorizing the Debtors to enter into and implement the Global Settlement and overruling GOPAC's objections to the Global Settlement.

In approving the Global Settlement, the Bankruptcy Court observed at the Settlement Hearing that the circumstances of these Chapter 11 Cases would preclude "100%" distributions to any prepetition creditor. Indeed, the Bankruptcy Court stated that "it is significant that the only possible recovery for other creditors is a gift from the secured lenders." The Bankruptcy Court further recognized that the Global Settlement Parties "have compromised, have given something in order to achieve a settlement." In overruling GOPAC's objections, the Bankruptcy Court determined that the Global Settlement Parties had met their burden for settlement approval with the presentations made in the Global Settlement Approval Motion and at the Settlement Hearing. The Bankruptcy Court also found that the modifications made to the Global Settlement in comparison to the Original Settlement addressed the *sub rosa* plan concerns that had contributed to the Bankruptcy Court's denial of approval of the Original Settlement.

In addition, as discussed above in Section III.J concerning the WARN Action, the Bankruptcy Court's approval of the Global Settlement included approval for the Debtors to enter into the WARN Settlement. At the time of the approval of the Global Settlement, the Bankruptcy Court also entered and order in the WARN Action granting preliminary approval of the WARN Settlement, subject to notice to class members and final approval. As noted, final approval of the WARN Settlement was granted in early October 2013.

#### 5. Summary of Key Terms of the Global Settlement

The Global Settlement provides the foundation for the Plan. The Global Settlement is capable of being implemented outside of a chapter 11 plan. In fact, initial steps to implement the Global Settlement have been initiated in advance of the Confirmation of the Plan, such as the formation of the Avoidance Action Committee, the retention of Avoidance Action counsel and the commencement of the Debtors' pursuit of Avoidance Action Recoveries. Additional steps to implement the Global Settlement also may be initiated or completed prior to Confirmation of the Plan. As such, the Plan does not constitute the exclusive means of implementing the Global Settlement; however, the Plan provides a orderly and efficient approach to complete the implementation of the Global Settlement, and in doing so to conclude these cases in a manner consistent with the Bankruptcy Code.

The Plan is attached as Annex A to this Disclosure Statement and the Global Settlement Term Sheet is attached to the Plan as Exhibit A thereto. The Global Settlement Term Sheet is incorporated herein and into the Plan by reference. The key terms and conditions of the Global Settlement, as reflected in the Global Settlement Term Sheet, include the following:[10]

(a) Liens and Claims of the Second Lien Agent. On the Settlement Effective Date, the Settlement Parties stipulate that: (i) the Second Lien Agent holds valid, perfected, enforceable and unavoidable liens (which, following the satisfaction of the DIP Facility as discussed above in Section IIIG, became the first priority liens) on all of the Assets of the Debtors, subject to certain permitted liens and the Carve-Out under the Interim Cash Collateral Order; (ii) the Debtors are

10 The following summary of the primary terms of the Global Settlement is provided for the benefit of the Court and other parties in interest. Nothing herein is intended to modify the Global Settlement. To the extent that the terms and conditions summarized herein are inconsistent with the Global Settlement, the Global Settlement shall govern. Capitalized terms in this summary and not otherwise defined in this Disclosure Statement or the Plan shall have the meanings given to them in the Global Settlement.

indebted to the Second Lien Agent without defense, counterclaim, offset or challenge of any kind in the aggregate principal amount of not less than $71,595,210 on account of the Second Lien Obligations; (iii) the Second Lien Claim exceeds the value of the Assets and thereby applies to all Assets; (iv) the Second Lien Claim is deemed allowed for all purposes in an amount no less than $71,595,210; and (v) the Second Lien Agent, on behalf of itself and for the benefit of the Second Lien Lenders, holds an allowed superpriority Adequate Protection Claim in the amount of $2,250,000, which will be satisfied solely from the first $2,250,000 in net recoveries on Avoidance Actions.[11]

(b) Liens and Claims of ACAS. On the Settlement Effective Date, the Settlement Parties stipulate that ACAS holds an allowed secured claim in the amount of $3,100,000 against the Debtors' estates, which allowed claim is included in the $71,595,210 in Second Lien Obligations. The amount of $3,100,000 will represent the sole recovery available to ACAS in these chapter 11 cases and will be payable to ACAS from the proceeds of the General Assets, according to the schedule set forth in the Global Settlement Term Sheet.

(c) The WARN Claimants. Distributions on WARN Claims will be funded solely by the first $1,650,000 in net recoveries from Avoidance Actions.

(d) Recovery on the General Assets. As used in the Global Settlement, the term "General Assets" excludes the Litigation Claims (discussed below) and Avoidance Actions, but otherwise includes all remaining Assets of the Estates, including the Committee Challenge Assets and the net sale proceeds from the Asset Sales. After the Debtors, the Committee and the Second Lien Agent agree on the amount of a Reserve (as defined in the Global Settlement Term Sheet) to fund aspects of the Chapter 11 Cases, the remaining General Assets will be distributed as follows, according to the schedules set forth in the Global Settlement Term Sheet: (i) the first $3,100,000 to ACAS and as otherwise set forth in the Global Settlement Term Sheet and the Third Amendment on account of the ACAS Claims; (ii) the next $14,000,000 to the SPV, 80% of which shall be paid to NBPCo (up to $11,200,000) and 20% to the Creditor Recovery Pool; and (iii) all remaining amounts to the SPV, 90% of which shall be paid to Yucaipa and 10% to the Creditor Recovery Pool. ***Thus, the foregoing funding of the Creditor Recovery Pool constitutes a gift by the SPV to junior creditors, taken from its collateral.***

(e) Recovery on the Litigation Claims. Any and all recoveries received from the Litigation Claims — which comprise the Debtors' claims in the Cargill Litigation and their GOPAC Product Recall Claims in the GOPAC Commercial Claims Litigation — will be divided as follows: (i) 50% ***will be gifted by the SPV to the Creditor Recovery Pool***, *provided, however,* that the first $2,000,000 of such recoveries that would be paid to the Creditor Recovery Pool will be divided equally between NBPCo and the Creditor Recovery Pool until NBPCo receives $1,000,000 (the "NBPCo Litigation Recovery"); and (ii) 50% will be paid to Yucaipa, *provided, however,* that any recovery received by Yucaipa between $2,000,000 and $4,000,000 will be divided equally between Yucaipa and NBPCo until NBPCo receives $1,000,000 (the "Additional NBPCo Litigation Recovery").

(f) Litigation Recovery Fund. The funds necessary to pursue and monetize the Litigation Claims shall be funded as follows: (i) an initial fund of $250,000 (the "Litigation Recovery Fund") shall be established from recoveries received from the General Assets by the SPV and the Creditor Recovery Pool, with the SPV contributing 80% (i.e., $200,000) and the Creditor Recovery Pool contributing 20% (i.e., $50,000); and (ii) if the Second Lien Agent, NBPCo and the entity or

---

11 In addition to addressing the Second Lien Lenders' claims under the Second Lien Credit Facility, the foregoing terms of the Global Settlement also address the satisfaction of Yucaipa's claims under the Term B Loans under the First Lien Credit Facility. The Term B Loans previously had been paid on a provisional basis in connection with the satisfaction of the DIP Facility, as noted above in Section III.G, subject to the Committee's potential challenges to the Term B Loans as insider claims, as described in Section III.M.1 above.

entities that, pursuant to the Plan, are "responsible for administering the Creditor Recovery Pool" determine that additional funds must be contributed to the Litigation Recovery Fund to monetize the Litigation Claims, the SPV will contribute 80% of such funds and the Creditor Recovery Pool will contribute 20%. The first dollars of any recovery received from the Litigation Claims shall be used to return the funds contributed to the Litigation Recovery Fund, with the SPV receiving 80% of all such returned funds and the Creditor Recovery Pool receiving 20%.

(g) Avoidance Action Committee. The Avoidance Action Committee shall be (and since has been) appointed to manage the prosecution of the Avoidance Actions. Specifically, the appointed members of the Avoidance Action Committee are Yucaipa (through counsel), the WARN Class (through counsel) and San Angelo Foods (a trade creditor appointed to the Avoidance Action Committee by the Committee). Avoidance Action Counsel shall be compensated solely on a contingency basis and paid from the gross proceeds of the Avoidance Actions. As noted above in Section III.B.3, Avoidance Action Counsel is ASK LLP, which has retained The Rosner Law Group LLP as its local Delaware counsel.

(h) Recovery on Avoidance Actions. After payment of the fees and expenses of the Avoidance Action Counsel, the first $1,650,000 of net recoveries received from the Avoidance Actions (the "WARN Settlement Amount") shall be paid to fund the maximum settlement amount in the WARN Settlement. The WARN Settlement Amount shall be the only source of funding for the settlement in the WARN Action. Following payment of the WARN Settlement Amount, any and all net recoveries received from the Avoidance Actions between $1,650,001 and $2,250,000 will be divided 55%-45% between Yucaipa and NBPCo, respectively. Such funds shall be paid to the Second Lien Agent for distribution to Yucaipa and NBPCo. Any and all net recoveries received from the Avoidance Actions above $2,250,000 will be paid to the Creditor Recovery Pool; *provided, however, that after recoveries on Avoidance Actions and other Creditor Recovery Pool assets are sufficient to fund payment in full of all Twenty-Day Claims and any Non-Tax Priority Claims, any and all additional net recoveries received from the Avoidance Actions will be divided 50%-50% between Yucaipa and the Creditor Recovery Pool* (the "Creditor Avoidance Action Recovery"). ***Other than the Creditor Avoidance Action Recovery (if any), all funds in the Creditor Recovery Pool represent a gift from the SPV out of its collateral.***

(i) Certain Releases. The Revised Term Sheet provides for certain releases (all such releases collectively, the "Releases"). In particular, on the Settlement Effective Date, the Debtors (on behalf of themselves and their estates and each of their affiliates and certain related entities), the Committee (on behalf of itself and its members and each of their affiliates and certain related entities) and **ALL CREDITORS THAT ACCEPT A DISTRIBUTION FROM THE CREDITOR RECOVERY POOL, FUNDED BY THE GIFT FROM THE SPV, AS CONSIDERATION IN EXCHANGE FOR THEIR RELEASES** (collectively, the "Releasing Parties") will be deemed to release Yucaipa, ACAS, all ACAS Lenders, BPI, NBPCo, the SPV, the First Lien Agent, the Second Lien Agent and the Second Lien Lenders and each of their affiliates and related entities (collectively, the "Released Parties") from all claims (including Avoidance Action claims). On the Settlement Effective Date, the Released Parties also shall release the Releasing Parties to the same extent that Releasing Parties released the Released Parties. For the avoidance of doubt, no Creditor or Committee member will be released from liability in connection with any Avoidance Action. In addition, the Revised Term Sheet provides for certain Releases among BPI, NBPCo, ACAS, all ACAS Lenders and Yucaipa from all claims.

(j) Settlement Effective Date. There are two prerequisites to the effectiveness of the Global Settlement: (i) the WARN Settlement being approved on a final, non-appealable basis, which has occurred as discussed in Section III.J above; and (ii) the Global Settlement itself being approved on a final, non-appealable basis, which is discussed further below.

### 6. Diagram of the Flow of Funds Under the Global Settlement

Set forth below is a diagram depicting the flow of funds pursuant to the Global Settlement, which has been incorporated into the Plan. This diagram is for illustrative purposes only for the convenience of parties in interest and the Bankruptcy Court, and does not modify the Global Settlement or the Plan. In the event of any inconsistency between the following chart and the Global Settlement or the Plan, the Global Settlement and the Plan shall govern.


GENERAL ASSETS
(All Estate Assets including Miscellaneous Assets but excluding Litigation Claims and Avoidance Actions)
Payments under Cash Collateral Order and Case Administration Budget, including Reserve to pay Administrative and Priority Claims
$3.1 million Class 2 Distribution to ACAS
YCIF II SECOND LIEN HOLDINGS LLC, as the SPV
Funds 80% of costs
Amounts below $14 million
Amounts above $14 million
LITIGATION RECOVERY FUND
80% up to $11.2 million
20%
10%
90%
Class 2 Distribution to NPBCo
Class 2 Distribution to Yucaipa
AVOIDANCE ACTION RECOVERIES
Pays costs to pursue
LITIGATION CLAIM RECOVERIES
First, to reimburse the SPV and the Creditor Recovery Pool for funding the Litigation Recovery Fund
Second, divided
50% Class 2 Distribution to Yucaipa & NBPCo to be divided between them per Global Settlement
50%, but subject first to 50/50 split with NBPCo until NBPCo receives $1 million
Funds 20% of costs
CREDITOR RECOVERY POOL
DISTRIBUTIONS TO CREDITORS PURSUANT TO PLAN ARTICLE III
First, to pay Avoidance Action counsel contingency fees
Second, to pay $1,650,000 settlement payment to WARN Claimants as sole recovery
Third, from $1,650,000 to $2,250,000
45% Class 2 Distribution to NBPCo
55% Class 2 Distribution to Yucaipa
Fourth, proceeds greater than $2,225,000 provided that, once Twenty-Day Claims and Priority Claims are paid in full, any remainder is divided 50% as part of the Class 2 Distribution to Yucaipa and 50% to the Creditor Recovery Pool

### 7. Appeal of the Global Settlement Approval Order

On July 16, 2013, GOPAC commenced an appeal from the Global Settlement Approval Order (the "GOPAC Appeal"). The GOPAC Appeal is pending in the United States District Court for the District of Delaware as Case No. 1:13-cv-01416-RGA, with briefing scheduled to occur between January and March. There is no stay of the Global Settlement Approval Order pending the GOPAC Appeal. The Debtors intend to contest, and seek dismissal of, the GOPAC Appeal.

### 8. Effectiveness and Implementation of the Global Settlement

The Global Settlement contemplates only two prerequisites to its effectiveness. One prerequisite — the WARN Settlement being approved on a final, non-appealable basis, occurred in October 2013 with the Bankruptcy Court's final approval of the WARN Settlement and the subsequent passage of the appeal period.

The other prerequisite is the Global Settlement itself being approved on a final, non-appealable basis (the "Settlement Final Order Condition"). As noted above, the Bankruptcy Court entered the Global Settlement Approval Order on July 2, 2013. The order has not become final, however, because of the GOPAC Appeal. Accordingly, to date, the Global Settlement effective date has not occurred because the Settlement Final Order Condition has not been satisfied or waived.

To date, there is no stay of the Global Settlement Approval Order pending GOPAC's appeal. The Global Settlement Parties have discussed terms under which they may waive the Settlement Final Order Condition and promptly consummate the Global Settlement. Any such waiver could occur prior to the Confirmation or effectiveness of the Plan and prior to the resolution of the GOPAC Appeal. Absent prior satisfaction or waiver of the Settlement Final Order Condition, the Debtors anticipate that this condition will be waived in connection with the consummation of the Plan.

Because the Global Settlement is consistent with the Plan and incorporated into the Plan, implementation of some or all of the Global Settlement prior to Confirmation and the Plan Effective Date will not adversely impact the implementation of the Plan. Indeed, the Global Settlement Parties already have taken certain steps to implement the Global Settlement, such as forming the Avoidance Action Committee, retaining ASK LLP as Avoidance Action counsel and initiating the process of evaluating and pursuing Avoidance Actions.

## IV. PLAN TERMS FOR TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A. Summary

Article III of the Plan contains a table that sets forth the classification under the Plan of Claims against and Equity Interests in the Debtors for all purposes, including voting, confirmation and distribution pursuant the the Plan and sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that any such Claim or Interest has not been paid or otherwise resolved prior to the Effective Date or is not the subject of a current objection. The classification of a Claim in a particular Class for voting purposes shall not be deemed as an allowance of such Claim. The Debtors and the Plan Administrator reserve all rights to object to or to dispute any such Claims as further provided in the Plan.

### B. Administrative Claims and Priority Claims

### 1. Administrative Claims

Unless otherwise agreed by the holder of an Allowed Administrative Claim and the Debtors or the Liquidating Debtors, or unless a Final Order of the Bankruptcy Court provides otherwise, each holder of an Allowed

Administrative Claim will receive, in full satisfaction of its Allowed Administrative Claim, Cash equal to the full unpaid amount of such Allowed Administrative Claim, from the Plan Reserve and, only if and to the extent that the Plan Reserve has insufficient funds and after consultation with the Creditor Advisory Board, then from the Creditor Recovery Pool, either: (a) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (b) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due); (c) at such time and upon such terms as may be agreed upon by the Debtors or the Liquidating Debtors and the holder of an Allowed Administrative Claim; or (d) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court. For the avoidance of doubt, Administrative Claims do not include Twenty-Day Claims, WARN Claims and Reclamation Claims.

**2. Priority Tax Claims**

Each Holder of an Allowed Priority Tax Claim will be paid in respect of such Allowed Priority Tax Claim, from the Plan Reserve and, only if and to the extent that the Plan Reserve has insufficient funds and after consultation with the Creditor Advisory Board, then from the Creditor Recovery Pool, either (a) the full amount thereof, without postpetition interest or penalty, in Cash, as soon as practicable after the later of (i) the Effective Date or (ii) ten Business Days after the date on which such Claim becomes an Allowed Priority Tax Claim, or (b) such lesser amount as to which the holder of an Allowed Priority Tax Claim and the Debtors or Liquidating Debtors might otherwise agree.

**3. Adequate Protection Claim**

For the avoidance of doubt, the Adequate Protection Claim held by the Second Lien Agent, on behalf of itself and the benefit of the Second Lien Lenders, will be satisfied pursuant to the terms of the Global Settlement and Global Settlement Approval Order.

**4. WARN Claims**

For the avoidance of doubt, the WARN Claims will be satisfied pursuant to the terms of the Final WARN Settlement Order, solely from Avoidance Action Recoveries (as such term is defined in the Global Settlement).

**5. Reclamation Claims**

All asserted Reclamation Claims, to the extent asserted to be of priority or secured status, are Disputed Claims because the Debtors do not believe any valid Reclamation Claims entitled to priority or secured status can or do exist pursuant to, among other things, applicable law. Accordingly, pursuant to the Confirmation Order, all Reclamation Claims shall be disallowed without further action by the Debtors or the Liquidating Debtors; provided, however, that any holder of an alleged Reclamation Claim may reassert such Claim as a General Unsecured Claim, subject to any applicable Bar Date(s), with such Claim, if Allowed as such, to receive the treatment provided for an Allowed General Unsecured Claim under the Plan.

**C. Classes of Claims and Equity Interests: Classification, Treatment and Voting Rights**

Holders of Claims and Equity Interests are divided into Classes and treated as follows:

**1. Non-Tax Priority Claims (Class 1)**

**a. Classification**

Class 1 consists of Non-Tax Priority Claims.

**b. Treatment**

Unless otherwise agreed to by a holder of an Allowed Non-Tax Priority Claim and, as applicable, the Debtors or the Liquidating Debtors, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which the subject Non-Tax Priority Claim becomes Allowed, each holder of an Allowed Claim in Class 1 will receive, in full and final satisfaction of its Allowed Non-Tax Priority Claim, Cash equal to the full unpaid amount of such Allowed Class 1 Claim, from the Plan Reserve and, only if and to the extent that the Plan Reserve has insufficient funds and after consultation with the Creditor Advisory Board, then from the Creditor Recovery Pool, after the payment of or reserve for, in full, all Administrative Claims and Priority Tax Claims.

**c. Voting**

Class 1 is Unimpaired, and holders of Non-Tax Priority Claims are conclusively deemed to have accepted the Plan.

**2. Second Lien Lender Secured Claims (Class 2)**

**a. Classification**

Class 2 consists of the Second Lien Lender Secured Claims.

**b. Treatment**

Each holder of Allowed Claims in Class 2 will receive, in full and final satisfaction of its Allowed Second Lien Lender Secured Claim, the applicable amount(s) provided for such holder under the Global Settlement and Global Settlement Approval Order, pursuant to the terms thereof, to the extent not previously paid. The Liquidating Debtors shall pay such amounts solely to the party specified under the Global Settlement (*i.e.*, ACAS or the SPV, as applicable), on behalf of the holder of the Allowed Claim. Such payments shall be made as soon as practicable after the Effective Date, or as otherwise provided in the Global Settlement.

**c. Voting**

Class 2 is Impaired. The holders of Claims in Class 2 are entitled to vote on the Plan.

**3. Other Secured Claims (Class 3)**

**a. Classification**

Class 3 consists of the Other Secured Claims.

**b. Treatment**

Unless otherwise agreed to by a holder of an Allowed Other Secured Claim and, as applicable, the Debtors or Liquidating Debtors, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which the subject Other Secured Claim becomes Allowed, each holder of an Allowed Claim in Class 3 will receive a Cash payment, from the Plan Reserve and, only if and to the extent that the Plan Reserve has insufficient funds and after consultation with the Creditor Advisory Board, then from the Creditor Recovery Pool, equal to the amount of its Allowed Other Secured Claim, in full and final satisfaction of such Allowed Claim.

**c. Voting**

Class 3 is Unimpaired. The holders of Claims in Class 3 are conclusively deemed to accept the Plan and are not entitled to vote on the Plan. No Claim in Class 3 shall be entitled to any Distribution under the terms of the Plan unless such Claim is an Allowed Claim.

**4. Twenty-Day Claims (Class 4)**

**a. Classification**

Class 4 consists of the Twenty-Day Claims.

**b. Treatment**

As soon as practicable after the Effective Date, subject to the funding of the Creditor Recovery Pool pursuant to the terms of the Global Settlement, the Liquidating Debtors shall pay each holder of an Allowed Twenty Day Claim, in full and final satisfaction of such Allowed Twenty Day Claim, its Pro Rata share of the Creditor Recovery Pool (after the payment of or reserve for, in full, Administrative Claims, Priority Tax Claims and Other Secured Claims to the extent such Allowed Claims are payable from the Creditor Recovery Pool), up to the full amount of such Allowed Claim. The Creditor Recovery Pool will be funded as set forth in the Global Settlement Term Sheet from a portion of (a) the Miscellaneous Assets (or proceeds thereof); (b) Litigation Claim Recoveries, if any; and (c) Avoidance Action Recoveries, if any. To the extent required, the Plan shall constitute a compromise and settlement of Allowed Twenty-Day Claims, with each such claimant who does not timely object in writing to the treatment proposed for it with respect to its Allowed Class 4 Claim under the Plan.

**c. Voting**

Class 4 is Impaired. The holders of Claims in Class 4 are entitled to vote on the Plan.

**5. General Unsecured Claims (Class 5)**

**a. Classification**

Class 5 consists of General Unsecured Claims.

**b. Treatment**

As soon as practicable after the payment of or reserve for, in full, all other Allowed Claims payable from, and expenses funded by, the Creditor Recovery Pool, the Liquidating Debtors shall pay each holder of an Allowed General Unsecured Claim, in full and final satisfaction of such Allowed General Unsecured Claim, its Pro Rata share of any remaining amounts in the Creditor Recovery Pool, subject to the terms and conditions set forth in the Global Settlement and Global Settlement Approval Order. In the Plan Administrator's discretion, after consulting with the Creditor Advisory Board, the Plan Administrator may request the Bankruptcy Court to enter an order establishing a Bar Date for the filing of General Unsecured Claims, before making Distributions to holders of Allowed General Unsecured Claims.

**c. Voting**

Class 5 is Impaired. However, to preserve Estate resources, and because no Distribution to holders of Class 5 Claims is anticipated, the Debtors have determined (i) not to solicit votes from Class 5, (ii) to deem Class 5 to reject the Plan and (iii) to seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

**6. Equity Interests (Class 6)**

**a. Classification**

Class 6 consists of Equity Interests.

**b. Treatment**

Holders of Equity Interests shall neither receive nor retain any property under the Plan on account of such Equity Interests. On the Effective Date or on such later date as determined by the Plan Administrator, all Class 6 Equity Interests shall be deemed canceled, null and void and of no force and effect.

**c. Voting**

Class 6 is Impaired. The holders of Claims in Class 6 are conclusively deemed to reject the Plan and are not entitled to vote on the Plan.

**D. Acceptance or Rejection of the Plan**

**1. Impaired Classes of Claims Entitled to Vote**

Except as otherwise provided in order(s) of the Bankruptcy Court pertaining to solicitation of votes on the Plan, holders of Claims in **Classes 2 and 4** shall be entitled to vote to accept or reject the Plan.

**2. Classes Deemed to Accept the Plan**

Class 3 (Other Secured Claims) is Unimpaired under the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, the holders of Claims in Class 3 under the Plan are conclusively deemed to accept the Plan. Therefore, the votes of such holders are not solicited.

**3. Classes Deemed to Reject the Plan**

Class 5 is Impaired. However, to preserve Estate resources, and because no Distribution to holders of Class 5 Claims is anticipated, the Debtors have determined (i) not to solicit votes from Class 5, (ii) to deem Class 5 to reject the Plan and (iii) to seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

Pursuant to section 1126(g) of the Bankruptcy Code, the holders of Equity Interests in Class 6 are fully Impaired and conclusively are presumed to reject the Plan. Therefore, the votes of such holders are not solicited.

**4. Nonconsensual Confirmation**

The Debtors intend to request Confirmation under section 1129(b) of the Bankruptcy Code with respect to any impaired Class that has not accepted or is deemed not to have accepted the Plan pursuant to the terms of the Plan or section 1126 of the Bankruptcy Code. The Debtors reserve the right to modify the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires any such modification.

## V. CERTAIN PLAN TERMS FOR MEANS FOR IMPLEMENTATION OF THE PLAN

**A. Corporate Action; Winding Up of Affairs; Closing of the Cases**

(1) On the Effective Date and automatically and without further action, (a) each existing member of the boards of directors and officers of the Debtors will be deemed to have resigned as of such date without any further corporate action, (b) the Plan Administrator shall be deemed the sole director, officer and representative of the Liquidating Debtors to exercise the rights, power and authority of the Liquidating Debtors under applicable provisions of the Plan and bankruptcy and non-bankruptcy law, and (c) all matters provided under the Plan shall be deemed to be authorized and approved without further approval from the Bankruptcy Court. The Confirmation Order shall act as an order modifying the Debtors' by-laws or other applicable governance documents such that the provisions of the Plan can be effectuated. The Plan shall be administered by the Plan Administrator, subject to consultation with the Creditor Advisory Board where provided for in the Plan, and all actions taken thereunder in the name of the Liquidating Debtors shall be taken

through the Plan Administrator. All corporate governance activities of the Liquidating Debtors shall be exercised by the Plan Administrator in his or her discretion, subject to the terms of the Plan.

(2) Following the Confirmation Date, the Debtors shall not engage in any business activities or take any actions, except those necessary to (a) effectuate the Plan and the Global Settlement and (b) wind up the affairs of the Debtors. On and after the Effective Date, the Plan Administrator may, in the name of the Liquidating Debtors, subject to consultation with the Creditor Advisory Board where provided for in the Plan, take such actions as the Plan Administrator determines are necessary or appropriate for the foregoing purposes, in each case without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan, the Confirmation Order, the Global Settlement or the Global Settlement Approval Order. Without limiting the foregoing, the Plan Administrator may pay the charges that the Plan Administrator incurs after the Effective Date (for himself or on behalf of the Liquidating Debtors) for professional fees and expenses that, but for the occurrence of the Effective Date, would constitute Allowed Administrative Claims. Payments pursuant the prior sentence may be made without application to or approval of the Bankruptcy Court, but subject to the Global Settlement, first from the Plan Reserve and, if and to the extent the Plan Reserve has insufficient funds and after consultation with the Creditor Advisory Board, then from the Creditor Recovery Pool.

(3) From and after the Effective Date, (a) the Debtors, for all purposes, shall be deemed to have withdrawn their business operations from any state in which they were previously conducting or are registered or licensed to conduct their business operations, and the Debtors shall not be required to file any document, pay any sum or take any other action, in order to effectuate such withdrawal; and (b) the Debtors shall not be liable in any manner to any taxing authority for franchise, business, license or similar taxes accruing on or after the Effective Date.

(4) The Plan Administrator, in his or her discretion, without the need of any further approval, at such time as he or she deems appropriate (including, without limitation, on or promptly following the Effective Date), may execute and file documents and take all other actions as he or she deems appropriate to effectuate the cancelation of the Equity Interests in and the dissolution of one or more of the Liquidating Debtor(s) — *provided, however*, that at least one Liquidating Debtor shall remain in existence until the Plan, the Global Settlement and the Global Settlement Approval Order have been fully implemented — and all applicable regulatory or governmental agencies shall take all steps necessary to allow and effect the prompt dissolution of such Liquidating Debtor(s) as provided herein, without the payment of any fee, tax or charge and without need for the filing of reports or certificates.

(5) The Plan Administrator, in his or her discretion, at such time as he or she deems appropriate (including, without limitation, on or promptly following the Effective Date), may seek authority from the Bankruptcy Court to close one or more of the Chapter 11 Cases in accordance with the Bankruptcy Code, the Bankruptcy Rules and the local rules of the Bankruptcy Court; *provided, however*, that at least one Chapter 11 Case shall remain open until the Plan, the Global Settlement and the Global Settlement Approval Order have been fully implemented.

(6) Notwithstanding any other provision herein, with the consent of the Debtors, the Creditors' Committee and the Second Lien Agent, a liquidating trust may be established as of the Effective Date, with the Plan Administrator to serve as the liquidating trustee. In such event, the form of liquidating trust agreement shall be Filed with the Bankruptcy Court prior to the Confirmation Hearing.

**B. Revesting of Assets Free and Clear**

Except as otherwise provided in the Plan or in the Global Settlement and Global Settlement Approval Order, as of the Effective Date, all property of the Estates and the Debtors, including, without limitation, the General

Assets, all rights and interests in Causes of Action (including, without limitation, the Avoidance Actions, the Cargill Litigation and the GOPAC Litigation), and any executory contracts that may be assumed by the Debtors as provided in Section VII.A of the Plan, shall be the property of, and vest in, the Liquidating Debtors not dissolved by the Plan Administrator pursuant to Section IV.A.4 of the Plan, free and clear of all Claims, liens, charges, other encumbrances and interests, and shall be under the exclusive dominion and control of the Liquidating Debtors (or, if applicable, the liquidating trust), acting through the Plan Administrator (or, if applicable, the liquidating trustee), to administer for the benefit of the creditors of the Estates, without the need of notice or further order of the Bankruptcy Court, subject to the terms of the Plan (including the oversight roles of the Creditor Advisory Board), the Global Settlement and Global Settlement Approval Order.

## C. Source of Funds for Plan Distributions

Generally, the Debtors' Cash as of the Effective Date and the Cash generated from the liquidation or monetization of assets thereafter, all as a "gift" from the Second Lien Lenders out of their collateral recoveries, shall fund the Plan (including the Plan Reserve and the Creditor Recovery Pool), subject to the terms of the Global Settlement and Global Settlement Approval Order. In the event that there are any excess funds remaining in the Plan Reserve (after the payment of or reserve for all Plan Expenses and other expenditures from this fund as permitted under the Plan, the Global Settlement and the Global Settlement Approval Order), such excess funds shall be paid, consistent with the Global Settlement, to the SPV, to be distributed immediately according to the terms of the Global Settlement. Any such distribution made by the SPV to the Creditor Recovery Pool under such circumstances shall be available for distribution to creditors in accordance with the Plan.

## D. Plan Administrator

On the Effective Date, the Plan Administrator shall begin acting for the Liquidating Debtors in the same fiduciary capacity as applicable to a board of directors, subject to the provisions hereof, although the fiduciary duties shall be to all creditors of the Debtors rather than to equity owners. The Plan Administrator shall serve in such capacity through the earlier of the date that all of the Liquidating Debtors are deemed dissolved in accordance with the Plan and the date such Plan Administrator resigns, is terminated or otherwise unable to serve.

The qualifications and proposed compensation of and other disclosures regarding the Plan Administrator shall be set forth in a notice to be Filed with the Bankruptcy Court as part of the Plan Supplement. Such compensation, as well as reimbursement of the Plan Administrator's actual, reasonable and necessary expenses incurred in connection with the performance of the Plan Administrator's duties, shall be paid from the Plan Reserve and, if and to the extent that the Plan Reserve has insufficient funds and after consultation with the Creditor Advisory Board, then from the Creditor Recovery Pool, without further order of the Bankruptcy Court. The compensation of the Plan Administrator shall be reasonably acceptable to the Second Lien Agent and the Creditors' Committee (or, after the Effective Date, the Creditor Advisory Board), and any disputes about reasonableness may be presented to the Bankruptcy Court for determination.

Except as otherwise provided in the Plan, the Global Settlement and Global Settlement Approval Order, all distributions to be made to creditors under the Plan shall be made by the Plan Administrator (or his or her designated agent). The Plan Administrator shall deposit and hold all Cash in trust for the benefit of creditors (including Professionals) receiving distributions under the Plan. Subject to the Global Settlement and Global Settlement Approval Order, the duties and powers of the Plan Administrator shall include, without limitation, the following (without need of further notice or Bankruptcy Court or other approval, except as may be expressly provided herein or in the Global Settlement and Global Settlement Approval Order):

(1) To exercise all power and authority that may be exercised, to commence all proceedings (including the power to continue any actions and proceedings that may have been commenced by or against the Debtors prior to the Effective Date) that may be commenced, and to take all actions that may be taken by any officer or director of the Liquidating Debtors with like effect as if authorized, exercised, and taken by unanimous action of such officers and directors, including consummating the Plan and all transfers thereunder on behalf of the Liquidating Debtors;

(2) To wind up the affairs of the Liquidating Debtors as expeditiously as reasonably possible;

(3) To maintain all accounts, make distributions and take other actions required under or consistent with the Plan and the Global Settlement, including the maintenance of appropriate reserves (including the Plan Reserve) and, after consultation with the Creditor Advisory Board and the Second Lien Agent, the funding of the Litigation Recovery Fund, in the name of the Liquidating Debtors, subject to the limitations expressed in Section V.A of the Plan;

(4) To use, manage, sell, abandon, convert to Cash and/or otherwise dispose of the property of the Estates, for the purpose of liquidating all remaining property of the Estates, making distributions and fully consummating the Plan and the Global Settlement *provided, however*, that the sale or other disposition of the Churchill Share must be approved by the Second Lien Agent and the Creditor Advisory Board or approved by the Bankruptcy Court after notice to the Second Lien Agent and the Creditor Advisory Board;

(5) To take all steps necessary to terminate the corporate existence of the Debtors;

(6) To prosecute objections to and compromise or settle Claims;

(7) To commence, prosecute, abandon, compromise or settle any litigation and Causes of Action on behalf of the Liquidating Debtors in any court or other tribunal; *provided, however*, notwithstanding any other provision herein, (a) in respect to any Avoidance Actions, the Plan Administrator shall be subject to the oversight of the Avoidance Action Committee, which, pursuant to the Global Settlement shall manage the prosecution of Avoidance Actions; and (b) with regard to the Litigation Claims, settlement, abandonment, or other dispositive decisions and decisions concerning funding of the Litigation Recovery Fund must be approved by the Second Lien Agent and the Creditor Advisory Board or approved by the Bankruptcy Court after notice to the Second Lien Agent and the Creditor Advisory Board.

(8) To prepare and file tax returns and to pay taxes to the extent required by law;

(9) To employ and compensate any and all such professionals and agents as the Plan Administrator, in the Plan Administrator's reasonable discretion, deems reasonably necessary to assist in the performance of the Plan Administrator's duties under the Plan without further order of the Bankruptcy Court;

(10) To pay solely from the Creditor Recovery Pool the expenses of the Creditor Advisory Board, including professionals hired by the Creditor Advisory Board; and

(11) To take all other actions not inconsistent with the provisions of the Plan and the Global Settlement that the Plan Administrator deems reasonably necessary or desirable in connection with the administration of the Plan and the implementation of the Global Settlement, including, without limitation, filing all motions, pleadings, reports, and other documents in connection with the administration and closing of the Chapter 11 Cases.

**E. Resignation, Death or Removal of Plan Administrator**

In the event of the resignation, removal, death or incapacity of the Plan Administrator, the Second Lien Agent and Creditor Advisory Board shall jointly nominate and the Bankruptcy Court shall appoint another person to become Plan Administrator, with notice thereof provided to the Post-Effective Date Service List.

**F. Substantive Consolidation**

The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order substantively consolidating all of the Estates into a single consolidated Estate for all purposes associated with Confirmation and Consummation. Pursuant to the Confirmation Order: (1) all assets and liabilities of the Debtors shall be deemed merged; (2) all Claims of one Debtor against another Debtor shall be deemed eliminated; (3) all guarantees by one

Debtor of the obligations of any other Debtor shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of all of the Debtors; and (4) each and every Claim Filed or to be Filed in the Chapter 11 Case of any of the Debtors shall be deemed Filed against the Debtors and shall be deemed one Claim against and a single obligation of all of the Debtors. Such consolidation (other than for the purpose of implementing the Plan) shall not affect the legal and corporate structures of the Debtors.

**G. Compromise and Settlement of Twenty-Day Claims**

The holders of Allowed Twenty-Day Claims are anticipated to receive less than full payment under the Plan. To the extent required, the Plan shall constitute a compromise and settlement of Allowed Twenty-Day Claims, with each holder of such a Claim that does not timely object in writing to the treatment proposed for it with respect to its Allowed Claim under the Plan. All holders of Twenty-Day Claims who do not timely object to the proposed treatment shall be deemed to have consented to such treatment. The Confirmation Order will constitute an order under Bankruptcy Rule 9019 compromising and settling Allowed Twenty-Day Claims in such manner.

**H. Dissolution of the Committee**

Upon the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to: (1) obligations arising under confidentiality agreements, joint interest agreements and protective orders entered during the Chapter 11 Cases, which shall remain in full force and effect according to their terms; (2) applications for Professional Fee Claims; and (3) any pending motions, or any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order.

**I. Creditor Advisory Board**

Upon the Effective Date, the Creditor Advisory Board will be formed. The Creditor Advisory Board shall consist of at least three and no more than five members, who shall be holders of Twenty-Day Claims and/or General Unsecured Claims. The Creditors' Committee shall select the initial members of the Creditor Advisory Board, and any vacancies on the Creditor Advisory Board after the Effective Date shall be filled by election by other members of the Creditor Advisory Board. The Creditor Advisory Board shall be a party in interest in the Chapter 11 Cases and shall have the oversight rights and powers delineated in the Plan, including the Plan Supplement. In all such instances, any disputes that cannot be resolved informally with the Creditor Advisory Board may be submitted to the Bankruptcy Court for resolution on notice. The Creditor Advisory Board may employ any and all such professionals and agents as it, in its reasonable discretion, deems reasonably necessary to perform its functions. The fees and costs of such professionals shall be paid by the Plan Administrator solely from the Creditor Recovery Pool.

## VI. CERTAIN PLAN TERMS GOVERNING DISTRIBUTIONS

**A. Reserves**

In addition to any reserve(s) that the Debtors may be required or deem appropriate to establish before the Effective Date pursuant to the Global Settlement and the Global Settlement Approval Order, the Plan Administrator may, from time to time, in consultation with the Creditor Advisory Board, set aside and reserve from the Plan Reserve or the Creditor Recovery Pool, as applicable, amount(s) that he or she reasonably determines to be necessary to provide for contingencies in implementation of the Plan, including, without limitation, to provide contingent Plan Expenses and may set aside and reserve from the Plan Reserve or Creditor Recovery Pool amounts that he or she reasonably determines to be necessary to provide for the possible allowance of Disputed Claims in Classes that would be paid from such fund, *provided, however*, that the Plan Administrator may not establish any reserves that would delay, hinder or prevent any payments that have been specifically provided for, allocated and required to be remitted to certain parties pursuant to, or otherwise used in strict compliance with, the Global Settlement and the Global Settlement Approval Order. By way of example, and without limiting the foregoing, if the Plan Administrator determines to make a Pro Rata distribution to Allowed Claims in a Class while one or more

Claims in the same Class are Disputed Claims, the Plan Administrator may, in consultation with the Creditor Advisory Board, set aside and reserve for any such Disputed Claims as if they may become Allowed Claims for their full asserted amounts.

**B. Delivery of Distributions**

The Plan Administrator shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible; *provided, however*, that the Plan Administrator's discretion may not be exercised in a manner inconsistent with any express requirements of the Plan or the Global Settlement.

If a cash payment otherwise provided for by the Plan with respect to an Allowed Claim would be less than $50.00 (whether in the aggregate or on any payment date provided in this Plan), notwithstanding any contrary provision of the Plan, the Plan Administrator shall not be required to make such payment. In that event, these *de minimis* undistributed funds shall be distributed to other holders of Allowed Claims in accordance with Articles II and III of the Plan or handled as provided in Section V.C.1 of the Plan.

In connection with the Plan, the Plan Administrator, in the Plan Administrator's discretion, may deduct any federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, and shall be authorized to take any additional actions to comply with any applicable requirements, of law, including tax reporting and withholding requirements. Notwithstanding any other provision of the Plan to the contrary, the Plan Administrator shall be authorized to take any actions that may be necessary or appropriate to comply with such requirements, including, without limitation, utilizing a portion of a Distribution to be made under the Plan to pay applicable withholding taxes or establishing any other mechanisms that the Plan Administrator believes are reasonable and appropriate, including requiring Claim holders to submit appropriate tax and withholding certifications. To the extent that any Claim holder fails to submit appropriate tax and withholding certifications as required by the Plan Administrator, such Claim holder's Distribution may, in the Plan Administrator's reasonable discretion, be deemed undeliverable and subject to Section V.C.3 of the Plan. Notwithstanding any other provision of the Plan, each holder of an Allowed Claim that has received (or is deemed to receive) a distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any governmental unit, including income, withholding and other tax obligation, on account of such distribution. The Debtors, the Liquidating Debtors and the Plan Administrator reserve the right to allocate and distribute all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens and similar encumbrances.

**C. Application of Distributions**

To the extent applicable, all Distributions to a holder of an Allowed Claim shall apply first to the principal amount of such Claim until such principal amount is paid in full and then to any interest accrued on such Claim prior to the Petition Date

## VII. CERTAIN PLAN TERMS CONCERNING DISPUTED CLAIMS

**A. No Distribution Pending Allowance**

Notwithstanding any other provision of the Plan, the Plan Administrator shall not Distribute any Cash or other property on account of any Disputed Claim unless and until such Claim becomes Allowed.

**B. Resolution of Disputed Claims**

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, subject to section 502(a) of the Bankruptcy Code, the Plan Administrator on behalf of the Liquidating Debtors shall have the right, to the exclusion of all to make, File, prosecute, settle, compromise, withdraw or resolve, in any manner approved by the Bankruptcy Court, objections to Claims; *provided, however*, that the Plan Administrator may settle, resolve, release or compromise any Claims and objections to Claims (including Twenty-Day Claims) on behalf of the Liquidating Debtors without need for notice or order of the Bankruptcy Court and provided further that (1) nothing in the Plan

shall limit the rights of parties in interest to object to the Professionals' applications for allowances of compensation and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code; (2) where the prosecution or settlement of a Disputed Claim involves the resolution of an Avoidance Action against the holder of such Disputed Claim, the Plan Administrator shall act in consultation with and with the consent of the Avoidance Action Committee; and (3) the settlement or resolution of any Claims held by insiders or any Administrative Claims, Priority Claims, or Twenty-Day Claims with a face value of more than $100,000 require consent of the Creditor Advisory Board or an order of the Bankruptcy Court.

### C. Objection Deadline

Subject to extension, all objections to Disputed Claims shall be Filed and served upon the holders of each such Claim by the later of (1) the first Business Day that is at least 120 days after the Effective Date and (2) the first Business Day that is at least 90 days after the filing of a proof of Claim, provided that the Plan Administrator may seek extension(s) thereof subject to Bankruptcy Court approval and with notice only to parties on the Post-Effective Date Service List.

In the Plan Administrator's discretion, the Plan Administrator may request the Bankruptcy Court to enter an order establishing a Bar Date for the filing of General Unsecured Claims, in which case, notwithstanding the foregoing provision, the Claims Objection Deadline in respect of any proofs of Claim Filed pursuant to any such order shall be the later of (1) the first Business Day that is at least 180 days after the applicable Bar Date and (2) the first Business Day that is at least 90 days after the filing of a proof of Claim.

### D. Estimation of Claims

At any time: (1) prior to the Effective Date, the Debtors; and (2) subsequent to the Effective Date, the Plan Administrator on behalf of the Liquidating Debtors, may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Liquidating Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the Claim, the Plan Administrator may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim. All of the aforementioned procedures for Claims objections, estimation and resolution are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court, or by the Plan Administrator without need for notice or order of the Bankruptcy Court as provided in Section VI.B of the Plan with respect to Disputed Claims.

## VIII. PLAN TERMS FOR TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A. Rejection/Assumption of Executory Contracts and Unexpired Leases

On the Effective Date, except for any executory contract or unexpired lease that (1) was previously assumed or rejected by an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code or (2) is identified as to be assumed in the Plan Supplement, each executory contract and unexpired lease that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, effective as of the Effective Date. Notwithstanding the foregoing, unless otherwise provided in the Plan Supplement, nothing in the Plan shall cause the rejection (if such contract is an executory contract for purposes of section 365), breach or termination of any contract of insurance benefiting the Debtors, their current or former directors and officers, the Estates and/or the Liquidating Debtors or the Plan Administrator. Nothing in the Plan shall be construed as an acknowledgement that a particular contract or agreement is executory or is properly characterized as a lease for purposes of section 365 of the Bankruptcy Code.

If applicable, proposed cure amounts for the assumption of executory contracts and unexpired leases shall be set forth in the Plan Supplement, and any objection thereto of the subject nondebtor counterparty must be Filed and served on Debtors' counsel by the deadline set for Filing objections to the confirmation of the Plan or by any alternative deadline established in the Plan Supplement.

**B. Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Any Rejection Damages Claim shall be treated as a Claim in Class 5 (General Unsecured Claims), consistent with sections 365(g) and 502(g) of the Bankruptcy Code. Except to the extent another deadline applies pursuant to an order of the Bankruptcy Court, all proofs of Claim with respect to Claims arising from the rejection of executory contracts under the Plan must be filed with the AFA Claims Processing Center at the following address:

AFA Claims Processing Center
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, CA 90245

## IX. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**A. Conditions Precedent to Confirmation**

The following are conditions precedent to Confirmation that must be satisfied or waived:

1. The Confirmation Order shall be reasonably acceptable in form and substance to the Debtors and the other Settlement Parties.

2. The Plan will not have been materially amended, altered or modified except as may be (a) otherwise permitted under the Plan or (b) reasonably acceptable in form and substance to the Debtors and the other Settlement Parties.

3. All Plan Exhibits and other materials in the Plan Supplement are in form and substance reasonably satisfactory to the Debtors and the other Settlement Parties.

**B. Conditions Precedent to the Effective Date**

The following are conditions precedent to the Effective Date that must be satisfied or waived:

1. The Confirmation Order shall have been entered by the Bankruptcy Court.

2. The Confirmation Order has not been reversed, stayed, modified or amended, and has become a Final Order.

3. The Confirmation Date shall have occurred and no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending.

4. The appointment of the Plan Administrator shall have been confirmed by the Confirmation Order or other order of the Bankruptcy Court.

5. The Global Settlement Approval Order shall not have been vacated, reversed or modified on appeal or remand.

6. The conditions to the Global Settlement shall have been satisfied or duly waived by the Global Settlement Parties.

Notwithstanding the foregoing, conditions 2, 3 and 4 may be waived by the Debtors, after consultation with the Committee, the Second Lien Agent and ACAS, and any such waiver shall not require further order of the Bankruptcy Court or notice to any party (except counsel to the Committee, the Second Lien Agent and ACAS).

## X. RELEASES, INJUNCTIONS AND RELATED PROVISIONS

### A. Compromise and Settlement

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Equity Interests. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable and reasonable and in the best interests of the Debtors, the Estates and holders of Claims and Equity Interests.

### B. Releases Implemented by the Global Settlement Approval Order

For the avoidance of doubt, nothing herein or in the Plan or the Confirmation Order is intended to limit or otherwise modify or affect the releases, waivers of liability and/or any other similar covenants and agreements set forth in and implemented by the Global Settlement and the Global Settlement Approval Order, including, without limitation, the release set forth on pp. 8-9 of the Global Settlement Term Sheet attached to the Plan.

**THE PLAN IMPLEMENTS AND MAKES BINDING AND ENFORCEABLE THE PROVISION OF THE GLOBAL SETTLEMENT, DESCRIBED IN SECTION III.M.5(i) ABOVE, THAT ANY CLAIMANT WHO RECEIVES A DISTRIBUTION FROM THE CREDITOR RECOVERY POOL SHALL BE DEEMED TO BE BOUND BY, AND TO GRANT AND CONSENT TO, THE RELEASES PROVIDED FOR THE GLOBAL SETTLEMENT PARTIES IN THE GLOBAL SETTLEMENT.**

**ACCORDINGLY, IF YOU ACCEPT A DISTRIBUTION UNDER THE PLAN FROM THE CREDITOR RECOVERY POOL — WHICH IS FUNDED BY GIFTING FROM THE SPV OUT OF ITS COLLATERAL — YOU WILL BE BOUND BY, AND TO GRANT AND CONSENT TO, SUCH RELEASES IN EXCHANGE FOR THE CONSIDERATION OF THE DISTRIBUTION.**

### C. Exculpation

**Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall neither have nor incur any liability to any Entity for any and all claims and causes of action arising on or after the Petition Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, the Global Settlement or any other contract, instrument, release or other agreement or document created or entered into in connection with or related to the Plan, the Global Settlement or the Chapter 11 Cases; *provided, however*, that the foregoing provisions of this Article shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence or willful misconduct; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents; provided, further, that the foregoing provisions shall not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or any defenses thereto.**

### D. Vesting and Preservation of Causes of Action

1. Unless a Cause of Action against any Entity is expressly waived, relinquished, released, compromised or settled in the Plan, the Global Settlement, the Global Settlement Approval Order and/or any Final Order (including the Confirmation Order), the Debtors, the Liquidating Debtors and the Plan Administrator on their behalf expressly reserve all Causes of Action (including,

without limitation, all Avoidance Actions, all Causes of Action associated with the Cargill Litigation and the GOPAC Litigation and all Causes of Action in all other litigation presently pending in other forums between any Debtors and the defendant in the GOPAC Litigation) for later adjudication, as applicable, by the Debtors or the Liquidating Debtors (including, without limitation, Causes of Action not specifically identified or described in the Disclosure Statement, of which the Debtors, the Plan Administrator and the Avoidance Action Committee may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors, the Plan Administrator and the Avoidance Action Committee at this time or facts or circumstances which may change or be different from those that the Debtors, the Plan Administrator and the Avoidance Action Committee now believe to exist).

2. In addition, the Debtors and the Liquidating Debtors and the Plan Administrator on their behalf expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co defendants in such lawsuits.

**E. Release and Injunction**

1. The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Equity Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtors or any of their assets or properties. On the Effective Date, all such Claims against, and Equity Interests in, the Debtors shall be satisfied and released in full.

2. All Parties and Entities shall be permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest satisfied and released under the Plan, from:

(a) commencing or continuing in any manner any action or other proceeding of any kind against any of the Debtors, the Liquidating Debtors, the Estates, the Plan Administrator, and their respective successors and assigns, and such entities' assets and properties; *provided, however*, that this injunction does not apply to the continuation of any action or other proceeding (i) in which a Debtor is the plaintiff or (ii) with respect to which the Bankruptcy Court has entered an order lifting or otherwise modifying the automatic stay under the Bankruptcy Code;

(b) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any of the Debtors, the Estates, the Liquidating Debtors, the Plan Administrator and their respective successors and assigns, and such entities' assets and properties;

(c) creating, perfecting or enforcing any encumbrance of any kind against any of the Debtors, the Liquidating Debtors, the Estates, the Plan Administrator and such entities' assets and properties;

(d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any of the Debtors or against the property or Estate of any of the Debtors, except to the extent a right to setoff, recoupment or subrogation is asserted with respect to a timely filed proof of Claim; or

(e) except as provided above, commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled hereunder or under the Global Settlement and the Global Settlement Approval Order.

### F. Releases of Liens

Except as otherwise expressly provided in the Plan, in any contract, instrument, release or other agreement or document created pursuant to the Plan, or in the Global Settlement and the Global Settlement Approval Order, on the Effective Date, all mortgages, deeds of trust, liens, pledges or other security interests against property of the Debtors and the Estates shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens, pledges or other security interest shall revert to the Liquidating Debtors and their successors and assigns.

## XI. CONSOLIDATION OF THE DEBTORS AND CANCELLATION OF INTERCOMPANY CLAIMS

Pursuant to the Confirmation Order or other order of the Bankruptcy Court, the Bankruptcy Court will approve the consolidation of the Debtors solely for the purpose of implementing the Plan, including for purposes of voting, Confirmation and Distributions to be made under the Plan. Pursuant to such order: (1) all assets and liabilities of the Debtors shall be deemed merged; (2) all Claims of one Debtor against another Debtor shall be deemed eliminated; (3) all guarantees by one Debtor of the obligations of any other Debtor shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of all of the Debtors; and (4) each and every Claim Filed or to be Filed in the Chapter 11 Case of any of the Debtors shall be deemed Filed against the Debtors and shall be deemed one Claim against and a single obligation of all of the Debtors. Such consolidation (other than for the purpose of implementing the Plan) shall not affect the legal and corporate structures of the Debtors. The Plan serves as a motion seeking entry of an order consolidating the Debtors, as described and to the limited extent set forth above.

## XII. RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and the Plan as is legally permissible, including, without limitation, jurisdiction to:

A. allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests; *provided, however*, that that the Plan Administrator may settle, resolve, release or compromise any Claims and objections to Claims on behalf of the Liquidating Debtors without need for notice or order of the Bankruptcy Court;

B. grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

C. resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

D. ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and the Global Settlement;

E. decide or resolve any disputes between the Plan Administrator and the Creditor Advisory Board;

F. decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving a Debtor that may be pending on the Effective Date or instituted by the Plan Administrator after the Effective Date, *provided, however*, that the Plan Administrator shall reserve the right to commence actions in all appropriate jurisdictions;

G. enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan, the Global Settlement and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, Plan Supplement, the Global Settlement or the Disclosure Statement;

H. resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or the Global Settlement or any Entity's obligations incurred in connection with the Plan or the Global Settlement;

I. issue injunctions, enforce them (including without limitation the Plan Injunction), enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

I. enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

J. resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the Global Settlement or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan, the Global Settlement or the Disclosure Statement;

K. adjudicate any matters directed, raised or implicated by any remand from the GOPAC Appeal;

L. determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for taxes;

M. enter an order and/or the decree contemplated in Bankruptcy Rule 3022 concluding the Chapter 11 Cases; and

N. hear any other matter not inconsistent with the Bankruptcy Code.

## XIII. CERTAIN ADDITIONAL TERMS OF THE PLAN

### A. Final Fee Applications

The deadline for submission by Professionals of applications for Bankruptcy Court approval of Accrued Professional Compensation shall be 45 days after the Effective Date.

### B. Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid prior to the closing of the Chapter 11 Cases on the earlier of when due or the Effective Date, or as soon thereafter as practicable.

### C. Modification of Plan

Subject to the limitations contained in the Plan: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, and to the extent consistent with the terms of the Global Settlement, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors, the Liquidating Debtors or the Plan Administrator, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, and to the extent consistent with the terms of the Global Settlement, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan; *provided that* any modification to the Plan must be approved by the Committee and Second Lien Agent and any modification impacting any aspect of the Global Settlement must be approved by all of the Settlement Parties.

**D. Revocation of Plan**

The Debtors reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to File alternative chapter 11 plans to the extent consistent with the Global Settlement. If the Debtors revoke or withdraw the Plan or if entry of the Confirmation Order or the Effective Date does not occur, then: (1) the Plan (but not the Global Settlement) shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (but not the Global Settlement), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan, other than the Global Settlement, shall: (a) constitute a waiver or release of any claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

**E. Successors and Assigns**

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

**F. Governing Law**

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

**G. Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order; *provided, however*, that the Bankruptcy Court previously has approved and authorized the Debtors to enter into the Global Settlement. Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by a Debtor or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) any Debtor with respect to the holders of Claims or Equity Interests or other parties-in-interest; or (2) any holder of a Claim or other party-in-interest prior to the Effective Date.

**H. Section 1146 Exemption**

Pursuant to section 1146(a) of the Bankruptcy Code, the following shall not be subject to any stamp tax or other similar tax, real estate transfer tax, mortgage recording tax, filing fee or similar tax: (1) any dissolution or liquidation transaction; (2) the sale, liquidation, transfer, foreclosure, abandonment or other disposition of the Debtors' assets; or (3) the transfers of property, the making or delivery of any deed or other instrument of transfer, under, in furtherance of or in connection with the Plan, including any agreements of liquidation or dissolution, bills of sale or assignments, applications, certificates or statements executed or filed in connection with any of the foregoing or pursuant to the Plan. The Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

**I. Section 1125(e) Good Faith Compliance**

The Debtors and each of their respective Representatives shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

## J. Plan Controls Disclosure Statement

In the event and to the extent any provision of the Plan is inconsistent with any provision of this Disclosure Statement, the provisions of the Plan shall control and take precedence.

## K. Notices

Any notices required under the Plan or any notices or requests of the Debtors, the Liquidating Debtors or the Plan Administrator by parties in interest under or in connection with the Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the parties listed in Article XI.O of the Plan.

## L. Filing of Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

# XIV. CERTAIN FACTORS TO BE CONSIDERED REGARDING THE PLAN

Holders of Claims and Equity Interests against the Debtors should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

## A. Risks of Delayed Confirmation or Non-Confirmation of the Plan

There is are risks that (1) one or more impaired Classes entitled to vote rejects the Plan and the Bankruptcy Court determines that the Plan cannot be "crammed down" on such Class(es) or (2) the Bankruptcy Court determines that the Plan cannot be "crammed down" on other Classes deemed to reject the Plan. Likewise, the Bankruptcy Court might not confirm the Plan based on other requirements of the Bankruptcy Code. Although the Debtors believe that the Plan meets all applicable requirements for Confirmation, and will file briefing in support of the Confirmation of the Plan, there can be no assurance that the Bankruptcy Court will reach the same conclusion. If the Plan is not confirmed, a significant risk exists that the Chapter 11 Cases may be converted to Chapter 7 Cases. In such event, the Debtors believe that Creditor recoveries will be substantially diminished by the additional costs of the chapter 7 process and the potential for lower realization on the remaining Estate assets, particularly if access to cash collateral is no longer available or if the Global Settlement is not consummated.

In addition, any objection to or appeal of Confirmation of the Plan, even if ultimately unsuccessful, could delay confirmation or the Effective Date, potentially for a significant period of time. In such case, payments to Creditors could be delayed and Administrative Claims could continue to accrue.

The Debtors, in consultation with the Global Settlement Parties, reserve the right to modify the terms of the Plan as may be necessary to achieve Confirmation without the acceptance of one or more impaired Classes otherwise entitles to vote on the Plan.

## B. Risks Associated with Proving and Collecting Claims Asserted in Litigation

The ultimate recoveries under the Plan to holders of certain Allowed Claims depends in significant part upon the ability of the Liquidating Debtors to realize favorable litigation outcomes or settlements of the Causes of Action (including the Avoidance Actions and the claims against GOPAC and Cargill). It is extremely difficult to place a value on litigation, and litigation outcomes cannot be predicted. *It is possible that the Estates may recover nothing at all, or very little, on account of such litigation.*

The risks in such litigation include, but are not limited to, risks associated with defenses and counter-claims of opposing parties to the litigation, the delay and expense associated with discovery and trial of factually intensive and complex disputes, the additional delay and expense inherent in appellate review, the diminishing availability of former employees to serve as witnesses because they have moved from the geographic area or have otherwise become unavailable, the impossibility of predicting judicial outcomes and the difficulty collecting favorable judgments.

With respect to the Cargill Litigation in particular, the action is bifurcated into a liability phase preceding any damages phase. Fact and expert discovery in the liability phase has been completed, but the federal trial court in California has not yet set a trial date for the liability phase. Thus, there has not yet been a finding that Cargill is liable for the Debtors' claims. Even if such a finding is reached at trial, which cannot be guaranteed, the parties then would commence a phase to adjudicate damages. Very little discovery, and no pre-trial proceedings, concerning damages have occurred yet. Discovery and/or pre-trial proceedings could bring unknown facts and unpredictable litigation issues and strategies to light that could materially impact the value and collectability of the Debtors' claims in the Cargill Litigation. The Debtors expect Cargill to defend itself vigorously.

With respect to the GOPAC Commercial Claims Litigation, the action was only filed in early September 2013 and remains in a nascent stage. Just as with the Cargill Litigation, discovery and/or pre-trial proceedings could bring unknown facts and unpredictable litigation issues and strategies to light that could materially impact the value and collectability of these claims, and the Debtors expect GOPAC to defend itself vigorously.

With respect to Avoidance Actions, the Debtors' preliminary analysis, as presented to the Bankruptcy Court at the hearing on the Original Settlement, suggested that significant defenses potentially could be asserted by the defendants of any Avoidance Actions concerning Preferences. This topic is discussed further in Section III.K above. The Debtors consequently concluded, subject to further review, that only approximately $2 million in valid Preference claims may exist. This is a gross figure that does not account for the costs of pursuing such claims, their collectability or other factors that might diminish recoveries.

The amount of recoveries, if any, in the foregoing litigation matters can impact creditor recoveries under the Plan. Avoidance Action recoveries are the sole source of designated payment to WARN Claimants under the terms of the Global Settlement and the WARN Settlement. If Avoidance Action recoveries, net of attorney fees and costs, exceed the WARN Settlement payment, such excess recoveries would fund certain distributions to Yucaipa and NBPCo and, beyond those distributions, would supplement the Creditor Recovery Pool. Similarly, any recoveries from Cargill and GOPAC, after reimbursing the Litigation Recovery Fund, also would be allocated among certain distributions to Yucaipa and NBPCo and payments into the Creditor Recovery Pool. Consequently, these litigation recoveries, if any, can materially impact the potential distributions to certain creditors under the Plan.

## C. Risks Regarding the Amount of Certain Claims

The terms of the Global Settlement provide for funds from the General Assets to be budgeted and set aside in the Reserve for the purpose of satisfying Administrative Claims and Priority Claims in full (which will be part of the Plan Reserve under the Plan). The funding, and use, of the Reserve affects the amount of General Assets available for distribution to the SPV and thereafter for distributions by the SPV to other Second Lien Lenders and the Creditor Recovery Pool under the terms of the Global Settlement. The amount of the Reserve will be determined based on certain analyses, assumptions and projections, which are not yet final. In addition, the amount of Other Secured Claims, payable in full in many cases from Liens attaching to sale proceeds, must be projected and could impact cash available to make Distributions to other creditors. The assumptions and projections about the ultimate Allowed amounts of Administrative Claims and Priority Claims are subject to various uncertainties, some of which may be material. Some of these Administrative Claims and Priority Claims may be subject to litigation, the outcome of which is uncertain. In addition, the terms of the Plan provide for the Creditor Recovery Pool to be a potential source of funding for Allowed Claims that the Reserve does not satisfy in full. If the amounts of Allowed Other Secured Claims, Allowed Administrative Claims and Priority Claims is materially higher than anticipated, recoveries for the holders of certain creditor groups, including holders of Allowed Twenty Day Claims, could be negatively impacted.

### D. Risks Associated with the Costs of Administering the Estates After the Effective Date

Monetizing and administering the Debtors' remaining Assets and the disbursement of proceeds to creditors under the Plan will result in the incurrence of administrative costs that may vary based on a number of factors. The amount of costs will be projected and funded into the Plan Reserve; however, such costs cannot be predicted with certainty, and many of these costs are outside of the control of the Debtors, the Liquidating Debtors or the Plan Administrator. As a result, it is possible that the costs of administering the Plan could be higher than projected, and that such increased costs could be material. If that occurs, the amount of funds available for recoveries under the Plan could be adversely affected. See Section XIV.C above.

### E. Risks Regarding the Consummation of the Global Settlement

The Plan is premised in substantial part on the Global Settlement. In fact, as discussed above in Section III.M.8, the Settlement Final Order Condition is a prerequisite to the effectiveness of the Global Settlement and must be satisfied or waived to permit the Global Settlement to be implemented. Satisfaction or waiver of the conditions necessary to close the Global Settlement also is a condition to the effectiveness of the Plan. To date, the Settlement Final Order Condition has not occurred because the Global Settlement Approval Order remains subject to the pending GOPAC Appeal (*i.e.*, the Global Settlement Approval Order is not a final order). To date, the Settlement Parties have not waived the Settlement Final Order Condition, and the Global Settlement has not been consummated.

If the Settlement Final Order Condition is not satisfied or waived in a timely manner, the effectiveness or implementation of the Plan may be delayed, and such delay could be material. Similarly, if the Settlement Final Order Condition is never satisfied or waived, or if the Global Settlement is overturned on appeal or stayed, the implementation of the Plan may not be possible. Although the Settlement Parties believe that they have strong arguments in the GOPAC Appeal, there is no assurance that they will prevail in this litigation. Likewise, prosecution of the GOPAC Appeal, and any subsequent appeals, could take an extended period of time and could delay implementation of the Plan. Likewise, there is no assurance that the Settlement Parties will waive the Settlement Final Order Condition either before or after Confirmation of the Plan.

## XV. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. General

**A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW. THE DESCRIPTION IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "IRC"), TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT AND ALL SUBJECT TO CHANGE, POSSIBLY WITH RETROACTIVE EFFECT. CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION COULD CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.**

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN IMPORTANT RESPECTS, UNCERTAIN. NO RULING HAS BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE (THE "IRS"); NO OPINION HAS BEEN REQUESTED FROM DEBTORS' COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN; AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT.**

**THE DESCRIPTION THAT FOLLOWS DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO HOLDERS OF CLAIMS. FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX EXEMPT ORGANIZATIONS AND NON-U.S. TAXPAYERS. NOR DOES IT ADDRESS TAX CONSEQUENCES TO THE DEBTORS, TO HOLDERS OF INTERESTS OR TO**

**HOLDERS OF CLAIMS WHOSE CLAIMS ARE PAID IN FULL OR WHICH OTHERWISE ARE NOT IMPAIRED UNDER THE PLAN; RATHER, IT ONLY ADDRESSES HOLDERS WHO ARE IN VOTING CLASSES (AS DESCRIBED BELOW). IN ADDITION, THE DESCRIPTION DOES NOT DISCUSS STATE, LOCAL OR NON-U.S. TAX CONSEQUENCES.**

**FOR THESE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM. HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND NON U.S. TAX CONSEQUENCES OF THE PLAN.**

## B. Federal Income Tax Consequences

### 1. Federal Income Tax Consequences to Holders of Allowed Claims in Class 2 and Class 4

In accordance with the Plan, each holder of an Allowed Claim in Class 2 shall be entitled to receive its recovery as provided for under the Global Settlement and Global Settlement Approval Order, and each holder of an Allowed Claim in Class 4 shall be entitled to receive its Pro Rata share of the Cash in the Creditor Recovery Pool (Class 2 and Class 4, collectively, are hereinafter referred to as the "Voting Classes"). Each holder of an Allowed Claim in a Voting Class will recognize gain or loss in an amount equal to the difference between the "amount realized" by such holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and such holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest). The amount realized is equal to the amount of any Cash received plus the fair market value of any property received or deemed received. Generally, any gain or loss recognized by a holder of an Allowed Claim in a Voting Class will be a long-term capital gain if the Claim is a capital asset in the hands of the holder and the holder has held such Claim for more than one year, unless the holder had previously claimed a bad debt or worthless securities deduction or the holder had accrued market discount with respect to such Claim. See "Market Discount" below for a discussion of the character of any gain recognized from a Claim with accrued market discount.

### 2. Certain Other U.S. Federal Income Tax Consequences to Holders of Claims

Accrued Interest. In general, a Claim holder that previously was not required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be required to take such amount into income as ordinary taxable interest. A Claim holder that previously was required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan. The Plan provides that, to the extent applicable, all Distributions to a holder of an Allowed Claim will be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such Distributions, if any, will be deemed to apply to any interest accrued on such Claim prior to the Petition Date. There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such holder is properly allocable to prepetition interest. Each holder of a Claim on which interest accrued prior to the Petition Date is urged to consult its tax advisor regarding the tax treatment of its Distributions under the Plan and the deductibility of any accrued but unpaid interest for federal income tax purposes.

Post-Effective Date Cash Distributions. Holders of Claims may receive Cash Distributions subsequent to the Effective Date, including Distributions out of the Creditor Recovery Pool. The imputed interest provisions of the IRC may apply to treat a portion of any post-Effective Date Distribution as imputed interest. With respect to certain holders, imputed interest may accrue over time using the constant interest method, in which event the holder may be required, under some circumstances, to include imputed interest in income prior to receipt of a Distribution. In addition, because additional Distributions may be made to holders of Claims after the initial Distribution, any loss and a portion of any gain realized by a holder may be deferred until the holder has received its final Distribution. All holders are urged to consult their tax advisors regarding the possible application of, or ability to elect out of, the "installment method" of reporting gain that may be recognized in respect of a Claim.

Bad Debt Deduction. A holder who receives on account of a Claim an amount under the Plan less than the holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier year) to a bad debt deduction in

some amount under Section 166(a) of the IRC. The rules governing the character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

Market Discount. A holder that purchased its Claim from a prior holder with market discount will be subject to the market discount rules of the IRC. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

Installment Method. A holder of a Claim constituting an installment obligation for tax purposes may be required to recognize currently any gain remaining with respect to the obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold, or otherwise disposed of within the meaning of Section 453B of the IRC.

Information Reporting and Backup Withholding. All Distributions under the Plan will be subject to applicable federal income tax reporting and withholding. The IRC imposes "backup withholding" (currently at a rate of 28%) on certain "reportable" payments to certain taxpayers, including payments of interest. Under the IRC's backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to Distributions or payments made pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional federal income tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of income tax. A holder of a Claim may be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

### C. Discussion Intended Only as a Summary

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

## XVI. ALTERNATIVES TO CONFIRMATION OF THE PLAN

The primary alternatives to the Plan are conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or dismissal. The Debtors believe that the Plan provides a recovery to Creditors that is greater than or at least equal to the probable recoveries by Creditors if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Dismissal likely reduces recoveries, including by eliminating the ability to pursue potentially valuable Avoidance Actions premised on the provisions of the Bankruptcy Code.

### A. Acceptance and Confirmation of the Plan

The Debtors believe that the Plan satisfies all the requirements for Confirmation.

### B. General Confirmation Requirements

Section 1129 of the Bankruptcy Code contains several requirements for confirmation of a plan. Among them are requirements that (1) the plan be proposed in good faith; (2) all impaired classes either accept the plan or, if

an impaired class rejects the plan, the plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class; (3) the plan be feasible; (4) certain information be disclosed regarding payments made or promised to be made to insiders and (5) the plan comply with the other applicable provisions of chapter 11. The Debtors believe that the Plan complies with these requirements, including those requirements discussed below.

## C. Best Interests Test

To confirm the Plan, the Bankruptcy Court must independently determine that the Plan is in the best interests of each Holder of a Claim or Interest in any Impaired Class who has not voted to accept the Plan. Thus, under section 1129(a)(7) of the Bankruptcy Code, each holder of a Claim or Interest in an Impaired Class must either (1) accept the Plan or (2) receive or retain, under the Plan, Cash or property of a value, as of the Effective Date of the Plan, "that is not less than" the value such holder would receive or retain if the Debtors' operations were terminated and their assets were liquidated under chapter 7 of the Bankruptcy Code. The Bankruptcy Court will determine whether the Cash, property or other value issued under the Plan to each holder of a Claim or Interest equals or exceeds the value that would be allocated to such holders in a liquidation under chapter 7 of the Bankruptcy Code (the "Best Interests Test"). Such a determination must take into account the requirement that secured claims and any administrative claims resulting from the chapter 11 cases and from the chapter 7 cases would have to be paid in full before any payments could be made to holders of junior claims and interests.

The Debtors believe that the Plan satisfied the Best Interests Test because, for the reasons explained below, the holders of Allowed Claims against and Equity Interests in the Debtors will receive, under the Plan, an equal or greater recovery than they could receive in a hypothetical chapter 7 liquidation.

The Plan is premised on the Global Settlement. As summarized in Sections III.E-H above, the Debtors already have reduced virtually all of their physical assets to Cash through sales of their Facilities and related Assets, with each of such sales having been approved by the Bankruptcy Court. All or substantially all of the Debtors' remaining Assets are encumbered by senior security interests. The Global Settlement provides an opportunity for Administrative Claims, Twenty-Day Claims, Priority Claims and other unsecured claims to achieve a recovery that otherwise would not be available given the size of the Secured Claims of the Second Lien Lenders, as the Bankruptcy Court observed at the Settlement Hearing.

The Global Settlement is approved and may be implemented whether or not the Plan is confirmed. In particular, the Global Settlement is binding on a chapter 7 trustee and therefore would apply if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code. See Global Settlement Approval Order at p. 5, para. 11. Because the Global Settlement applies equally in chapter 7 or under the Plan in chapter 11, the Debtors submit that the Plan permits creditors to achieve a recovery that is at least equal to the recovery in a chapter 7 liquidation. Because a chapter 7 trustee would be bound to manage and distribute the Debtors' remaining Assets pursuant to the same Global Settlement terms that apply under the Plan, and is subject to the same Releases and limitations on pursuing recoveries from the released parties, the chapter 7 trustee would not be in a position to create any greater value from the Debtors' remaining Assets than such Assets would have under the Plan. Moreover, the Debtors believe that the implementation of the Global Settlement pursuant to the Plan will enhance recoveries by (1) avoiding the additional administrative expenses and commissions, as well as delays, associated with the appointment of a chapter 7 trustee and (2) enhancing the potential recoveries by maintaining continuity of management most knowledgeable about the monetization of the remaining Assets, including litigation assets.

The Debtors submit that, in any chapter 7 cases, the value available for satisfaction of Claims and Equity Interests in the Debtors would be reduced by: (1) the costs, fees and expenses of the liquidation under chapter 7, which would include disposition expenses and the compensation of a chapter 7 trustee and his or her counsel and other professionals retained; (2) the fees of the chapter 7 Trustee; and (3) certain other costs arising from conversion of the Chapter 11 Cases to cases under chapter 7. For example, among other things, in chapter 7 cases, value available for distribution would be reduced by the chapter 7 trustee's statutory fee, which is calculated on a sliding scale from which the maximum compensation is determined based on the total amount of moneys disbursed or

turned over by the chapter 7 trustee. Section 326(a) of the Bankruptcy Code permits reasonable compensation not to exceed 3% of the proceeds in excess of $1 million distributable to creditors.[12]

The Chapter 7 Trustee and his or her replacement professionals, including legal counsel and accountants, who initially would be unfamiliar with the background of the Debtors, their Assets and these Chapter 11 Cases, could add substantial administrative expenses that would be entitled to be paid ahead of Allowed Claims and Equity Interests against the Debtors. In a chapter 7 setting, there are material questions about whether then Chapter 7 Trustee would be able to glean critical information from the Debtors' books and records or from former management and other former employees, and whether such former personnel would be accessible to and would cooperate with the Chapter 7 Trustee. By contrast, the Debtors believe that these factors are significantly less uncertain and more favorable in the chapter 11 setting with the Plan Administrator.

In addition, the monetization of the Debtors' Estates, and distributions to creditors, likely would suffer additional delays while the chapter 7 trustee and his/her professionals take time to crest the learning curve to complete the administration of the Estates. The Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for professionals), which will constitute Allowed Claims in any Chapter 7 Cases.

Under the Plan, the Debtors' Causes of Action will be pursued by the Plan Administrator. The Plan Administrator is anticipated to be familiar with the facts and legal theories pertaining to, and the trial counsel previously engaged to pursue, the Debtors' Causes of Action. Conversely, a chapter 7 trustee would have no initial familiarity with the Estates' litigation or claims and have less capability to maximize the value of such Causes of Action. The points raised above concerning the Debtors' books and records and former personnel bear directly on this issue as well.

It is also anticipated that a chapter 7 liquidation would result in a significant delay in payments being made to Creditors. In addition to the reasons described above, Bankruptcy Rule 3002(c) provides that conversion of a chapter 11 case to chapter 7 will trigger a new bar date for filing claims against the Estates, and that the new bar date will be 90 days after the first date set for the meeting of creditors called under section 341 of the Bankruptcy Code. Not only would a chapter 7 liquidation delay distribution to Creditors, but it is possible that additional claims that were not asserted in the Chapter 11 Cases, or were late-filed, could be filed against the Estates. Thus, reopening the bar date in connection with conversion to chapter 7 would provide these and other claimants an additional opportunity to timely file claims against the Estates. Moreover, the Debtors would lose the benefit of having an established Second Administrative Expense Request Deadline.

For the reasons set forth above, the Debtors believe that the Plan provides an equal or better recovery for Entities holding Allowed Claims compared to a liquidation under chapter 7 of the Bankruptcy Code. Therefore, the Plan meets the requirements of the Best Interests Test.

**D. Financial Feasibility Test**

For the Plan to be confirmed by the Bankruptcy Court, the Bankruptcy Court must determine that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. Because the completion of the Debtors' liquidation is proposed in the Plan and no further financial reorganization of the Debtors is contemplated, the Debtors believe that the Plan meets the feasibility requirement.

**E. Acceptance by Impaired Classes**

Bankruptcy Code § 1129(b) provides that a plan can be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of claims has accepted it. The process by which nonaccepting

---

12 Section 326(a) of the Bankruptcy Code permits a chapter 7 trustee to receive 25% of the first $5,000 distributed to creditors; 10% of additional amounts up to $50,000; 5% of additional distributions up to $1 million and reasonable compensation up to 3% of distributions in excess of $1 million.

classes are forced to be bound by the terms of a plan is commonly referred to as "cramdown." The Bankruptcy Court may confirm the Plan at the request of the Debtors notwithstanding the Plan's rejection (or deemed rejection) by impaired Classes as long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted it. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A class of claims under a plan accepts the plan if the plan is accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims in the class that actually vote on the plan. A class of interests accepts the plan if the plan is accepted by holders of interests that hold at least two-thirds in amount of the allowed interests in the class that actually vote on a plan.

A class that is not "impaired" under a plan is conclusively presumed to have accepted the plan. Solicitation of acceptances from such a class is not required. A class is "impaired" unless (i) the legal, equitable and contractual rights to which a claim or interest in the class entitles the holder are not modified, or (ii) the effect of any default is cured and the original terms of the obligation are reinstated.

A plan is fair and equitable as to a class of secured claims that rejects the plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the liens securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, at least equal to the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim, or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

In connection with seeking acceptance and confirmation of the Plan:

**CLASSES 2 AND 4** ARE IMPAIRED UNDER THE PLAN, WILL POTENTIALLY RECEIVE DISTRIBUTIONS UNDER THE PLAN AND HAVE THE RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN.

**CLASSES 1 AND 3** ARE UNIMPAIRED UNDER THE PLAN AND ARE DEEMED TO ACCEPT THE PLAN.

**CLASS 5** IS IMPAIRED UNDER THE PLAN AND NO DISTRIBUTION IS ANTICIPATED TO THE HOLDERS OF CLAIMS IN THIS CLASS.

**CLASS 6** IS IMPAIRED UNDER THE PLAN BECAUSE THE HOLDERS OF EQUITY INTERESTS WILL RECEIVE NO DISTRIBUTION UNDER THE PLAN AND ARE DEEMED TO REJECT THE PLAN.

In the event that either of **Classes 2 or 4** votes to reject the Plan, the Debtors intend to request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) with respect to such Class(es). The Debtors also intend to request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) with respect to **Classes 5 and 6**.

With respect to **Classes 2 and 4**, if necessary, the Debtors intend to show that the Plan "does not discriminate unfairly" and is "fair and equitable" because (1) each such Class is treated equally with respect to other classes of equal rank and (2) the holders of Allowed Claims in each such Class will receive or retain on account of their Allowed Claims a value that satisfies the requirements of the Bankruptcy Code.

With respect to **Classes 5 and 6**, if necessary, the Debtors intend to show that the Plan the Plan "does not discriminate unfairly" and is "fair and equitable" because (1) each such Class is treated equally with respect to other classes of equal rank and (2) no junior parties will receive or retain any property at all under the Plan.

## XVII. RECOMMENDATION AND CONCLUSION

The Debtors believe that the Confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all parties who are entitled to vote to accept the Plan by duly and timely completing and returning their Ballots. Moreover, the Debtors respectfully request that the Bankruptcy Court confirm the Plan.

Wilmington, Delaware
Dated: December 24, 2013

AFA INVESTMENT INC., *ET AL.*

By: ______________________________
David J. Beckman
Chief Restructuring Officer